# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CRIMINAL ACTION NO.** |
| | ) | |
| **Plaintiff,** | ) | **1:21-CR-00119-CJN** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GARRET MILLER,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT'S MOTION TO REVOKE MAGISTRATE JUDGE'S DETENTION ORDER

**F. Clinton Broden**
**TX Bar No. 24001495**
**Broden & Mickelsen**
**2600 State Street**
**Dallas, Texas 75204**
**214-720-9552**
**214-720-9594 (facsimile)**
**clint@texascrimlaw.com**

**LOCAL COUNSEL:**
**Camille Wagner**
**DC Bar No. 1695930**
**Wagner PLLC**
**1629 K Street NW, Suite 300**
**Washington, DC 20006**
**(202) 630-8812**
**law@myattorneywagner.com**

**Attorneys for Defendant**
**Garret Miller**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS..................................................................................................2

TABLE OF AUTHORITIES..........................................................................................4

I. PRIOR PROCEEDINGS............................................................................................6

II. MOTIONS TO REVOKE DETENTION ORDER GENERALLY.........................7

III. LEGAL STANDARDS FOR DETENTION...........................................................8

IV. FACTUAL BACKGROUND...................................................................................9

V. DISCUSSION............................................................................................................14

    A.  The Government Cannot Prove That There Are Absolutely No Conditions or Combination of Conditions Which Will Reasonably Assure Mr. Miller's Appearance as Required.............................................................................................14

    B.  The Government Cannot Prove by *Clear and Convincing Evidence* That There Are Absolutely No Conditions or Combination of Conditions Which Will Reasonably Assure the Safety of the Community if Mr. Miller is released on Strict Conditions...............................................................................................................18

        1. Introduction...................................................................................................18

        2. Mr. Miller.....................................................................................................19

        3. Other Cases..................................................................................................20

        4. Conclusion....................................................................................................23

VI. PROPOSED RELEASE PLAN..............................................................................24

VII. CONCLUSION.......................................................................................................25

CERTIFICATE OF SERVICE.......................................................................................27

# TABLE OF AUTHORITIES

**Page**

*Truong Dinh Hung v. United States*, 439 U.S. 1326 (1978)....................................8

*United States v. Boado*, 835 F.Supp. 2d 920 (E.D. Tex. 1993)................................8

*United States v. Bisignano*, No. 1:21-CR-0036-CJN................................................21

*United States v. Cua*, 2021 WL 918255 (D.D.C. 2021)...........................................20

*United States v. Delker*, 757 F.2d 1390 (3rd Cir. 1985)..............................................8

*United States v. Fernandez-Alfonso*, 813 F.2d 1571 (9th Cir. 1987)........................7

*United States v. Fortna*, 769 F.2d 243 (5th Cir. 1985).........................................9, 17

*United States v. Hunt*, 240 F.Supp 3d 128 (D.D.C. 2017)........................................7

*United States v. Motamedi*, 767 F.2d 1403 (9th Cir, 1985)....................................16

*United States v. Orta*, 760 F.2d 887 (8th Cir. 1985) (*en banc*)...........................9, 17

*United States v. Patriaca*, 948 F.2d 789 (1st Cir. 1991)........................................18

*United States v. Quinnones*, 610 F.Supp. 74 (S.D.N.Y. 1985)................................7

*United States v. Riley June Williams*, No. 1:21-MJ-00099-RMM..........................21

*United States v. Salerno*, 481 U.S. 739 (1997)....................................................8, 17

*United States v. Singleton*, 182 F.3d 7 (D.C. Cir. 1999)...........................................8

*United States v. Smith*, 79 F.3d 1208 (D.C. Cir 1996)............................................18

*United States v. Stone*, 608 F.3d 939 (6th Cir. 2010)................................................8

*United States v. Taylor*, 289 F.Supp. 3d 55 (D.D.C. 2018)......................................8

*United States v. Townsend*, 897 F.2d 989 (9th Cir. 1990).........................................15

## **Other Authorities**

18 U.S.C. § 3142(e-f)...................................................................................9, 24

18 U.S.C. § 3142(f)(2)......................................................................................18

18 U.S.C. § 3142(g)..........................................................................................16

18 U.S.C. § 3142(I)...................................................................................6, 7, 25

18 U.S.C. § 3145(f)..........................................................................................6, 7

U.S.S.G § 2A2.4...............................................................................................16

Defendant, Garret Miller, pursuant to 18 U.S.C. § 3145(f), hereby moves this court to revoke the detention order entered in this case.

## I.  PRIOR PROCEEDINGS

A detention hearing was held in this case on January 25, 2020, before Magistrate Judge Rebecca Rutherford in the United States District Court for the Northern District of Texas.  A transcript of that hearing is attached hereto as Attachment A.  Following the hearing, Magistrate Judge Rutherford orally found that there were no conditions or combinations of conditions she could set for Mr. Miller's release that would reasonably assure the safety of the community and that would reasonably assure Mr. Miller's appearance as required.  *See* Attachment A at 103-07.

The Magistrate Judge entered her "Report of Proceedings Under Rules 5(c)(2) and 5.1 and Ordered Entered Thereon," in which she placed a check mark next to "[t]he defendant shall be detained." *See* Attachment B.  Nevertheless, the Magistrate Judge  failed to enter a written order of detention as required by 18 U.S.C. § 3142(I) of  the Bail Reform Act.  As explained by one Court:

> The provision of the Bail Reform Act in issue is unambiguous in its terms and the procedural safeguards incorporated into the Act must be strictly applied.  *United States v. Pavden*, 759 202, 204-05 (2d Cir. 1985)  Accordingly, pursuant to the express language of the statute, a written detention order constraining the information [set forth in 18 U.S.C. § 3142(I)] above must be issued whether a defendant, after a detention hearing, is ordered to be detained prior to trial and deprived

6

of his or her liberty during ht period of time in which the presumption of innocence is extremely important.

*United States v. Quinnones*, 610 F.Supp. 74, 75-76 (S.D.N.Y. 1985). Indeed, because a written order of detention complying with 18 U.S.C. § 3142(I) was not entered by the Magistrate Judge in *Quinnones*, the District Court concluded that it was "compelled" to release the defendant. *Id.* at 76.

Magistrate Judge Rutherford also ordered that Mr. Miller be removed "forthwith" to the District of Columbia. Nevertheless, seven weeks later, Mr. Miller has made it no further than Oklahoma

## II. MOTIONS TO REVOKE DETENTION ORDER GENERALLY

A district court should review a magistrate judge's detention order *de novo*. *United States v. Hunt*, 240 F.Supp 3d 128, 132 (D.D.C. 2017) (Identifying supporting cases from the Second, Third, Fourth, Fifth, Sixth, Seventh, Eight, Ninth, Tenth and Eleventh Circuits).

Pursuant to 18 U.S.C. § 3145(f), this review "shall be determined promptly." *See United States v. Fernandez-Alfonso*, 813 F.2d 1571, 1572 (9th Cir. 1987) (Thirty days in resolving motion was not "prompt[].")[1]

---

[1] On February 2, 2021, Undersigned counsel had ordered the transcript of the detention hearing held in the Northern District of Texas with a fourteen-day turnaround. Nevertheless, the court reporter did not produce the transcript until on or about March 8, 2021.

A party is allowed to submit new evidence when moving to revoke a magistrate judge's detention order. *See, e.g., United States v. Delker*, 757 F.2d 1390, 1393-94 (3rd Cir. 1985); *United States v. Boado*, 835 F.Supp. 2d 920, 921 (E.D. Tex. 1993) (Cobb, J.) ("On review of release and detention orders, the district court may take additional evidence....").

### III.  LEGAL STANDARDS FOR DETENTION

Generally, pretrial release should only be denied for "the strongest of reasons." *Truong Dinh Hung v. United States*, 439 U.S. 1326, 1329 (1978) (citation omitted). "Detention until trial is relatively difficult to impose." *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999).

"[T]he default position of the law . . . is that a defendant should be released pending trial." *United States v. Taylor*, 289 F. Supp. 3d 55, 62 (D.D.C. 2018) (*quoting United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010)). Indeed, "[i]n our society liberty is the norm and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1997)

In order to justify detention, the government must establish by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community, or, by a preponderance of the evidence, that no condition or combination of conditions will reasonably assure the appearance of the

defendant as required. *See* 18 U.S.C. § 3142(e-f).  It is important to recognize, of course, that it is not required a court be able to set conditions that *guarantee* a defendant's appearance as required and the safety of the community only that it be able to set conditions that "reasonably assure" them. *See United States v. Fortna,* 769 F.2d 243, 250 (5th Cir. 1985);*United States v. Orta*, 760 F.2d 887,891-92 (8th Cir. 1985) (*en banc*).

A court must consider *all* available conditions under the Bail Reform Act before it orders a defendant detained.   *Orta*, 760 F.2d at 891-92.

## IV.  FACTUAL BACKGROUND

Mr. Miller, who had been diagnosed as learning disabled while in school, lived in the Dallas, Texas area prior to his arrest.  At his detention hearing, evidence was introduced that he entered the Capitol Building with a throng of others on January 6, 2021.  In fact, he posted selfies online of himself inside the Capitol Building. *See* Attachment A at 12.   Nevertheless, FBI Agent Christopher Ford admitted the following on cross-examination:

> Q.   Okay.  Is fair to say that we just listened to a plethora of statements where Mr. Miller was very vociferous about his activities on January 6th?  Is that a fair statement?
>
> A.   Yes.
>
> Q.   Okay. One of the things that seem common in a lot of his

statements is that he was acting peacefully that day and was unarmed, correct?

A.    Yes.

Q.    And you have actually no indication that he was armed that day. Is that a fair statement?

A.    That's a fair statement, yes.

Q.    Okay.  Other than the actual breach of the - - the Capitol Building, you have no indication that he wasn't peaceful that day; is that correct?

A.    Correct.

Q.    Okay.  We had various pictures of Mr. Miller in the Capitol Building, the rotunda area, correct?

A.    Yeah. Specifically the one with the statue looked like it was - - it was roughly in that area, yes.

Q.    And I'm sure you're familiar that some protestors breached or moved beyond the rotunda to go to individual representatives buildings into the actual hall of the - - I believe it was the Senate or the House of Representatives, I forget, but one of the -- one of the two chambers?

A.    Yes.

Q.    You have absolutely no indication that Mr. Miller left the Rotunda Building.

A.    At this time, no.

Q.    Okay.  And were you able to confirm the timing of his leaving the rotunda building with the statement issued by former President

Trump asking his supporters to go home?

A.     I'm not certain of that.  I can't answer that.

Q.     Were you able to determine what time he left the Capitol Building?

A.     No, sir.  I can't answer that, either.

Q.     And as far as you know, the entire time he was in D.C. - - and, again, put the breach of the actual building aside - - he committed no violent acts.

A.     Not to my knowledge.  But, again, I'm not the case agent.  As far as what I am privy to, no.

Q.     Well, you're the agent that the Government chose to have testify in this case, so I'm asking you, since you're who's presented. The Government has no indication that he did anything violent that day to your knowledge, correct?

A.     To my knowledge, no.

*See* Attachment A at 53-54.

In addition, the government offered several incendiary social media posts made by Mr. Miller.  For example, when Congresswoman Alexander Ocasio-Cortez posted on her own Twitter feed "Impeach" on January 6th, Mr. Miller responded, "Assassinate AOC".  *See* Attachment A at 13-14; Statement of Facts in Support of Criminal Complaint at 7. Also, Mr. Miller was apparently misinformed and believed that Ashli Babbitt (the rioter who was killed inside the Capitol) had, in fact, been a

sixteen-year-old child.  *See* Attachment A at 14; Gov't Ex. 1 to Detention Hearing at

6.  Mr. Miller became fixated on the death of this person he believed was a child, and

he then began posting vile posts aimed at the Capitol Police officer he believed was

responsible for killing the child, such as, "We going to get ahold of him and hug his

neck with a nice rope."  *See* Attachment A at 18, 25.  Nevertheless, Agent Ford

admitted that the government had Mr. Miller under surveillance from on or about

January 13, 2021, until the day of his arrest on January 20, 2021, and Mr. Miller did

not take *any* apparent steps to act on any threats.  *See* Attachment A at 59-60.

At the time of his arrest, there is no indication that Mr. Miller was anything but

peaceful.  Nevertheless, he did possess several firearms at his residence, along with

a ballistic vest, a bump cap, a gas mask, a crossbow,[2] rope and a grappling hook.  *See*

Attachment A at 27-28, 47-52.

Mr. Miller offered the following proffer at the Detention Hearing:

First: He was in Washington, D.C., on January 6th, 2021 because he believed he was following the instructions of former President Trump, who he viewed as his Commander in Chief.

Public statements from Trump and others had him believing the election was stolen.  Nevertheless, he now recognized the election is over, and he fully understands that Biden is the President of the United States.

He wants the Court to know that he recognizes that Donald Trump is no

---

[2]The crossbow was used by Mr. Miller for deer hunting.  *See, e.g.*, Attachment C.

longer president following the swearing-in of President Biden and would have no reason to follow the lead of Donald Trump.

Second: While he never intended to harm Congresswoman Ocasio-Cortez or Senator Schumer nor harm any members of the Capitol Police Force, he realizes his social media posts were completely inappropriate. He wants to publicly apologize to Congresswoman Ocasio-Cortez, Senator Schumer and the Capitol Police officers for his past social media posts.

Third: While not an excuse for his actions on January 6th, Mr. Miller wanted me to point out to the Court that he was, in fact, not armed when he entered the Capitol, and he stayed in the Capitol's Rotunda area, unlike others. He left Washington, D.C., and started back to Texas immediately after President Trump asked his supporters to go home.

Until very recently, he has never been very interested or involved in politics. Recently, combined with the loss of his job and really his sense of purposed, what Donald Trump had been saying about the election got to him, and he felt that he had a need to support the then Commander in Chief. He recognizes, however, that he, and he alone, are responsible for his actions, and there are no excuses.

He wants the Court to know he accepts responsibility for his actions. And towards that end, he has directed me, as his attorney, to explore Rule 40 possibilities with the prosecutors of the District of Columbia.

He is also prepared to testify at any trial or congressional proceeding.

He wants you to know he comes from a good family, a supportive family, former Eagle Scout and college graduate and has previously been a law-abiding citizen.

He wanted me to assure the Court that if it sees fit to release him today, he's going to live with his parents, his third-party custodians, and will abide by all conditions that will be set by the Court.

13

Attachment A at 62-65.[3]

*Since the detention hearing, it should be noted that, on or about February 23, 2021, Mr. Miller broke his collar bone while playing soccer in the recreation yard. Nevertheless, he is not scheduled to see an orthopedist until March 29, 2021, and that is only if he is still in FTC Oklahoma on that date.*

## V.  DISCUSSION

### A.  The Government Cannot Prove That There Are Absolutely No Conditions or Combination of Conditions Which Will Reasonably Assure Mr. Miller's Appearance as Required.

The entirety of the government's evidence that Mr. Miller might be a flight risk is his online media post that "it might be time for me to be hard to locate" after he was told that "they are arresting people who got in the capitol [sic.]. *See* Attachment A at 20.  This and the fact that he owned a van with a bed and a power source.  *Id.* at 46.[4]  Nevertheless, Agent Ford admitted at the detention hearing that Mr. Miller took absolutely no steps to flee while he was under government surveillance from on or

---

[3]Mr. Miller also directed his counsel to explore the possibility of entering a guilty plea in the Northern District of Texas pursuant to Fed. R. Crim. P. 40.  The government declined to allow the case to proceed in the Northern District of Texas rather than have Mr. Miller shipped to the District of Columbia.

[4]The van had been converted into a camper by Mr. Miller and his father to use for hunting trips and alike.  Significantly, this was done long before January 6, 2021.  As an example, a picture taken by Mr. Miller's friend, Keith Nelson, on a hunting trip on January 18, 2020- a year before the incidents in question, show the van with the bed and power source. *See* Attachment C.

about January 13, 2021 until the day of his arrest on January 25, 2021.  *Id*. at  59-60.

Likewise, there is no evidence that he resisted arrest in any way.

In contrast, Mr. Miller has lived in the Dallas area his entire life.  He lives with

his younger brother and a roommate.  Meanwhile, his older brother, Jason Miller, is

a high school math teacher who lives in the area with his wife.  *See* Attachment A at

66-75.  Mr. Miller's 70 year-old father, a Navy veteran, and his mother also live in

the area.  *Id*. at 76-78.[5]

Mr. Miller's father testified at the Detention Hearing that he and his wife would

act as third-party custodians for their son.  *See* Attachment 79-80.  Moreover, in the

event that the government is dissatisfied with Mr. Miller's parents acting as third-

party custodians, his brother Jason and Jason's wife are also willing to act as third-

party custodians and have Mr. Miller live in their home.  *See* Letter from Jason Miller

(Attachment D)

Mr. Miller also has no criminal history and there is nothing in his part that

would indicate he would fail to appear as required or obey all court orders.  Indeed,

Mr. Miller has provided the Court with numerous letters attesting to his overall

character, his ties to the community and indicating that he would comply with all

---

[5]When considering ties to the community that includes ties to where a defendant normally resides.  *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990).

court orders if released pending resolution of his case.

Meanwhile, although the evidence against Mr. Miller is strong as to some of the counts against him,[6] it is also important to note the advisory sentencing ranges under the United States Sentencing Guidelines (assuming acceptance of responsibility) in the event that Mr. Miller is convicted of one or more of the various counts:

| | | |
|---|---|---|
| Count 1 | Level 8 | 0-6 months (Zone A)[7] |
| Count 2 | Level 8 | 0-6 months (Zone A)[8] |
| Count 3 | Level 12 | 10-16 months (Zone C) |
| Count 4 | Level 8 | 0-6 months (Zone A) |
| Count 5 | Level 10 or 12 | 6-12 months (Zone B) or 10-16 months (Zone C) |
| Count 6 | Level 12 | 10-16 months (Zone C) |
| Count 7 | No Guideline | 1 Year Maximum Sentence |
| Count 8 | Level 2 | 0-6 months (Zone A) |
| Count 9 | Level 2 | 0-6 months (Zone A) |

---

[6] The "wight of the evidence" is the "least important" of the consideration factors set forth in 18 U.S.C. § 3142(g). *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985).

[7] The most analogous Guideline is 2A2.4

[8] The most analogous Guideline is 2A2.4

16

| Count 10 | No Guideline | Six Month Maximum Sentence |
| Count 11 | No Guideline | Six Month Maximum Sentence |
| Count 12 | No Guideline | Six Month Maximum Sentence |

As noted above, it is not required that a court be able to set conditions that *guarantee* a defendant's appearance, only that it be able to set conditions that "reasonably assure" them. *See Fortna,* 769 F.2d at 250; *Orta*, 760 F.2d at 891-92. Here, with due respect to the Magistrate Judge, there is a paucity of evidence that Mr. Miller would not appear as directed. Despite one off-hand remark about making himself "hard to locate," the proof is in the pudding that he did not do so during the week or more the government had him under surveillance, nor is there any events that Mr. Miller took any actual steps to make himself hard to locate. Indeed, he was sleeping in his bed when law enforcement arrived at this house to arrest him. Also, Mr. Miller has lived in the Dallas area his entire life along with his two brothers and his parents. Moreover, both his parents and older brother are willing to act as third-party custodians.

Simply put, given that "liberty is the norm,"[9] the Court must consider *all* available conditions under the Bail Reform Act before Mr. Miller is detained pending the resolution of his case. *Orta*, 760 F.2d at 891-92. Likewise, the burden is on the

---

[9]*Salerno*, 481 U.S. at 755.

government to show that there is no condition or combination of conditions that can be set that would "reasonably assure" Mr. Miller's appearance as required.  Here, if there is any real concern that Mr. Miller would not appear as required, conditions such as house arrest, home monitoring, and/or a third-party custodian would certainly "reasonably assure" his appearance.  While unnecessary, Mr. Miller could also be ordered to turn over his van to a third-party during the pendency of the case.

### B.   The Government Cannot Prove *by Clear and Convincing Evidence* That There Are Absolutely No Conditions or Combination of Conditions Which Will Reasonably Assure the Safety of the Community if Mr. Miller is Released on Strict Release Conditions.

### 1. Introduction

With regard to whether a defendant should be detained on grounds of dangerousness, the government must establish clear and convincing evidence "that *no* condition or combination of conditions will reasonably assure the safety of any other person and the community," 18 U.S.C. § 3142(f)(2).  In other words, the government must prove that pretrial detention is the *only* means by which the safety of the community can reasonably be assured.  *United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir 1996).  The evidence must prove that the defendant actually poses a danger, not that he does so in theory.  *United States v. Patriaca*, 948 F.2d 789 (1ˢᵗ Cir. 1991).

### 2. Mr. Miller

In evaluating whether the government has sustained its heavy burden of proving by clear and convincing evidence that absolutely no conditions could be set guaranteeing the safety of the community from Mr. Miller, it is important to distinguish between what Mr. Miller allegedly *did* do and what he clearly did *not* do.

Mr. Miller did enter the Capitol building on January 6, 2021. In addition, Mr. Miller did respond "Assassinate AOC" to Congresswoman Alexander Ocasio-Cortez's tweet to "impeach," and he did make several vile and racially tinged threats against a Capitol Police officer he believed shot and killed a sixteen-year-old girl.

On the other hand, the evidence is that Mr. Miller simply walked into the Capitol *after* the security had been breached. There is *no evidence* that Mr. Miller, unlike many others, moved past the Rotunda or that he tried to enter the Congressional chambers or offices. There is *no evidence* that Mr. Miller took a weapon into the Capitol building. There is *no evidence* that Mr. Miller engaged in any acts of destruction while in the Capitol Building. Finally, while Mr. Miller's online threats, especially toward the Capitol Police officer he wrongfully believed shot and killed a sixteen-year-old girl were certainly vile and reprehensible, there is absolutely *no evidence* that he took any affirmative steps to carry outs any acts of violence against Congresswoman Alexander Ocasio-Cortez or the Capitol Police

officer or anybody else.

There is also no evidence that Mr. Miller, who in the past has been determined to suffer from a learning disability, has any criminal record, nor is there evidence of previous acts of violence.  Moreover, at the detention hearing, his brother testified to the improvement he had seen in his brother following his brother's ban from certain online platforms.  *See* Attachment A at 61.

### 3.  Other Cases

Mr. Miller's actions can be contrasted with the actions of Burno Joseph Cua, who was recently ordered released by Judge Moss.  *See United States v. Cua*, 2021 WL 918255 (D.D.C. 2021) (attached hereto as Attachment E).  Cua breached the Capitol building twirling a black baton.  *Id*. at *1.  After he entered he attempted to open doors to various rooms and made his way to the foyer of the Senate Chamber. *Id*.  There, he shoved aside a guard and entered the Senate Chamber and "sat 'atop the Senate dais in the chair previously occupied by former Vice President Pence with his feet up on [] the desk.' "  *Id*.  Cua also made several social media posts calling for "execution of public officials" as well as  threatening "political violence," a "blood bath," and expressing his desire for a "blood war."  *Id*. at *2, 5-6.[10]  Moreover, Cua

---

[10]Judge Moss described Cua's online postings as "chilling and violent" and "call[ing] for the violent revolution against the duly elected representatives of the People."  *Id*. at *6.

had "several previous encounters with law enforcement." *Ids*. at *2. Nevertheless, Judge Moss, guided by "the default rule favoring liberty" and the need for the government to show more than a theoretical threat, revoked a detention order previously entered against Cua by a Magistrate Judge in the Northern District of Georgia." *Id*. at *8.

This Court revoked a detention order in *United States v. Bisignano*, No. 1:21-CR-0036-CJN and ordered her released with high-intensity supervision. According to the criminal complaint in that matter, Bisignano "entered the Capitol in at least two separate locations and encouraged other rioters to enter as well." She appeared on video fighting with a police officer. Meanwhile, the government characterized her as an "instigator, and an active participant in the violence" and she was heard shouting into a bullhorn that the rioters "need weapons" while other rioters assaulted police officers by spraying them with fire extinguishers. Nevertheless, this Court revoked the detention order entered by a Magistrate Judge in the Central District of California.

In another case, a defendant was released who stole Speaker Pelosi's laptop and took steps to sell the laptop to Russia's foreign intelligence service. *See United States v. Riley June Williams* No. *See* No. 1:21-MJ-00099-RMM.

In addition to the three cases discussed above, it is important to compare Mr.

Miller's case to cases of many other persons the government has charged in connection with the Capitol Hill riots who have been released.  In many of the cases, defendants with more serious conduct- several of whom engaged in actual violence- were released over the government's objections or with the government not even seeking detention.  Attached is a list of fourteen such cases, including the Bisignano case, that was previously compiled.  *See* Attachment F.[11]

Indeed, Mr. Miller, unlike many of the others in the cases described above and in Attachment F, did not move past the Rotunda.[12]  There is no evidence that Mr. Miller took a weapon into the Capitol Building, much less that he used a weapon; unlike many of the others in the cases described above and in Attachment F.[13]  There is no evidence that Mr. Miller engaged in any acts of destruction while in the Capitol

---

[11]The list was initially contained in Cua's Emergency Motion for Release from Custody and Request for Detention hearing, based upon the facts contained in the Criminal Complaints of those listed cases.  Undersigned Counsel has personally reviewed the Criminal Complaints of the listed cases to verify that they were accurately reported in Cua's motion and to black out comparisons to Cua's case itself.  It should be noted that the Motion to Revoke the Detention Order in the case of *United States Matthew Miller* was heard before Judge Moss who ordered Mr. Miller released.

[12]*See, e.g.* 1) Cua- attempted to open doors to various rooms and made his way to the Congressional chamber where he sat in the Speaker's chair; 2) Jones- was seen right outside Congressional chamber where Ashli Babbitt was shot; 3) Colt-Scaled the wall into the Congressional chamber and sat in the Speaker's chair; 4) Williams- broke into Nancy Pelosi's office where she stole the Speakers' laptop to sell to Russia.

[13]*See, e.g.* 1) Cua- baton; 2) Jones-flagpole used to break glass 3) Powell- battering ram; 4) Alberts- found on Capitol grounds with firearm.

Building.[14]  Finally, there is no evidence that Mr. Miller engaged in any physical confrontations; unlike many of the others in the cases described above and in Attachment F.[15]

### 4. Conclusion

Mr. Miller does not attempt to defend his actions on January 6, 2021, nor his social media postings.  Indeed, at the detention hearing, he proffered his acceptance of responsibility and regret for his actions in detail.  *See* Attachment A at 62-65. Nevertheless, he has no history of violence, and he did not engage in any acts of violence in connection with the charged offenses, unlike many others who have previously been released.  Moreover, the government had him under surveillance for approximately a week before his arrest and there is absolutely no indication that he intended to act on any of his social media postings.  Finally, at the time of his arrest, law enforcement seized any weapons he possessed.

Again, while some of Mr. Miller's online postings were incendiary and vile, they do not indicate by *"clear and convincing evidence"* that the Court is unable to set *any* condition or combination of conditions that would reasonably assure the

---

[14]*See, e.g.* 1)DeCarlo/Ochs-graffitied Memorial Door with "Murder the Media;" 2) Powell-broke Capitol window valued at approximately $1,000.

[15]*See, e.g.* 1) Cua- shoved guards; 2)Gossjankowski-tased officers; 3) Matthew Miller-discharged fire extinguisher; 4) Leffingwel- punched law enforcement officers; 5) Capsel-fought National Guardsmen; 6) Council- pushed female Capitol police officer.

safety of any other person and the community.   Indeed, in many cases where defendants engaged in *actual* acts of violence on January 6th, courts were able to set conditions for release that they believed would reasonably assure the safety of other persons and the community. In contrast, Mr. Miller has not engaged in *any* actual acts of violence.   Certainly, various conditions that would prohibit his access to weapons, prohibit his use of the internet, and restrict his travel could be set in order to "reasonably assure" the safety of others and the community.

## VI. PROPOSED RELEASE PLAN

As discussed above, Mr. Miller submits the Court *can* set conditions or a combination of conditions that would reasonably assure the safety of the community and his appearance as required. *See* 18 U.S.C. § 3142(e-f).  The conditions can, and in at least some cases should, include:

1. No internet access[16]

2. No access to firearms

3. Appropriate counseling

4. Home monitoring

5. Travel restrictions limited to the Northern District of Texas and the

---

[16]Undersigned Counsel believes this condition is particularly appropriate given the change of Mr. Miller's behavior, for the better, observed by his brother following his ban from various social media platforms.  *See* Attachment A at 69-71.

Eastern District of Texas except for court appearances

6. Home detention

7. Third party custodians

8. Turning over his van to a third-party during the pendency of the case.

## VII. CONCLUSION

This Court should default to liberty.  This is especially true when Mr. Miller's case is compared to similarly situated cases and where, as here, the Magistrate Judge did not comply with the provisions of 18 U.S.C. § 3142(I).  As such, Mr. Miller respectfully requests this Court revoke the Magistrate Judge's detention order and order his release on any and all conditions that Court believes appropriate.

Respectfully submitted,


/s/ F. Clinton Broden
F. Clinton Broden
TX Bar No. 24001495
Broden & Mickelsen
2600 State Street
Dallas, Texas 75204
214-720-9552
214-720-9594 (facsimile)
clint@texascrimlaw.com

LOCAL COUNSEL:
Camille Wagner
DC Bar No. 1695930
Wagner PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(202) 630-8812
law@myattorneywagner.com


Attorneys for Defendant
Garret Miller

## **CERTIFICATE OF SERVICE**

I, F. Clinton Broden, certify that, on March 19, 2021 I caused a copy of the

above document to be served by electronic means on:

Elizabeth C. Kelley
United States Attorney's Office
555 4th Street, N.W.
Washington, DC 20350

/s/ F. Clinton Broden
F. Clinton Broden

27