# ATTACHMENT A

```
         IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
                  DALLAS DIVISION

UNITED STATES OF AMERICA, )
                          )
         Plaintiff,       )
                          )
vs.                       ) 3:21-MJ-00052-BN
                          )
GARRET MILLER,            )
                          )
         Defendant.       )

                 DETENTION HEARING
      BEFORE THE HONORABLE REBECCA RUTHERFORD
         UNITED STATES MAGISTRATE JUDGE
                JANUARY 25, 2021

                A P P E A R A N C E S
For the Government:

     UNITED STATES ATTORNEY'S OFFICE
     1100 Commerce Street - 3rd Floor
     Dallas, TX  75242
     214/659-8600
     BY:  JOSEPH ANDREW MAGLIOLO

For the Defendant:

     BRODEN & MICKELSEN
     2600 State Street
     Dallas, TX  75204
     214/720-9552
     Email: clint@texascrimlaw.com
     F. CLINTON BRODEN

COURT REPORTER:  SHAWNIE ARCHULETA, TX CCR No. 7533
                 1100 Commerce Street
                 Dallas, Texas 75242


proceedings reported by mechanical stenography,
transcript produced by computer.
```

SPECIAL AGENT CHRISTOPHER FORD

Direct Examination By Mr. Magliolo                 6
Cross-Examination by Mr. Broden                   53

JASON MILLER

Direct Examination By Mr. Broden                  66
Cross-Examination by Mr. Magliolo                 72

PHIL MILLER

Direct Examination By Mr. Broden                  76
Cross-Examination by Mr. Magliolo                 81
Redirect Examination By Mr. Broden                89

REPORTER'S CERTIFICATE                           109


GOVERNMENT'S EXHIBITS:


GX 1        Photographs and Tweets                11

GX 2        Photographs and Tweets                15

GX 3        Facebook posts                        16

GX 4        Facebook posts                        17

GX 5        Photographs and Facebook posts        18

GX 6        Facebook posts                        21

GX 7        Photographs and Facebook posts        21

GX 8        Photographs and Facebook posts        23

GX 9        (Not referred to)                     23

GX 10       Photographs and Facebook posts        25

GX 11       Photographs and Instagram comments    31

GX 12       Instagram comments                    34

GX 13       EXHIBIT RESERVED                       34

GX 14       Photographs and Instagram comments    34

GX 15        Photographs and Instagram comments    41

GX 16        Photographs                           43

GX 17        Photo - Items on Mr. Miller's person  44
             when arrested

GX 18        Photos - Contents of Van              45

GX 19        Photos - Items from Bedroom           49

GX 20        Photos - Laundry Basket/Driver's      52
             License/Bank Card/Calendar page

```
 1                    (In open court.)
 2              THE COURT:  The Court calls United States
 3    of America v. Garret Miller.
 4              This is case 3:21-MJ-52-BN.
 5              For the Government?
 6              MR. MAGLIOLO:  Joe Magliolo for the
 7    Government, Your Honor.
 8              THE COURT:  Good morning.
 9              For the defense?
10              MR. BRODEN:  Clint Broden for Mr. Miller,
11    Your Honor.
12              THE COURT:  I understand we are set for a
13    probable cause hearing and also a hearing on the
14    Government's Motion for Detention.  Is that correct?
15              MR. MAGLIOLO:  Yes.
16              MR. BRODEN:  Your Honor, we are going to
17    waive the probable cause hearing and just proceed on
18    the detention hearing.
19              THE COURT:  Very well.
20              Mr. Miller, let me make sure you
21    understand you have the right to a preliminary
22    hearing, where the Government would have to put on
23    evidence to establish probable cause that you
24    committed the offense that's charged in the
25    complaint.
```

1                    Do you understand that?

2                    THE DEFENDANT:  Yes.

3                    THE COURT:  And do you agree to waive that

4    hearing?

5                    THE DEFENDANT:  Yes.

6                    THE COURT:  All right.  Then I find that

7    you have knowingly and voluntarily waived your right

8    to the preliminary hearing.  And based on that

9    waiver, I do find that there is probable cause to

10   believe you committed the offenses that are charged

11   in that amended complaint.

12                   So we will proceed only with respect to

13   the detention hearing then.

14                   MR. MAGLIOLO:  Very well, Your Honor.

15                   THE COURT:  Go ahead.

16                   MR. MAGLIOLO:  Thank you, Your Honor.

17                   Your Honor, the Government calls Special

18   Agent Christopher Ford.

19                   THE COURT:  If you would please raise your

20   right hand.

21                   (Witness sworn.)

22                   THE WITNESS:  I do.

23                   MR. BRODEN:  And Your Honor, before we

24   proceed, I want to make sure that if Agent Ford has

25   brought any 3226 materials, that we may have them.

1          MR. MAGLIOLO:  He has none, Your Honor.

2          And, Your Honor, I have tendered a binder

3    with exhibits that I intend to use with the witness

4    to the Court and to Mr. Miller's attorney.

5          THE COURT:  Very well.

6          MR. MAGLIOLO:  May I proceed?

7          THE COURT:  Yes.

8          **SPECIAL AGENT CHRISTOPHER FORD,**

9    **having been first duly sworn, testified as follows:**

10                    **DIRECT EXAMINATION**

11   BY MR. MAGLIOLO:

12   Q.   Sir, could you state your name and spell it for

13   the record?

14   A.   Christopher Ford, C-H-R-I-S-T-O-P-H-E-R,

15   F-O-R-D.

16   Q.   Mr. Ford, what do you do for a living?

17   A.   Special Agent with the Federal Bureau of

18   Investigation.

19   Q.   And how long have you done that?

20   A.   Almost 16 years.

21   Q.   What are your current job responsibilities?

22   A.   Work counterterrorism matters, specifically

23   weapons of mass destruction.

24   Q.   And why are you here today?

25   A.   I am here to help explain evidence associated

1  with Mr. Garret Miller, his involvement with the

2  January 6th, 2021, Capitol riots, and also discuss

3  some of the posts that he demonstrated online.

4            THE COURT:  Thank you.

5            If you would, please, just pull the

6  microphone a little bit closer to you.

7            THE WITNESS:  Yes, ma'am.

8            Better?

9            THE COURT:  Thank you.  Yes.

10  Q.   (By Mr. Magliolo)  Okay.  Special Agent Ford,

11  will you describe just at a high level of generality

12  what it was that happened when you were talking

13  about the Capitol riots on January 6th?

14  A.   January 6th, 2021, was when the joint session

15  of Congress was taking place to certify the 2020

16  presidential election Electoral College vote count.

17            So on that day, there was also a pro-former

18  President Trump rally near the Capitol.  And those

19  folks made their way towards the U.S. Capitol

20  roughly 2 p.m. Eastern Time that same day, on

21  January 6th, breached Capitol ground security

22  measures, and then ultimately made their way

23  unauthorized into the Capitol Building, itself,

24  disrupting those Congressional proceedings, again,

25  certifying that Electoral College vote count.

1  Q.    Did political officials and congressmen and

2  senators and even the Vice President have to take

3  cover as a result of these actions?

4  A.    Yes, sir.

5  Q.    Were Capitol officers injured that day?

6  A.    Yes.

7  Q.    In fact, one died, correct?

8  A.    Yes.

9  Q.    And was it also the case that an individual

10  named Ashli Babbitt, who was one of the Capitol

11  rioters, was shot that day by some member of law

12  enforcement?

13  A.    Yes, sir.

14  Q.    The FBI's investigation into these events began

15  almost immediately after they concluded?

16  A.    Yeah, that's fair to say.  Once the perceived

17  threat was dealt with, then we rolled into

18  investigative mode, yes.

19  Q.    Can you please describe your role in these

20  investigations?

21  A.    Yeah.  I'm assigned to the Dallas Field Office,

22  obviously not in D.C. where the riot took place.  So

23  we were receiving leads through our Washington Field

24  Office of individuals that were participating in

25  those riots, were on Capitol grounds, were inside

1  the Capitol Building.  And that has been the extent

2  of our investigative work so far.

3  Q.   The FBI eventually learned about Mr. Miller's

4  involvement in the Capitol riots, correct?

5  A.   Yes.

6  Q.   And how did that happen?

7  A.   That came through a lead from the Washington

8  Field Office based on somebody's social media posts.

9  Q.   Can you describe, you know, what was seen and

10  what tipped them off?

11  A.   Yeah.  There was information posted to at least

12  a couple of his social media accounts, one being

13  Instagram -- or Twitter, excuse me, where I believe

14  his handle is @garretamiller.  But again, it was

15  photos being on Capitol property and potentially

16  inside the building during January 6.

17  Q.   Now, how did the FBI determine that that Garret

18  A. Miller account was associated with the Defendant,

19  Mr. Miller?

20  A.   So it's great for us to get that lead

21  information.  We have to follow a legal process in

22  order to link posted messages on social media to an

23  actual user account.  So we use subpoena legal

24  process to determine that those social media

25  accounts were tied to Mr. Garret's cellular

```
 1   telephone.
 2   Q.   Okay.  And how did you determine the cellular
 3   telephone number was connected to Mr. Miller?
 4          MR. BRODEN:  Your Honor, we're going to
 5   stipulate that these are Mr. Miller's accounts, if
 6   the Government accepts that stipulation.
 7          MR. MAGLIOLO:  As long as you will
 8   stipulate that the posts that I have in Exhibits 1
 9   through 12 inclusive, 14, 15, all came from
10   Mr. Miller's accounts, then the stipulation is fine
11   with the Government, Your Honor.
12          MR. BRODEN:  For purposes of this hearing
13   we will, Your Honor.
14          THE COURT:  All right.  Thank you.
15          MR. MAGLIOLO:  Okay.
16   Q.   (By Mr. Magliolo)  Sir, can you please turn to
17   Exhibit 1 in your binder?
18   A.   Yes.
19          MR. MAGLIOLO:  And just a point of
20   clarification, Your Honor.  May I move to admit
21   Exhibits 1 through 12 inclusive and 14, as well, on
22   the basis of that stipulation?
23          THE COURT:  Mr. Broden, any objection?
24          MR. BRODEN:  Yeah, I'm just looking.
25          We're fine with that, Judge.
```

1          THE COURT:  All right.  For purposes of

2     this hearing, they are admitted.

3     Q.   (By Mr. Magliolo)  All right.  Will you please

4     turn to page 1 of Exhibit 1 and describe what the

5     picture shows and quote the language.

6     A.   So this is a social media message from the

7     Twitter handle @garretamiller with the message:

8          "It was beautiful."

9          And it appears to be the gathering on Capitol

10    grounds.  The date of the post was January 6, 2021.

11    Q.   And just for record purposes, will you please

12    identify Mr. Miller in this courtroom and describe a

13    piece of clothing he's wearing?

14    A.   Yeah.  He's directly in front of me with the

15    striped jumpsuit.

16          MR. MAGLIOLO:  Your Honor, may the record

17    reflect that the witness has identified the

18    Defendant, Mr. Miller?

19          THE COURT:  Yes, it will.

20    Q.   (By Mr. Magliolo)  Okay.  Moving back to

21    Exhibit 1, will you please turn to page 2?

22          Explain what that shows.

23    A.   Again, it's from the Twitter handle

24    @garretamiller, January 6th.  Appears to be a video

25    that was posted to that social media account.

1   Q.    And did the FBI capture that video from that

2   Twitter account?

3   A.    We did.

4   Q.    Were you able to view that video?

5   A.    Yes, I was.

6   Q.    What did it show?

7   A.    It showed there appeared to be action inside of

8   the Capitol Building, itself, posted by Mr. Miller.

9   Q.    Will you please turn to page 4 of the same

10  exhibit?

11        And will you read the comment that Mr. Miller

12  wrote on January 6th, a little more than halfway

13  down the page?

14  A.    "They are right next time we bring guns."

15  Q.    And can you explain what he was saying that in

16  response to?

17  A.    And that would be in response to the gal that

18  was killed at the Capitol by U.S. Capitol Police.

19  Q.    Sorry.  I think maybe you're looking at the

20  wrong thing.

21        The comments directly above, can you read that,

22  please --

23  A.    Oh, I'm sorry.

24  Q.    -- "A line of people"?

25  A.    Yep.

1      "A line of people exit the Capitol Building.

2  One bloodied in the head and more came out who

3  previously stormed the building."

4      So that would be folks that encountered USCP,

5  U.S. Capitol Police Officers, who were attempting

6  folks from coming into the Capitol.

7  Q.   And he was saying, "Next time we bring guns,"

8  in response.

9  A.   Yes.  Yep.

10 Q.   Now, turn to page 6, please read Mr. Miller's

11 first tweet from January 6.

12 A.   "Assassinate AOC."

13 Q.   And who do you understand AOC to be?

14 A.   That would be Congress Woman Alexandria

15 Ocasio-Cortez.

16 Q.   A prominent Trump critic?

17 A.   Yeah, fair to say.

18 Q.   Could you please read, in response to Franklin

19 Graham's tweet on the same page, Mr. Miller's

20 response?

21 A.   At the bottom, yes.

22      "It was Beutiful (sic).  Wake the fuck up

23 already."

24 Q.   Page 7.

25      Please read the tweet from TX_WalkerRanger and

14

1    Mr. Miller's response, please.

2    A.    From TX_WalkerRanger:

3         "The people storming The Capitol are not

4    Patriots."

5         Mr. Miller's response:

6         "Nah we stormed it.  We were gentle.  We were

7    unarmed.  We knew what had to be done.  A beautiful

8    soul was lost today.  We must know her name.  She

9    will not be forgotten."

10   Q.   Page 11, please.

11        Please read all four tweets and the authors it

12   names.

13   A.   From Alexandria Ocasio-Cortez, she messaged:

14        "Impeach."

15        Yungfolk messaged:

16        "Arrest any MAGA supporter in DC and hold

17   them."

18        Mr. Miller responded:

19        "We acted with honor and we were not armed.  We

20   were gentle with the police.  They murdered a

21   child."

22        And he also responded:

23        "Assassinate AOC."

24   Q.   Page 13, please.

25        And can you read the tweet from Mr. Miller?

1  A.    From Mr. Miller on January 6th:

2       "I was there.  We were gentle with police.  We

3  were pepper sprayed, batoned, tear gassed, cuffed

4  and released.  We stormed congress and pushed our

5  way through.  Patriots fighting fir (sic) freedom.

6  I have seen 2 news stories about it and both were

7  completely false.  It was Beutiful (sic)."

8  Q.    Thank you.

9       Would you please turn to Exhibit 2,

10 particularly on page 3.

11      Please describe the picture first.

12 A.    So this would be what appears to be a selfie

13 for Mr. Garret --

14 Q.    You mean Mr. Miller?

15 A.    -- Mr. Miller, excuse me -- wearing a Trump

16 2020 beanie, a red Trump 2020 beanie.  And it's in a

17 grass- -- open grassy area with what appears to be

18 several pro-former President Trump supporters.

19 Q.    The comments there to the right, starting with,

20 "Mark Brown, former FBI agent."

21      Would you please read that one and the next

22 two, along with the author?

23 A.    So Mr. Miller messaged Mark Brown:

24      "Nah that's bullshit.  That dudes (sic) been at

25 the Trump rallies.  I remember the tatt."

16

1   Q.   Actually if you will just read all of the

2   comments all the way down, that would be terrific.

3   A.   Sure.  The next comment was Mark Brown:

4        "Lot of misinformation out there."

5        Another comment:

6        "Former FBI agent saw a busload of ANTIFA

7   arrive."

8        The next message:

9        "A congressman also id'd him from ANTIFA by his

10  tatt and there is this guy," which is a -- looks

11  like a screenshot of the individual wearing the

12  viking horns with the fur around his neck.

13  Q.   Individual who was in the Capitol.

14  A.   Correct, inside the Capitol.

15       Then Mr. Miller messaged Mark Brown:

16       "You don't think we should have stormed the

17  Capitol?"

18       That's it.

19  Q.   Okay.  Let's turn to Exhibit 3.

20       And Exhibit 3 consists of Facebook Business

21  Records which you obtained concerning Mr. Miller's

22  account.  And by "you" I mean the FBI.

23  A.   Correct, yes.

24  Q.   Can you read Mr. Miller's comments from

25  November 15th, 2020, a little above halfway down,

1   starting with, "I'm in D.C."

2   A.   Yes.  So this is November 15, 2020, from

3   Mr. Miller on Facebook message:

4        "I'm in DC we're clearing out the ANTIFA scum."

5   Q.   Do you understand this to be a private message

6   that Mr. Miller sent to another individual?

7   A.   Yes.

8   Q.   All right.  Please turn to the next page and

9   read Mr. Miller's two messages at the top of that

10  page.

11  A.   Again this was on November 15, 2020.

12       Mr. Miller messaged:

13       "You know what's great.  Energy patriot had a

14  gun tonight and we still didn't shoot BLM."

15       Next message -- go ahead?

16  Q.   Oh, please.

17  A.   Next message is:  "Every not energy."

18  Q.   And do you understand on November 15th, 2020,

19  there was a pro-Trump rally in Washington, D.C.?

20  A.   Yes.

21  Q.   Please turn to Exhibit 4.

22       Describe that last message on the first page.

23  A.   This would be the jpeg that was attached.

24  Q.   Was it attached to a message Mr. Miller sent?

25  A.   Correct, on January 12th, 2021.

1    Q.    We can move on from that.

2          Let's turn to Exhibit 5, please.

3          Page 1.

4          Will you please read the date and body of

5    message that Mr. Miller sent, starting with, "This

6    block."

7    A.    So this will be on January 15, 2021, Mr. Miller

8    messaged:

9          "This block was for telling someone who made an

10   Ashli Babbit (sic) joke that I wanted to beat their

11   ass."

12   Q.    And two down, can you read Mr. Miller's next

13   quote, please?

14   A.    Mr. Miller messaged, again, on January 15,

15   2021:

16         "My Twitter ban lifted then I was happy to make

17   death threats so I just been off the rails tonight

18   lol."

19   Q.    And based on the FBI's review of Mr. Miller's

20   social media, would you say that Mr. Miller was

21   particularly fixated on the death of Ashli Babbitt?

22   A.    There were dozens of posts related to the -- to

23   the woman that was -- that was killed inside the

24   Capitol, yes.

25   Q.    Three up from the bottom, Mr. Miller, can you

---

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**

1  read that text, as well.

2  A.   Again, this is on January 15, 2021.  Mr. Miller

3  messaged:

4       "But I'm happy to be banned now.  If they want

5  me to be a radical they got it."

6  Q.   Turning to page 2, it seems that Mr. Miller

7  sent a picture January 10th, 2021.

8       Can you describe that picture?

9  A.   Yeah.  The picture appears to be that of at

10  least three U.S. Capitol Police Officers.  A couple

11  are -- are black, specifically a black male in the

12  center of the photo.

13  Q.   And did Mr. Miller send some version of this

14  picture multiple times on social media for the past

15  few weeks?

16  A.   Yes.

17  Q.   Please read page 4, the first two comments, one

18  from Mark Brown and one from Mr. Miller.

19  A.   Starting with Mark Brown?

20  Q.   Yes, please.

21  A.   So this is on January 10, 2021.  Mark Brown

22  messaged:

23       "Who is that?"

24       Same date, January 10, 2021, Mr. Miller

25  messaged:

1          "I think it's the guy who shot Ashli Babbit

2      (sic)."

3      Q.    And did Mr. Miller express multiple times he

4      believed this individual was the person who shot

5      Ashli Babbitt?

6      A.    Yes, that would be the black officer in the

7      photo.

8      Q.    Page 5, would you please read Mr. Miller's

9      comment about halfway down starting with, "It's so

10     hard to find aerial views"?

11     A.    So this was on January 13, 2021, Mr. Miller

12     messaged:

13         "It's so hard to find aerial views from the

14     March."

15     Q.    And then three up from the bottom, his next

16     comment please.

17     A.    Same date, January 13th, 2021, Mr. Miller

18     messaged:

19         "I want the helicopter shots."

20     Q.    And on page 6, Mr. Miller's last comment on

21     that page.

22     A.    This was on January 16, 2021.

23         Mr. Miller messaged:

24         "Idk --" which I took as "I don't know" -- "it

25     might be time for me to. . .be hard to locate."

1   Q.    Thank you.

2         Exhibit 6, please.  Turn to page 2.

3         Could you read Mr. Miller's comments about

4   halfway down about, "People waited nervously in

5   line"?

6   A.    This was on January 13th, 2021, Mr. Miller

7   messaged:

8         "People waited nervously in line to be pepper

9   sprayed bro, never struck a cop nothing just swarmed

10  them took the punishment then cycled out.  Shit was

11  beautiful."

12  Q.    Okay.  And the next long one starting, "But how

13  would you."

14  A.    Same date, January 13, 2021, Mr. Miller

15  messaged:

16        "But how would you hear that if you weren't

17  there and everyone is scared of being arrested to

18  tell the truth.  It's disgusting you spreading that

19  misrepresenting the events.  What I witnessed was

20  beautiful."

21  Q.    Could you please turn to Exhibit 7?

22        And on page 2, this appears to be a picture

23  that Mr. Miller sent on January 11th of this year,

24  correct?

25  A.    Yes.

1   Q.   And can you describe what it depicts?

2   A.   Yeah.  So this is a picture.  It appears to be

3   a selfie taken by Mr. Miller or the other gentleman

4   in the photo, inside of the Capitol Building, both

5   wearing red Trump 2020 or Trump-related hats, I

6   should say.  The one unidentified individual has a

7   Trump 2020 "Keep America Great" hat, while

8   Mr. Miller is wearing a "Make America Great Again"

9   hat, a MAGA hat.

10       Again, he's got a red, white, and blue

11   Star-Spangled, I guess, patterned neck gaiter.  But

12   there's a statue behind him that -- that is

13   something we would see in the Capitol, so that's how

14   we were able to identify it.

15  Q.   Could you please read the author and the first

16  three comments on the opposing page.

17  A.   So this was sent on January 11, 2021, by Eric

18  Leija:

19       "Bro you got in?  Nice!"

20  Q.   And then Mr. Miller responded?

21  A.   Mr. Miller responded, again, same date,

22  January 11, 2021:

23       "Just wanted to incriminate myself a little

24  lol."

25  Q.   And what did he say next?

23

```
1   A.   Same date January 11, 2021:
2        "We overwhelmed them on the front side.  Very
3   gentle."
4   Q.   Okay.  Turn to Exhibit 8, please.
5        Could you turn to page 2 and describe what that
6   picture appears to show.
7   A.   Yes.  So this appears to be a photo associated
8   with Mr. Miller's account, his Facebook account.
9   Q.   Does it --
10  A.   Where, again, he's discussing with Logan Murray
11  Ashli Babbitt literally dieing for freedom of
12  speech.
13  Q.   Can you read the entire thing he wrote?
14  A.   Yes, I'm sorry.  So this came from Mr. Miller:
15       "Logan Murray She literally died for freedom of
16  speech.  Millions of people banned at the same time
17  for being conservative.  You don't want to fight
18  then talk freedom of speech, but I still want to
19  beat the fuck out of you."
20  Q.   Turning to the opposing page -- or looking at
21  the opposing page, Garret Miller, January 14th.
22       Can you read the quote, "I took down police."
23  A.   How far down is it?
24  Q.   About two-thirds of the way down.
25  A.   I see it.  This was on January 14, 2021.
```

1    Mr. Miller messaged:

2         "I took down police without hitting them while

3    they whales (sic) on me with sticks.  No weapons in

4    my hands at all."

5    Q.   Okay.  Please turn to the next page and read

6    Mr. Miller's next-to-the-last quote at the bottom of

7    the page.

8    A.   So this was on January 10, 2021, Mr. Miller

9    messaged:

10        "Who killed Ashli Babbitt?"

11   Q.   And this is in the course of another

12   conversation he's having that day?

13   A.   Yes, sir.

14   Q.   Turning -- looking at the next page, can you

15   read, starting with, "He fired the first shot," and

16   the next quote after that?

17   A.   So on January 10, 2021, Mr. Miller posted -- or

18   messaged:

19        "He fired the first shot."

20        He then messaged:  "Right like they said in the

21   Civil War."

22   Q.   And then his next -- his second message after

23   that down the page, sir, "What's his name?"

24   A.   Again, the date is January 10, 2021, Mr. Miller

25   messaged:

25

```
1        "What's his name?  That's all that matters."
2   Q.   You take him to be talking about the Capitol
3   Police officer who he thinks killed Ashli Babbitt?
4   A.   Yes, based on that exchange with Josh DuBose,
5   or DuBose.  That's where we're going with it, yes.
6   Q.   And that exchange continues on to the next
7   page, if you could continue there.
8        Start with Mr. Miller saying, "He's everyone's
9   favorite cop now."  And just read the next five
10  messages, please.
11  A.   So this is on January 10th, 2021.  Mr. Miller
12  messaged:
13       "He's everyone's favorite cop now."
14       He then goes on to message:
15       "We going to get ahold of him and hug his neck
16  with a nice rope."
17       Josh DuBose responds:
18       "Didn't you say you were a Christian or some
19  lie?"
20       Mr. Miller responds:
21       "Justice."
22       And then he also responds:
23       "Not murder."
24  Q.   Okay.  Let's go over to Exhibit 10, please.
25       Two-thirds of the way down, Mr. Miller's
```

26

1  talking about grappling hood.

2       And then the next one, will you please read

3  those two?

4  A.   So this is on January 3rd, 2021, Mr. Miller

5  messages:

6       "I have a grappling hood and roped."

7  Q.   And what did he say next?

8  A.   The next message, same date:

9       "I can hang them."

10 Q.   Turning to the next page, January 3rd, after

11 the long link and everything, what did Mr. Miller

12 say on January 3rd, 2021?

13 A.   Where is it again?

14 Q.   About two-thirds of the way down after the Mark

15 Brown quote.

16 A.   This is Mr. Miller posting again on

17 January 23rd, 2021:

18      "I was there."

19 Q.   And do you understand him to be responding to a

20 story about another, I think, pro-Trump rally that

21 took place in Washington, D.C., before January 6th?

22 A.   Yes.

23 Q.   Top of page 3, can you please read the first

24 four quotes?

25 A.   The date is January 3rd, 2021.  Mr. Miller

27

messaged:

　　　"I have a grappling hook and rope and a level 3
vest.  Helmets, mouth guard and bump cap."

　　　The next message is:

　　　"And my must Thai shin guards and cup too."

　　　Mr. Mark Brown responds, same date:

　　　"I don't think cops are going to let you carry
a grappling hook around."

　　　Mr. Miller responds:

　　　"If I have to riot gear out, I can."

Q.　Can you explain a few of these terms?

　　　What's a level 3 vest?

A.　From a law enforcement perspective, a level 3
vest is a ballistic vest that typically stops most
caliber rounds, up to like a .45 caliber bullet.
Colloquially, it's a bulletproof vest.  It's a
ballistic bulletproof vest, yes.

Q.　What's a bump cap, to your understanding?

A.　A bump cap is a -- it looks like a ball cap or
it looks like a regular cap, but it has a plastic
shell on the inside, so it protects or semi-protects
someone's skull from maybe taking a shot on the
head.  It's typically camouflaged inside the cap.

Q.　Not to get ahead of ourselves.  Again, when the
search warrant was executed at Mr. Miller's house,

```
1    was a bump cap found?

2    A.    Yes.

3    Q.    Was a ballistic vest found?

4    A.    Yes.

5    Q.    Was a rope found?

6    A.    It was, yes.

7    Q.    A grappling hook was found?

8    A.    Yes.

9    Q.    Turning to the next page, please.  Just read

10   the first five quotes from Mr. Miller.

11   A.    Is this page 4?

12   Q.    Yes, please.

13   A.    The date is January 23rd, 2021.  Mr. Miller

14   messages:

15        "These people are soft."

16        Next message:

17        "I look forward to fighting them."

18        A third message:

19        "Plus this is the third time.  First time I had

20   a lot of guns with me, so I was very cautious."

21        Next message:

22        "But found out about the federal laws, and it's

23   a federal crime."

24   Q.    And the next one, please.

25   A.    Same date, January 23, 2021.  Mr. Miller
```

29

```
1   messages:
2        "So might just keep one hidden one and store
3   the rest in Virginia."
4   Q.   All right.  Let's turn to page 7 of the same
5   exhibit, please.
6        Mr. Miller starts responding to stories about
7   Ashli Babbitt.  And please start with, "Its the
8   first shot," and please read the next two after
9   that.
10  A.   This is January 7th, 2021.  Mr. Miller
11  messages:
12       "It's the first shot man of Civil War I think.
13       Mr. Brown responds:
14       "Maybe.  Trump needs to work fast and hard."
15       Mr. Miller responds:
16       "We were gentle with police."
17       He also says:
18       "They pepper sprayed, maced, batoned, cuffed."
19  Q.   Bottom of page 8, same exhibit.  Will you read
20  Mr. Miller's quote?  It goes on to page 9.
21  A.   So this would be on January 7th, 2021.
22  Mr. Miller messages:
23       "Well, we were getting in there no matter what.
24  It's supposed to be wild.  Cops fucked it up."
25  Q.   And then Mr. Miller's next comment, please?
```

```
 1    A.    Again, January 7, 2021 Mr. Miller messages:
 2          "Cop shot a woman and she died."
 3    Q.    Starting with Mr. Brown, "Were you in the
 4    building?"  How did Mr. Miller respond with the next
 5    three comments?
 6    A.    So Mr. Brown says on January 7, 2021:
 7          "Were you in the building?"
 8          Mr. Miller messages back:
 9          "Yeah."
10          He also messages:
11          "We charged."
12          And then he says:
13          "It wasn't ANTIFA."
14    Q.    Page 10.  Mr. Miller writes on January 7th,
15    "Yep, that woman is a here."
16          And in that context, are we again talking about
17    Ashli Babbitt?
18    A.    Yes.
19    Q.    Page 12.  Could you get there, please?
20          Let's start with the Josh DuBose comment:
21          "Are you traveling?"
22          And Mr. Miller's response?
23    A.    So Josh DuBose is -- on January 2nd, 2021,
24    message is:
25          "Are you traveling to protest?"
```

```
 1        Mr. Miller responds back:
 2        "Oh, yeah, things could get real dicey this
 3   week."
 4   Q.   What did Mr. DuBose say in response?
 5   A.   Mr. DuBose responded back:
 6        "Like you've traveled to protests before?"
 7        And Mr. Miller responds back:
 8        "Maybe I need to write a will and testament."
 9   Q.   And what did he say?
10   A.   "Been driving all over the country since the
11   fraud."
12   Q.   And after that, what did he say?
13   A.   Mr. Miller answered:
14        "Was denied health coverage by the Government
15   yesterday."
16   Q.   Okay.  Please turn to Government's Exhibit 11.
17        We are moving on to Instagram information.
18        Do you understand that on Instagram, like on
19   Facebook, individuals can engage in private
20   messaging back and forth?
21   A.   Yes.
22   Q.   And are the records that we retained from
23   Instagram, do they include those conversations
24   Mr. Miller had with others?
25   A.   Yes, they did.
```

 1   Q.   Okay.  On page 3, could you describe the two
 2   participants and the conversation, even if it's just
 3   a one-way conversation?
 4   A.   Yeah, you're talking the two threads on page 3?
 5   Q.   Starting with the bottom thread, please.
 6   A.   Say again.  Starting with what?
 7   Q.   Starting with the bottom thread -- or just the
 8   bottom thread.
 9        Who are the participants in that conversation,
10   on page 3 of Exhibit 11?
11   A.   I've got an image, a jpeg image, correct, from
12   garrmill?
13   Q.   On page 11?
14   A.   Sorry.  Page 11.
15            MR. MAGLIOLO:  May I approach the witness,
16   Your Honor?
17            THE COURT:  Yes.
18   Q.   (By Mr. Magliolo)  Who are the participants in
19   the conversation?  What are the -- what are the user
20   names?
21   A.   So user names on this particular thread are
22   what appears to be senschumer and then garrmill.  We
23   have garrmill tied to Mr. Miller.
24   Q.   Okay.  And senschumer, is that the Instagram
25   account associated with the Senate Majority Leader

1    Chuck Schumer?

2    A.    Yes.

3    Q.    So it appears Mr. Miller sent him a picture,

4    correct?

5    A.    Yes.

6    Q.    And then on page 5, he starts directing

7    comments towards Senator Schumer, correct?

8    A.    Yes, he does.

9    Q.    Can you read us the four comments he directed

10   to Senator Schumer and tell us what days they were

11   on?

12   A.    So the first comment is on November 7th, 2020,

13   from garrmill.  Messaged:

14        "Hey we are coming for you chick."

15        Then garrmill messages:

16        "Chuck."

17        Garrmill then says:

18        "We got you!"

19        And garrmill messages:

20        "I celebrated with family, without a mask, and

21   with a loaded gun in my pocket.  Just in case you

22   show up.  God bless America globalist coward."

23   Q.    Conversation continues with Senator Schumer,

24   sends him another picture, page 7.

25        Could you please read the comments that

```
 1    Mr. Miller directed to Senator Schumer?
 2    A.   So garrmill on -- you're talking on
 3    November 28th, 2020?
 4    Q.   Correct?
 5    A.   -- messaged:
 6         "Enjoying our wedding.  Hope you die."
 7         And then also says:
 8         "Soon, very soon.  Pig!"
 9    Q.   Let's turn to Exhibit 12.
10         Does this depict another conversation that
11    Mr. Miller had with somebody on Instagram?
12    A.   Yes.
13    Q.   Could you read Mr. Miller's last comment on
14    that page?
15    A.   So this comment was messaged on November 7th,
16    2020, from garrmill:
17         "Never been shot at in school.  Been shot near
18    at work but some people need to be shot and in
19    America you get to decide who deserves to be shot."
20    Q.   Turn to Exhibit 14, please:
21         And then turn to page 6 of that exhibit,
22    please.
23         Mr. Miller appears to be sending another image
24    to a user there, correct?
25    A.   Correct.
```

1  Q.   And what does that image depict?

2  A.   This appears to be a still image of the black

3  U.S. Capitol Police officer discharging his firearm

4  inside the Capitol the day of the riot.

5  Q.   Could you please read Mr. Miller's comment

6  directly below it?

7  A.   So garrmill messaged on January 10th, 2021:

8       "I only have this picture so far."

9  Q.   November 10th comment from Mr. Miller, about a

10  third of the way down on the following page, please,

11  starting with, "How could he."

12  A.   So this is from activistcentral, correct?

13  Q.   No, I'm sorry, from Mr. Miller to

14  activistcentral on November 10th, 2021.  One-third

15  of the way down starting, "How could he?"

16  A.   Understood.

17       This is from garrmill.  Message on

18  January 10th, 2021.

19       "How could he execute an unarmed women feet

20  away.  His execution must be televised."

21  Q.   Turning to page 8, series of comments from

22  Mr. Miller, starting about a third of the way down.

23  Could you please just read all six of those,

24  starting with, "Y'all call out"?

25  A.   So this will be garrmill messaging,

```
 1    January 10th, 2021:
 2         "Y'all call out some dumb ass shit."
 3         The message is:
 4         "Ratchet ghetto stuff idgaf about," which is I
 5    don't give a fuck about.
 6         Garrmill then messages:
 7         "She was by my side in battle.  Blood path."
 8         The next message is:
 9         "Oath."
10         And another message is:
11         "Battle bond."
12    Q.   What's he say next?
13    A.   The next message, again, January 10th, 2021,
14    garrmill messages:
15         "He's toast."
16    Q.   You take that to mean he's talking about the
17    Capitol Police officer he's been consumed with?
18    A.   Yes, sir.
19    Q.   Page 9, last full comment from Mr. Miller.
20    Will you please read that in full?
21    A.   This is on January 10th, 2021, garrmill
22    messages:
23         "After years of vilifying white people who
24    committed justifiable homicide on lethally dangerous
25    blacks, Leftists are valorizing a black cop who shot
```

1   an unarmed white woman at a political protest.

2   Vdare news."

3   Q.   A conversation about this person continues.

4   Page 11.  Can you please read Mr. Miller's comment

5   at the top, starting with, "I am threatening"?

6   A.   Yeah.  This is January 10th, 2021.  Garrmill

7   messages:

8        "I'm threatening justice on criminals."

9   Q.   And he sends a picture at the bottom.  Can you

10  describe what the picture is?

11  A.   The picture is of a rope tied in a noose.

12  Q.   Turn to the next page.  And again, that noose,

13  you believe he's describing what he intends to do

14  with Mr. -- with the person he believes killed Ashli

15  Babbitt?

16  A.   Yeah, based on his comments with bringing a

17  rope and hugging around the neck, yes.

18  Q.   Top comment on the next page starting with, "I

19  just want."

20  A.   This comment's on January 10th, 2021.  Garrmill

21  messages:

22       "I just want Ashli's killer atm --" which I

23  take is at the moment.  "Btw" -- by the way -- "how

24  many times did you vote?"

25  Q.   Five down, "I was there," can you read that

38

```
1   quote?
2   A.   Garrmill messages on January 10th, 2021:
3        "I was there.  She acted honorably.  That's why
4   we will fight."
5        He then messages:
6        "Nah, that's -- that's -- Nah, I just don't
7   give a fuck about who you fuck."
8   Q.   Okay.  On the next page, Mr. Miller starts
9   another conversation with another individual also on
10  January 10th.
11       Turn to page 14 and describe the picture he
12  sent, "he" being Mr. Miller.
13  A.   This would appear to be the same photo, a
14  stillshot of the -- the black U.S. Capitol Police
15  officer discharge his firearm inside the Capitol.
16  Q.   Can you please read Mr. Miller's comment
17  further down that page, "We'll find his name"?
18  A.   So garrmill, on January 10th, 2021, messages:
19       "We'll find his name so I can congratulate
20  him."
21  Q.   His top comment on the next page, please,
22  Mr. Miller's.
23  A.   January 10th, 2021, garrmill messages:
24       "I care.  He's a prize to be taken."
25  Q.   Almost halfway down, Mr. Miller, starting with,
```

1  "So far you cheered."

2  A.   Again, on January 10th, 2021, garrmill

3  messages:

4      "So far you cheered the death of an unarmed

5  women.  Called someone a cunt.  What happened to

6  Biden's shoot them in the leg?  The whole thing

7  comes apart now.  She did what had to be done.  He

8  will swing."

9  Q.   What did he say next?

10 A.   "I had a rope in my bag on that day."

11 Q.   Go to page 16, please.

12     Read Mr. Miller's three comments starting with,

13 "And then you fired."

14 A.   Where at?  I'm sorry.

15 Q.   About a third of the way down starting with,

16 "And then you fired."

17 A.   This is January 10th, 2021, garrmill messages:

18     "And then you fired the first shot."

19     Next message was:

20     "First shot of Civil War."

21     And he also messages:

22     "It's really beautiful what she started.  The

23 cleanse."

24 Q.   Can you read, "Three million people," that

25 quote, and the one right below it?

```
1   A.    It, again, on January 10th, 2021, garrmill
2   messages:
3         "Three million people hunting one man."
4         Another message:
5         "Let the games begin."
6         Some type of Emojicon follows that.
7   Q.    Page 18, and just read all the comments you can
8   down to, "The hunt."
9   A.    Starting at the top?
10  Q.    Yes, please.
11  A.    With barney?
12  Q.    Yes.
13  A.    So this is from author barneyarneyarneyarney,
14  January 10th, 2021, in capital letters:
15        "BLUE LIVES MATTER."
16        Garrmill then re- -- messages back:
17        "This one's different."
18        Looks like barneyarneyarneyarney is using
19  Emojicons.
20        Garrmill responds back:
21        "He doesn't get a pass."
22        Barneyarneyarneyarney responds back:
23        "Why is this one different?"
24        Garrmill then responds:
25        "The hunt makes it inevitable."
```

41

1    Q.   Okay.  Turn to -- looking at page 19, read
2    Miller's last two comments, please.
3    A.   This is on January 10th, 2021.  Mr. Miller,
4    garrmill, messages:
5         "I'm working on my home.  Gotta clean up a
6    murderer."
7         He then messages:
8         "It's for a sister in battle, warriors code."
9    Q.   Okay.  Please turn to Exhibit 15.  Looks like
10   another conversation between Senator Schumer and
11   garrmill.
12        Can you please tell us what Mr. Miller told to
13   Senator Schumer's account on January 4th, 2021.  On
14   page 2 of Exhibit--
15   A.   Oh, sorry.
16        So this is on January 4th, 2021.  Garrmill
17   responds to senschumer:
18        "Trump won.  Go send that Black national anthem
19   traitor."
20   Q.   Okay.  Another conversation with a different
21   individual starts immediately below.
22        That person asks, "You going to it?"
23        And please read Mr. Miller's response on
24   page 3.
25   A.   Garrmill responds on January 3rd, 2021.

```
 1   Message is:
 2        "Yah all loaded up.  I think Pence will certify
 3   the republican electors but might take till Friday.
 4   Then anarchy."
 5   Q.   Turn to page 5.  Kmcarr85 writes on
 6   January 7th, "So it wasn't ANTIFA."
 7        Could you please read Mr. Miller's responses?
 8   A.   Garrmill messages back again on January 7,
 9   2021:
10        "Nah it was us."
11        He then messages:
12        "I mean it was us where we charged in."
13   Q.   Last page of this exhibit.  Mr. Miller's first
14   comment on January 7th, can you please read it for
15   the Court?
16   A.   This will be January 7, 2021, garrmill
17   messages:
18        "I think we will start assassinating."
19   Q.   Okay.  I would like to switch gears a little.
20   Based on evidence the FBI developed, it obtained a
21   search warrant for Mr. Miller's residence, correct?
22   A.   Yes.
23   Q.   And that search warrant was executed on
24   January 20th?
25   A.   Yes, it was.
```

1  Q.   Okay.  I've got a series of pictures behind Tab

2  16, 17, 18, 19, and 20.

3       Are those pictures from the search warrant

4  execution and of Mr. Miller that day?

5  A.   Yes.

6  Q.   Are they true and correct copies of pictures

7  that were taken at Mr. Miller's residence and of

8  Mr. Miller?

9  A.   Yes, sir.

10       MR. MAGLIOLO:  Your Honor, I move to admit

11  Government's Exhibits 16 through 20 inclusive.

12       MR. BRODEN:  No objection.

13       THE COURT:  They are admitted.

14  Q.   (By Mr. Magliolo)  Please turn to Exhibit 16

15  and tell us what it depicts.

16  A.   So this is a photo of Mr. Miller after he was

17  arrested by the Joint Terrorism Task Force.  This

18  would be at the FBI Dallas Field Office before we

19  initiated processing his latent prints, his

20  fingerprints.

21  Q.   What shirt is he wearing that day?

22  A.   So he's wearing a black T-shirt.  It has a

23  depiction of a former President Trump giving a

24  thumbs up.  It's got a couple of quotes on the

25  front.  First it says, "Take America back."  It then

44

1    says, "Statistically impossible to have lost the

2    2020 election."

3         Then it says, "I was there.  D.C. January 6th,

4    2021 -- Washington, D.C., January 6th, 2021, and

5    Georgia, January 4 and 5th."

6    Q.   Can you describe what's on the back of the

7    shirt on page 25 of that exhibit?

8    A.   The back of the shirt has kind of a caricature

9    of the republican elephant.  The bottom half is red.

10        It says, "Trumplicans" inside.  And the top is

11   blue with three stars.  It's got a -- what appears

12   to be a depiction of former President Trump's

13   hairpiece, again on the elephant.  It says, "Defund

14   The Media" and "Stop The Steal."

15   Q.   Okay.  Exhibit 17, another picture, a number

16   items on the ground.

17        Can you please describe what these are, where

18   they were found?

19   A.   This photograph describes, I believe, a black

20   sweatshirt that Mr. Miller was wearing when we

21   arrested him at his residence in Richardson, Texas.

22   The items on the ground are some cash.  There's a

23   mouth guard.  There's two handgun magazines that are

24   loaded.  There's a folding knife, couple of vape

25   pens and maybe a couple of gloves, black gloves, or

45

```
 1   some materials that I can't quite make out.
 2   Q.   So he had that on his person when the FBI
 3   encountered him that morning?
 4   A.   Yes.  Yep.
 5   Q.   Let's turn to Exhibit 18.
 6        FBI determined that Mr. Miller had a 1980s
 7   white, I think, Ford van registered to him, correct?
 8   A.   Yes.
 9   Q.   And in the search warrant execution, agents
10   searched the contents of that van, didn't they?
11   A.   They did, yes.
12   Q.   Would you please turn to the first page of
13   Exhibit 18 and tell me what you see, particularly on
14   the driver's side seat?
15   A.   Yeah.  So this is a photograph inside through
16   the front side passenger seat.  Looks to me like
17   that's some type of vest that's draped over the
18   driver's seat.  So the front of the vest falls over
19   the backside so it looks like, if you're sitting in
20   a chair, you could pull it on over the top for
21   protection.  And, again, you can see sort of the
22   back part of the van as you look to the left part of
23   the photograph.
24   Q.   If you turn to the next page and describe what
25   looks to be the back of that particular van.
```

1   A.   So, again, this photograph is from the -- kind

2   of the cargo area of the van.  Looks like you're

3   able to sleep back there.  There's clothes, some

4   blankets, again, what appears to be a makeshift bed,

5   what may be a foam cooler with the lid off.

6   Q.   And have you learned that this van has some

7   sort of power source, you know, other than what

8   would come standard on a car?

9   A.   Yeah.  It looked like there was a built-in

10  inverter, some kind of power source against the

11  wall.

12  Q.   Page 3, can you describe those things and --

13  that are on the lawn?

14  A.   Yes.  There were three items pulled out of the

15  van in this particular photo.

16      One appears to be some type of Trump caricature

17  in front of the American flag.  It looks like it's

18  on a piece of cloth.

19      Another one is a card with Trump on it that

20  says, "USA."

21      And the other is some kind of Stop the Hate

22  MAGA.  It's got a caricature of Trump with maybe a

23  KKK representative and somebody wearing black

24  clothes.  Looks like they're coming out of something

25  that, again, has maybe some blood or spatter on it.

1    Q.    Okay.  Page 4.

2          And, again, everything in Exhibit 18 was either

3    in his van or taken from his van.

4    A.    Correct.  These items were removed from the

5    van.

6    Q.    All right.  Please describe what's on page 4.

7    A.    Yeah.  This would be a sling.  The sling is

8    typically used with a long gun or a rifle, and it

9    also has a pouch for a folding knife.  Looks like

10   the folding knife was on the pouch on the sling.

11   Q.    So it would allow someone to carry a rifle

12   without actually having to hold it in their hands?

13   A.    Correct.  Looks to me to be a one-point sling.

14   Q.    Page 5.

15         Can you describe basically what's in the middle

16   of the van?

17   A.    Yeah.  So this is inside the van.  It looks

18   like there's rope, at least a bundle of rope, and

19   just some other clothing items, some carabiners,

20   things like that.

21   Q.    Pages 6 and 7, can you please describe that?

22   A.    This was a -- some kind of -- some type of

23   suitcase that was found in the van.  This was opened

24   up for us to take the photograph.  It contains

25   several boxes of ammunition.

48

1        So then in photograph 7, the ammunition range
2   is from handgun ammunition to rifle ammunition, and
3   I think there's even Winchester shotgun ammunition,
4   lead shot shotgun ammunition, coupled with a few
5   carbine magazines, what look to be an AR-style
6   magazines that would hold .223 ammunition.
7   Q.   Turn to page 8, please, and describe what you
8   see.
9   A.   Page 8 would be a rope with a grappling hook.
10  And, again, that was taken from the van -- I mean
11  the items were removed from the van.
12  Q.   Just like he described that he had previously?
13  A.   Yes.
14  Q.   Page 9, what do you see there?
15  A.   Page 9 is some form of a gas mask with filters.
16  Q.   Is that the sort of mask you would wear if you
17  wanted to overcome the effects of tear gas or pepper
18  spray?
19  A.   Yeah.  That's why you would have it, at least
20  to try to prevent it, yes.
21  Q.   Pages 10 and 11, will you describe that?
22  A.   Page 10, it's kind of hard to tell, but that
23  appears to be an AR-style rifle with an orange or a
24  red rifle carrier.  And then page 11 is a shotgun.
25       There's a better photo of the AR-style weapon

```
 1    in that photograph, 11, but it looks to be either a
 2    single-shot or side-by-shot shotgun.
 3    Q.    AR15 very powerful rifle.
 4    A.    Yeah.  Shoots typically a .223 caliber round,
 5    yes.
 6    Q.    It's the sort of rifle that could penetrate,
 7    say, that level 3 vest that Mr. Miller was carrying?
 8    A.    Yeah.  We have level 3 at our -- for -- for our
 9    role, and it would not stop a rifle round from an
10    AR15 or an AR-styled rifle.
11    Q.    Page 12.
12          Describe what you see, please, and then do the
13    same with 13.
14    A.    So this is a photograph from inside the van.
15    It looks like it's showing the power source, or at
16    least the makeshift -- what appears to me to be an
17    inverter against the wall.  So, again, you could
18    plug things in and maybe charge a phone or other
19    electronics.
20          Page 13, this is crossbow with arrows taken
21    from the van.
22    Q.    Okay.  Government's Exhibit 19, please.
23          Series of pictures.  Do they depict items found
24    in Mr. Miller's bedroom within the house that was
25    searched?
```

1   A.   Correct, yes.

2   Q.   Okay.  Please describe what you see in

3   Exhibit 19.

4   A.   Nineteen is an overall photo of his closet.

5        And just a couple of things to point out:  On

6   the right side of the closet, you will see what

7   appears to be another AR-styled rifle hanging from

8   the clothesline or the clothes rack.  There's a box

9   above it that had ammunition in what appears to be a

10  U.S. Postal Service box.

11       In the middle of the shelf -- it's hard to

12  see -- but that was a handgun that was in a holster.

13       And then I think the box -- another box to the

14  left had more ammunition.

15  Q.   Page 2, does that depict the firearm that was

16  hanging in the closet?

17  A.   Yes.  That was the one hanging from the clothes

18  rack.

19  Q.   And with respect to this firearm, just

20  generally speaking, I know you're not a firearms

21  expert, but are there laws that require barrels of a

22  gun like this to be a certain length?

23  A.   There are, yes.

24  Q.   And are there people at the FBI investigating

25  whether or not this particular rifle is sufficiently

1    long to be legally possessed?

2    A.    Yes.

3    Q.    And if someone does not have the proper

4    documents to possess a firearm like this, is that a

5    felony?

6    A.    It is, yes.

7    Q.    Page 3, what do you see there?

8    A.    That would be the handgun that was in its

9    holster above the clothes rack on that shelf inside

10   the closet.

11   Q.    Page 4, is that the same handgun?

12   A.    Yeah.  That's the handgun with the slide lock

13   back and at least two magazines there.  No rounds in

14   the magazines.

15   Q.    Pages 5 and 6, can you please describe what are

16   in those boxes?

17   A.    That is ammunition that was discovered, again,

18   in the boxes on the top shelf of the closet.

19        Photograph 5 is primarily .9 millimeter handgun

20   ammunition.  Looks like a couple of AR-styled

21   magazines were found in that box, as well.

22        Photograph 6.  It's just miscellaneous rifle

23   rounds.  Again, I could throw you a guess saying

24   it's .223 caliber ammunition, but it's primarily

25   rifle rounds in that box.

```
 1   Q.    Please turn to Exhibit 20.  We're almost there.
 2         What's the first page of Exhibit 20 depict?
 3   A.    So this photograph was taken -- again, it's
 4   inside the residence at 426 Grace Drive in
 5   Richardson.
 6         This was a laundry basket outside of
 7   Mr. Miller's room.  It was in the hallway leading to
 8   the door.  And what stuck out was there was a loaded
 9   handgun inside the laundry basket, laying on top of
10   the clothes; again, in the laundry basket.
11   Q.    Page 2.  Please describe what that is.
12         Page 2 is a calendar, and January is the month
13   showing up top.  And he's got notes and whatnot
14   written on the calendar.
15   Q.    Can you please read the note on January 6th?
16   A.    January 6th and the calendar is of 2021.
17         It says, "Big Day Wild," and three exclamation
18   points.
19              MR. MAGLIOLO:  Your Honor, may I have a
20   moment?
21              THE COURT:  Yes.
22              (Pause in the proceedings.)
23   Q.    (By Mr. Magliolo)  Special Agent Ford, did you
24   run the search warrant that resulted in the evidence
25   that we've just been talking on January 20th?
```

1   A.    No, sir.

2   Q.    Did other FBI agents run that search warrant on

3   January 20th?

4   A.    Yes.  Yes.

5              MR. MAGLIOLO:   Thank you, Your Honor.  I

6   pass the witness.

7                     CROSS-EXAMINATION

8   BY MR. BRODEN:

9   Q.    Agent, I don't have a whole lot of questions

10  for you, but I do want to ask you a few things.

11       One is -- and my colleague at the U.S.

12  Attorney's Office mentioned that you didn't prepare

13  any reports, any emails, prepare any kind of

14  statements regarding the subject of your testimony

15  today.

16  A.    Correct.  Yes, sir.

17  Q.    Okay.  Is fair to say that we just listened to

18  a plethora of statements where Mr. Miller was very

19  vociferous about his activities on January 6th?

20       Is that a fair statement?

21  A.    Yes.

22  Q.    Okay.  One of the things that seem common in a

23  lot of his statements is that he was acting

24  peacefully that day and was unarmed, correct?

25  A.    Yes.

1  Q.   And you have actually no indication that he was

2  armed that day.  Is that a fair statement?

3  A.   That's a fair statement, yes.

4  Q.   Okay.  Other than the actual breach of the --

5  the Capitol Building, you have no indication that he

6  wasn't peaceful that day; is that correct?

7  A.   Correct.

8  Q.   Okay.  We had various pictures of Mr. Miller in

9  the Capitol Building, the rotunda area, correct?

10 A.   Yeah.  Specifically the one with the statue

11 looked like it was -- it was roughly in that area,

12 yes.

13 Q.   And I'm sure you're familiar that some

14 protestors breached or moved beyond the rotunda to

15 go to individual representatives buildings into the

16 actual hall of the -- I believe it was the Senate or

17 the House of Representatives, I forget, but one of

18 the -- one of the two chambers?

19 A.   Yes.

20 Q.   You have absolutely no indication that

21 Mr. Miller left the Rotunda Building.

22 A.   At this time, no.

23 Q.   Okay.  And were you able to confirm the timing

24 of his leaving the rotunda building with the

25 statement issued by former President Trump asking

1    his supporters to go home?

2    A.    I'm not certain of that.  I can't answer that.

3    Q.    Were you able to determine what time he left

4    the Capitol Building?

5    A.    No, sir.  I can't answer that, either.

6    Q.    And as far as you know, the entire time he was

7    in D.C. -- and, again, put the breach of the actual

8    building aside -- he committed no violent acts.

9    A.    Not to my knowledge.  But, again, I'm not the

10   case agent.  As far as what I am privy to, no.

11   Q.    Well, you're the agent that the Government

12   chose to have testify in this case, so I'm asking

13   you, since you're who's presented.

14         The Government has no indication that he did

15   anything violent that day to your knowledge,

16   correct?

17   A.    To my knowledge, no.

18   Q.    And then let's talk about, there were various

19   threats to Congresswoman Ocasio-Cortez.  I think we

20   saw some way back in November to Senator Schumer,

21   and of course the -- the -- the comments regarding

22   the Capitol Police officer who shot Ashli Babbitt.

23         When did the FBI first become -- well, let's

24   take the Schumer threat, since that goes back to

25   November.

1       When did the FBI first become aware -- or when
2   did the Government first become aware of the Schumer
3   threat?
4   A.   It would be after January 6th, 2021.
5   Q.   Okay.  That answers part of my question, but
6   when after January 6th?
7   A.   I would say, based on subpoena returns --
8   because, again, we retained all that stuff through
9   legal process -- within about a week --
10  Q.   So --
11  A.   -- of January 6th.
12  Q.   So no later than January 13th --
13  A.   I think that's fair to say, yes.
14  Q.   -- in that ballpark?
15  A.   Yes.
16  Q.   Senator Schumer didn't make the FBI or any law
17  enforcement authorities aware of these threats that
18  were, I guess, exchanged on one of his social media
19  platforms.
20  A.   Not that I'm aware of.
21  Q.   And you have no indication that Senator Schumer
22  took that threat seriously, because obviously if he
23  had, he would have reported it, correct?
24  A.   Yeah, I do not -- I do not know.
25  Q.   Okay.  Well --

1    A.    Senator --

2    Q.    -- was there any indication that Senator

3    Schumer reported it to the Government.

4    A.    Not to my knowledge.  But, again, he deals with

5    U.S. Capitol Police on those threats, so that's a

6    different animal.

7    Q.    So what did you do to prepare your testimony

8    today?

9    A.    I did plenty.

10   Q.    Okay.  Was one of them --

11   A.    So I don't -- I don't track Senator Schumer's

12   reporting to U.S. Capitol Police.

13   Q.    Well, is there a database this could be kept

14   in?

15   A.    There could be.

16   Q.    Okay.  Did you check that database?

17   A.    I'm not aware of a database, so I didn't know

18   to check it.

19        Are you aware of a database I should have

20   checked?

21   Q.    Well, you said there could be.  Did you

22   determine whether, in fact, there was a database?

23   A.    Typically those reports get reported to the

24   Joint Terrorism Task Force.  So if there was a

25   threat reported to any member of Congress, Senator,

1    Congressperson, it should get funneled to the FBI at

2    some point in time.

3    Q.   If that Congressperson reports it.

4    A.   Correct.

5    Q.   At that point there is a threat level assessed,

6    correct?

7    A.   Depending on the level of the threat, yes.

8    Q.   Okay.  What threat level was assessed to these

9    comments that Mr. Miller made to Senator Schumer's

10   social media platform?

11   A.   At the time, I'm not aware of a threat level

12   having been assessed.  I would say that right now

13   it's been assessed to rising to the level of terror.

14   Q.   Okay.  We'll get to that in a minute.  But --

15   okay.  Rising to the level of terror.

16        The comments to Congresswoman Ocasio-Cortez,

17   you became aware of those around the same time, I

18   guess, the January 13th area?

19   A.   Yes.  Yes.

20   Q.   Okay.  Do you know whether the Congresswoman

21   reported that, those threats made in connection with

22   her social media platform?

23   A.   I'm not aware of her having reported that

24   anyone.

25   Q.   Okay.  And so you said that the threat to

```
1    Senator Schumer back in November that was on a
2    public media platform used by Senator Schumer and
3    the threat to Congresswoman Ocasio-Torrez (sic) on
4    January 6th, also made to a public media platform,
5    is that correct, was rising to the level of terror?
6    A.    I believe the timeline on the AOC threat was
7    post January 6, 2021.
8    Q.    Would it help if you took a look at page 11 of
9    Exhibit 1?
10   A.    I'm sorry.  So those were -- those occurred on
11   January 6th.
12   Q.    Okay.  And so it's this threat and the threat
13   to Senator Schumer back in November that you were
14   talking about rising to the level of terrorism.
15   A.    Based on the actions of January 6th, that's how
16   this is being approached, yes.
17   Q.    And so Senator Schumer and Congresswoman
18   Ocasio-Cortez are threatened to the point of it
19   rising to the level of terrorism.
20   A.    No.  Keep in mind it's the totality of the
21   situation.  So just one comment doesn't
22   automatically rise it.
23   Q.    So totality took shape at least by --
24   A.    After January 6th.
25   Q.    -- by January 13th, correct?
```

```
 1   A.    Yes.
 2   Q.    January 14th, what did you do with Mr. Miller?
 3   A.    We were investigating him.
 4   Q.    Okay.  Did you stake him out to make sure he
 5   wasn't going to D.C.?
 6   A.    Yes.
 7   Q.    Okay.  January 15th?
 8   A.    Yes.
 9   Q.    January 16th?
10   A.    Yes.
11   Q.    And you had agents outside his house the entire
12   time.
13   A.    We had means we were using to make sure we knew
14   where he was at.
15   Q.    Okay.  What means?
16   A.    We were looking at his phones and doing
17   physical surveillance.
18   Q.    Okay.  So the phones, to make sure it was
19   pinging in the DFW area, the Dallas area --
20   A.    Correct.
21   Q.    -- and the physical surveillance --
22   A.    Correct.
23   Q.    -- to make sure he was in the Dallas area.
24   A.    Yes.
25   Q.    Did he ever leave the Dallas area?
```

1    A.    Not that I'm aware of.

2    Q.    Well, you would be aware, you just said you had

3    him under surveillance and his phone pings.

4    A.    Sure.

5    Q.    Okay.  So you are aware that he never left the

6    Dallas/Fort Worth area, correct?

7    A.    Yes.

8    Q.    Okay.  You're not aware that he has ever

9    physically harmed anybody, are you?

10   A.    I'm not aware of it, no.

11   Q.    Okay.  And, in fact, he was in Dallas in his

12   home the day of the inauguration, which is when you

13   arrested him, correct?

14   A.    Yes.

15   Q.    Okay.  There was no indication that -- well,

16   you arrest him, I guess, four or five hours before

17   President Biden was inaugurated.

18   A.    Yes, sir.  Yes.  It was after 6 a.m.

19   Q.    There was no indication that he was planning on

20   hopping on a plane to go up to D.C. to --

21   A.    We did not have that, no.

22            MR. BRODEN:  Okay.  Can I have one second,

23   Your Honor?

24            That's all I have, Judge.

25            THE COURT:  Thank you.

```
 1              Any redirect?

 2              SPEAKER#4:

 3              MR. MAGLIOLO:  No redirect, Your Honor.

 4              THE COURT:  You may step down.

 5              THE WITNESS:  Thank you, ma'am.

 6              THE COURT:  Did the Government have any

 7  other witnesses?

 8              MR. MAGLIOLO:  No, Your Honor.

 9              THE COURT:  Do you have any other witness

10  that you wish to proffer?

11              MR. MAGLIOLO:  Only potentially in

12  rebuttal, Your Honor.

13              THE COURT:  Thank you.

14              MR. BRODEN:  Judge, first I have a proffer

15  from Mr. Miller, and then I've got a couple of

16  witnesses to call.

17              THE COURT:  A proffer from?

18              MR. BRODEN:  Mr. Miller.

19              THE COURT:  Okay.

20              MR. BRODEN:  Mr. Miller has prepared the

21  following proffer for the Court in lieu of testimony

22  and wanted me to express to this Court.

23              First:  He was in Washington, D.C., on

24  January 6th, 2021 because he believed he was

25  following the instructions of former President
```

63

1    Trump, who he viewed as his Commander in Chief.

2            Public statements from Trump and others

3    had him believing the election was stolen.

4    Nevertheless, he now recognizes the election is

5    over, and he fully understands that Biden is the

6    President of the United States.

7            He wants the Court to know that he

8    recognizes that Donald Trump is no longer president

9    following the swearing-in of President Biden and

10   would have no reason to follow the lead of Donald

11   Trump.

12           Second:  While he never intended to harm

13   Congresswoman Ocasio-Cortez or Senator Schumer nor

14   harm any members of the Capitol Police Force, he

15   realizes his social media posts were completely

16   inappropriate.  He wants to publically apologize to

17   Congresswoman Ocasio-Cortez, Senator Schumer and the

18   Capitol Police officers for his past social media

19   posts.

20           Third:  While not an excuse for his

21   actions on January 6th, Mr. Miller wanted me to

22   point out to the Court that he was, in fact, not

23   armed when he entered the Capitol, and he stayed in

24   the Capitol's Rotunda area, unlike others.

25           He left Washington, D.C., and started back

1  to Texas immediately after President Trump asked his

2  supporters to go home.

3          Until very recently, he has never been

4  very interested or involved in politics.  Recently,

5  combined with the loss of his job and really his

6  sense of purpose, what Donald Trump had been saying

7  about the election got to him, and he felt that he

8  had a need to support the then Commander in Chief.

9  He recognizes, however, that he, and he alone, are

10 responsible for his actions, and there are no

11 excuses.

12         He wants the Court to know he accepts

13 responsibility for his actions.  And towards that

14 end, he has directed me, as his attorney, to explore

15 Rule 40 possibilities with the prosecutors of the

16 District of Columbia.

17         He is also prepared to testify at any

18 trial or congressional proceeding.

19         He wants you to know he comes from a good

20 family, a supportive family; former Eagle Scout and

21 college graduate and has previously been a

22 law-abiding citizen.

23         He wanted me to assure the Court that if

24 it sees fit to release him today, he's going to live

25 with his parents, his third-party custodians, and

1  will abide by all conditions that will be set by the

2  Court.

3          Law enforcement is in possession of every

4  firearm he has owned.  And he's prepared to have his

5  travel restricted and to wear an ankle monitor to

6  track his movements per the fact that his movements

7  have been tracked for the last at least week prior

8  to his arrest.  And I think that portends what would

9  happen if the Court was to release him.

10         But, again, and most importantly, he asked

11 me to emphasize that he understands this election is

12 over.  Joe Biden is the President of the United

13 States, and he totally accepts that.

14         THE COURT:  Thank you.

15         MR. BRODEN:  Call Jason Miller.

16         THE COURT:  Mr. Miller.

17         Raise your right hand, please.

18         (Witness sworn.)

19         THE WITNESS:  I do, ma'am.

20         THE COURT:  Thank you.  Have a seat.

21         Pull that microphone close to your mask so

22 that we can all hear you.

23         THE WITNESS:  We'll do.

24

25

1                              **JASON MILLER,**

2      **having been first duly sworn, testified as follows:**

3                            **DIRECT EXAMINATION**

4      **BY MR. BRODEN:**

5      Q.    It's Jason Miller, correct?

6      A.    Correct, sir.

7      Q.    Tell the Court how you are related to Garret

8      Miller.

9      A.    I'm his older brother.

10     Q.    How many siblings in the family?

11     A.    Three, three brothers:  Garret, myself, and my

12     youngest brother, Logan.

13     Q.    So Garret is in the middle?

14     A.    Correct.

15     Q.    And have y'all been raised in the Dallas/Fort

16     Worth area?

17     A.    For the most part.

18     Q.    Okay.  What do you do for a living, sir?

19     A.    I'm a high school math teacher.

20     Q.    Okay.  I want to take you back to -- let's at

21     least go back to the summer of 2020.

22           Was your brother, Garret, at all political?

23     A.    No; no, sir.

24     Q.    Do you know whether he ever even voted?

25     A.    I'm not aware of him ever mentioning the fact

1  that he voted.

2  Q.   You ever have -- and we're talking about prior

3  to, let's say the summer of 2020, did you ever have

4  conversations about his support or his opposition to

5  particular candidates for public office?

6  A.   No, sir.

7  Q.   Okay.  At some point, did you see a change in

8  your brother?

9  A.   Yes.

10  Q.   Tell -- tell us about that.

11  A.   I think it started to happen gradually over

12  this past summer and -- the divisiveness in the

13  nation, the rioting, the violence, and he became

14  more political gradually.

15      It accelerated greatly after the election on

16  November 3rd, and the talk of the election being

17  stolen became prominent and --

18  Q.   You and I talked a little earlier, and I had

19  analogized former President Trump to a cult leader.

20      Why do you think that your brother was drawn in

21  by this cult leader?

22  A.   I think that it was a combination of the

23  statements that he made and just the social media,

24  the feedback loop.

25  Q.   The statements who made?

```
 1   A.    Trump made.   And the social media feedback
 2   loop, constantly seeing stories related to election
 3   fraud.   So feeling feelings of maybe fraud,
 4   dishonesty.
 5        And near that time he lost his job, and I don't
 6   think he had a lot of purpose.   He had more time on
 7   his hands to engage in that feedback loop.
 8   Q.    Did you get the -- the -- the impression that
 9   he was spending an excessive amount of time on
10   social media way beyond what he was prior to --
11   to -- to maybe the summer of 2020?
12   A.    Yes, sir.   I don't -- I don't follow him on
13   Twitter or Instagram really, so I wasn't aware of
14   the comments that were brought up earlier, but I am
15   a friend with him on Facebook.   So he was posting,
16   you know, dozens of pro-Trump mainly music videos,
17   music videos like rap videos in support of Trump.
18   Q.    Well, in fairness, I mean, he was posting a lot
19   more.   We've heard a lot of that today.
20   A.    Yes.
21   Q.    Okay.   What -- I mean, what -- and we talked
22   about it a little, but what do you think brought
23   about this change from somebody who might not have
24   even voted in several elections -- how old is he?
25   A.    He's 34, sir.
```

1   Q.   So doing the math, that's probably four or five

2   elections, I guess, presidential elections, at

3   least.

4        You talked about him losing his job and having

5   more time to spend on social media and Trump's

6   influence, but anything else do you think --

7   A.   I think he felt he was a part of something

8   larger, felt a sense of purpose.  He brought some

9   meaning.  He felt he was doing what was right.

10  Fully believed he felt he was doing what he thought

11  was right.  He believed in the cause.  And the --

12  the rallies he went to were exciting atmospheres

13  with lots of energy and purpose, and he was meeting

14  people who were all devoted to the same cause.

15  Q.   That's kind of how cults work.

16  A.   Yeah.

17  Q.   Did there come a time recently where you saw

18  the old Garret kind of come back at least a little

19  bit?

20  A.   Yes.  So we had -- Martin Luther King Jr. Day

21  off on Monday, the Monday previous to his arrest,

22  and so --

23  Q.   So that would have been the --

24  A.   The Sunday evening before Martin Luther King

25  Jr. Day.

1    Q.   So the 17th or 18th, around that time?  Okay.

2    A.   Yes.  So I had him over me and my wife's house

3    with another friend of ours, and we played board

4    games.  And he seemed -- we -- we hardly talked any

5    politics.  He laughed.  He played the game.  We had

6    a wonderful evening with one another.

7         He briefly mentioned that he had been banned

8    from all social media.  And I -- I said, "Well, how

9    do you feel about that?"

10        And he said, "I feel good about being -- you

11   know, about not being on it."

12   Q.   Did he say anything further, other than he felt

13   good or why he felt good?

14   A.   Not that I can recall.

15   Q.   But -- and in fairness, you tried to discourage

16   your brother from going up to Washington on

17   January 6th, correct?

18   A.   Correct.

19   Q.   Compare the brother that you tried to

20   discourage from going up to D.C. on January 6th --

21   or whenever he left to go up to D.C. -- and the

22   brother you saw on Martin Luther King day eve?

23   A.   He wasn't -- he didn't have a singular focus on

24   one thing.  He was able to have fun, interact with

25   other people in the real world, laugh.  And I'm just

1  thankful that I had that evening with him before

2  this happened.

3  Q.    Did he complain that day about the election

4  being stolen from President Trump or him being upset

5  that Joseph Biden was being sworn in as President?

6  A.    No.

7  Q.    Okay.  And then, just briefly, take us to your

8  brother before the summer of 2020.  You were telling

9  me a story about his wrestling coach's wife.

10  A.    Well, obviously, a lot of people have been

11  reaching out.  And his former wrestling coach

12  reached out to me and --

13  Q.    Is this high school or college?

14  A.    High school wrestling coach.  Garret was the

15  captain of the wrestling team.  And around this time

16  last year, in 2019, his wrestling coach's wife came

17  down with -- she had cancer, she was diagnosed with

18  cancer.  It was very serious.  They had medical

19  bills racking up, and he organized a fund-raiser for

20  Zane and his wife.

21  Q.    Zane is the wrestling coach?

22  A.    Yeah.  So he reached out to all of the

23  wrestlers from that team who are all over the

24  country, and organized a fundraise for Zane and his

25  wife.  I contributed, my parents contributed, and we

```
 1    took that money over on Christmas to Zane to cover
 2    their medical expenses.
 3         So, I mean, when you have something good to
 4    focus on, he's a good man.
 5    Q.   Do you know him to be a violent person?
 6    A.   No, sir.
 7    Q.   Have you known him to ever harm anybody?
 8    A.   No, sir.
 9              MR. BRODEN:  May I have one second, Judge?
10              THE COURT:  Yes.
11              MR. BRODEN:  No further questions, Judge.
12              THE COURT:  Thank you.
13              MR. MAGLIOLO:  Brief cross, Your Honor.
14              THE COURT:  Yes.
15                      CROSS-EXAMINATION
16    BY MR. MAGLIOLO:
17    Q.   Mr. Miller, thank you for being here.
18         We noticed during the hearing you had your head
19    down.  Why was that?
20    A.   I'm just sad.
21    Q.   Why are you sad?
22    A.   I'm sad to hear what -- the things that my
23    brother said.  I'm sad that we're in this situation.
24    And I'm worried about what's going to happen to him.
25    Q.   Are you surprised what you heard today?
```

```
 1   A.   Yes.
 2   Q.   Even though on Facebook you saw him becoming
 3   increasingly radical over the last six months?
 4   A.   Yes, I was -- but I was surprised to hear those
 5   comments, yes.
 6   Q.   Scary, weren't they?
 7   A.   If you know my brother, I -- I don't think he
 8   was serious.
 9   Q.   Surprised by the racially tinged language he
10   used when he was talking about that officer?
11   A.   Well, there's not a racist bone in my brother's
12   body.  The third person who lives in that house that
13   was raided is another person who was on his
14   wrestling team, Sterling, another African-American.
15        Previous to that, our godfather, Ron Coxsom
16   (phonetic), an African-American person, lived with
17   us.
18        He's not a racist man.  I think he was
19   traumatized by the killing of Ashli Babbitt, and he
20   said things that he didn't mean in conversation --
21   in online conversations and public conversations
22   with people.
23   Q.   And yet, he said them again and again and
24   again.  He raised race again and again and again,
25   didn't he; isn't that correct?
```

```
1    A.    Apparently that's the case.  I was not privy to
2    those -- those private conversations online.
3    Q.    Do you know who owns the house that your
4    brother lives in?
5    A.    Yes.
6    Q.    Who?
7    A.    I own it, yes.
8    Q.    Did you know he kept guns in the house?
9    A.    I did.
10   Q.    How did your brother lose his job?
11   A.    I'm not quite sure about the circumstances.
12   There was the issue of him getting time off to go to
13   my wedding.  He was having some other issues.  He
14   works in a factory, where there's a lot of plastic
15   particles, and he had had some issues being able to
16   wear an M-95 mask and had some lung problems
17   associated with what he was breathing in in the
18   factory.  Worked there many years.  I'm not sure of
19   the exact circumstances, but I've heard things like
20   that alluded to.  But I know around -- around
21   Thanksgiving is when he lost his job.
22   Q.    Okay.  Just to be clear.  Are you proposing to
23   be the third-party custodian for your brother, or
24   are your parents proposing that?
25   A.    My parents.
```

```
 1   Q.   Last question.  You mentioned you saw your
 2   brother on the Sunday before he was arrested,
 3   correct?
 4   A.   Correct.
 5   Q.   And you thought something had changed, right?
 6   A.   (Witness nods head.)
 7   Q.   But on the Wednesday, he was arrested a few
 8   days later, he's still wearing a shirt promoting
 9   having been at that rally that day, wasn't he?
10   A.   Yes.
11           MR. MAGLIOLO:  No further questions, Your
12   Honor.
13           MR. BRODEN:  Nothing further from Jason
14   Miller, Judge.
15           THE COURT:  Thank you very much.
16           THE WITNESS:  Thank you.  Thank you,
17   ma'am.
18           MR. BRODEN:  Call Phil Miller.
19           THE COURT:  Mr. Miller.
20           (Witness sworn.)
21           THE WITNESS:  Yes, ma'am.
22           THE COURT:  Thank you.
23           Please have a seat.
24
25
```

1          **PHIL MILLER,**

2     **having been first duly sworn, testified as follows:**

3                    **DIRECT EXAMINATION**

4     **BY MR. BRODEN:**

5     Q.   Mr. Miller, first tell us how you are related

6     to Garret Miller.

7     A.   Garret is my middle son.

8     Q.   And your wife is also with us here today?

9     A.   She is.

10    Q.   Just a little less loud.

11    A.   I'm sorry.  Am I overwhelming the microphone?

12    Q.   Give us a little bit of your background.

13    A.   I'm 70 years of age.  I'm retired.  I spent

14    many years in the data and telecommunications

15    business, building infrastructure for law firms,

16    Fulbright & Jaworski, a lot of Fortune 500

17    companies, as well as K to 12 and higher education,

18    University of Texas-Dallas, North Texas State, Texas

19    Women's University, UT Arlington.  So we did a lot

20    of work with K to 12 and higher ed, as well as City

21    and Municipal Government.

22    Q.   Do you have military experience?

23    A.   I was in the United States Navy.  I was -- I

24    spent one year in active reserve -- or active

25    reserve and two years on active duty reserve

1  stationed out of San Diego, California.
2  Q.   And did you do any tours, or -- or was
3  (inaudible) to Vietnam in the Vietnam War?
4  A.   I'm sorry, I'm having trouble hearing you,
5  please.
6  Q.   That's my fault.
7       Were you in Vietnam at some point during the
8  Vietnam War?
9  A.   We did a couple what they called Kitty cruises,
10 90-day line periods over in the combat zones.  We
11 were subchasers.  We were an antisubmarine squadron.
12 So we would go temporary duty onto like
13 USS Ticonderoga or even back as far as USS Ross;
14 very, very old vessels.
15      So I did two tours in combat in the combat
16 zone, yes.
17 Q.   And I don't want to belabor the points in the
18 questions I asked your son, but you were present in
19 court where a lot of the postings on social media
20 from Garret were read.
21 A.   Could you please -- just a little bit louder.
22 I'm having trouble hearing you.
23 Q.   You were present in court when several numerous
24 social media posts that your son made were read out
25 loud, correct?

```
1    A.    I heard today the vast majority of posts.

2    Q.    Okay.

3    A.    Prior to today, I had only seen one or two.

4    Q.    And it's fair to say you don't support any of

5    that.

6    A.    Absolutely not.

7    Q.    Okay.

8    A.    No.  This is so out of character.  It's just

9    unbelievable that this has occurred.

10   Q.    Posts are repulsive.

11   A.    And several aspects beyond that, yes.

12   Q.    Okay.  You -- well, first of all -- and we

13   heard this a little bit from your son.  Your son

14   currently lives in your older son's house that he is

15   renting to Garret, Garret's younger brother, Logan,

16   and their wrestling friend; is that correct?

17   A.    Yes, that's correct.

18   Q.    And where do you live, sir?

19   A.    I live on the --

20   Q.    You don't need to give us your exact address,

21   but what town?

22   A.    I'm on west side of Central about three miles

23   from their home.

24   Q.    Is that in Richardson or Dallas?

25   A.    It's in Richardson.
```

```
 1   Q.    And it's just you and your wife?
 2   A.    My wife and I, and occasionally my
 3   mother-in-law, who is 97.  We take care of her on
 4   and off, between our residence and her residence, in
 5   East Texas.
 6   Q.    Okay.
 7   A.    Been there 25, 26 years; same home.
 8   Q.    You and I discussed to a fair degree you
 9   willing to be a third-party custodian for your son.
10   A.    Absolutely.
11   Q.    And I've tried to the best of my ability to try
12   to explain what that meant to you; that he would
13   have to live in your house.
14   A.    Yes, sir.
15   Q.    I don't speak for the job, but I'm sure there
16   would probably be home monitoring, where he couldn't
17   leave the house.
18   A.    Correct.
19   Q.    But the most important thing is as third-party
20   custodian -- and it's easier said than done -- but
21   if he violated the conditions -- and I'm sure he
22   wouldn't be allowed on social media.  If he violated
23   the conditions, you, sir, it would be your
24   obligation, you would swear an oath to it, in fact,
25   that you would bring that to the attention of the
```

80

1   officials, whether it be his Pretrial Services

2   Office, the Court, the U.S. Attorney's Office, that

3   would be on you.

4   A.   Yes.  We are fully prepared to accept any Court

5   directive or responsibility or charge the Court may

6   seem fit.

7   Q.   So, for example -- and this is just an example,

8   but if he wasn't allowed on a computer and one day

9   you walked in and saw him on Facebook or even

10  playing video games on a computer console, are you

11  willing --

12  A.   If that was the direction of the Court that

13  he's prohibited from that, then he would be reported

14  immediately.

15  Q.   Any doubt in your mind that you and your wife

16  can handle that?

17  A.   No, sir, there is no doubt in my mind.

18          MR. BRODEN:  That's all I have, Judge.

19          THE COURT:  Thank you.

20          THE WITNESS:  Are you through?

21          THE COURT:  No.

22          MR. MAGLIOLO:  Just a minute, Your Honor.

23  I want to play something in a moment that's set up.

24          (Audio played.)

25

81

## CROSS-EXAMINATION

**BY MR. MAGLIOLO:**

Q.   Mr. Miller, you -- you love your son very much, don't you?

A.   Absolutely, yes, sir.

Q.   I imagine you've done a lot for him over the course of raising him.

A.   I'm sorry, sir, I couldn't hear you.

Q.   I'm sorry.  It's tough to read lips with a mask on.

    You've done a great deal to help him along the way, correct?

A.   Absolutely.

Q.   You'd do anything to help him.  You'd do anything for your son.

A.   Yes, including providing some guidance if he should be allowed to remain here.

Q.   You mentioned that maybe you use social media yourself?

A.   I do not.

Q.   But you -- please, go ahead.

A.   Yeah.  As far as my participation in online technology is basically my e-mail account and searching solutions to repair cars or information off of Google, buying products.  That's about it.

```
 1   Q.   Okay.  I thought -- I thought you mentioned
 2   that you did see some of these posts previously,
 3   right?
 4   A.   I did.  They didn't come off my computer, they
 5   actually came from a news broadcast that I saw on
 6   one of the cell phones.
 7   Q.   Okay.  So you mean you've seen the posts only
 8   since your son has been arrested.
 9   A.   I did see that, yes.
10   Q.   Are you aware of if your wife uses social
11   media, is friends with him there?
12   A.   I would say probably Facebook.  I don't know
13   that she has any other connections on social media.
14   Q.   Were you-all aware of any of the things he
15   posted on Facebook through her account?
16   A.   Like I say, the only ones I saw were perhaps
17   pictures.  I didn't see any of the narratives until
18   just recently, which was broadcast on the
19   television.
20   Q.   Were you aware that he was becoming
21   increasingly radicalized over the last six months?
22   A.   I felt like there was a problem that was going
23   to be an overwhelming problem at some point in time,
24   because he was angry.  It was so out of character.
25   We had tried to counsel him, to get him advice.  And
```

83

```
1    from time to time, it just wasn't working for us.
2    He had made a decision that he was going to go up,
3    and that's what he did.
4    Q.   And he did it on a number of occasions, not
5    just on the 6th, right?
6    A.   I apologize.  I'm having trouble hearing.
7    Q.   I'm sorry.  So your son went to pro-Trump
8    events prior to January 6th, correct?
9    A.   Yes.
10   Q.   And then he also went up on the 6th.
11   A.   To my knowledge, yes.
12   Q.   Okay.  And there were times when you attempted
13   to counsel him, tell him not to do that sort of
14   thing.  Is that what I understand correctly?
15   A.   It was our best advice not to make any of those
16   trips, quite frankly.
17   Q.   He wouldn't take your advice?
18   A.   He would listen.  And when he made up his mind,
19   he would go.
20   Q.   So fair to say he wouldn't follow your advice?
21   A.   Most of the time, yeah.  And that has changed
22   since probably just after the 6th.  He's had an
23   opportunity to talk with some of my other friends
24   and family members that have influenced his
25   decision, for instance, not to go back on the 20th,
```

1    quite frankly.

2    Q.    Okay.  But his activity certainly didn't stop

3    online after January 6th, as you heard from today?

4    A.    After what I heard today, it did not stop on

5    the 6th, that's correct.

6    Q.    Okay.  And you propose to be a third-party

7    custodian for your son, correct?

8    A.    Yes, sir.

9    Q.    Understanding that you've got make him follow

10   the law or you've got to turn him in, correct?

11   A.    Absolutely.

12   Q.    You've spoken with your son this past week when

13   he was in jail, haven't you?

14   A.    I have a couple of times by telephone, and then

15   one video conference from the Johnson County -- I

16   believe the Johnson County facility.

17   Q.    Okay.  I would like to play for you a

18   recording, just a part of the call that you and your

19   wife had with your son last Wednesday.

20         (Recording played.)

21   Q.    (By Mr. Magliolo)  That was your voice, wasn't

22   it, sir?

23   A.    I'm sorry?

24   Q.    That was your voice on that recording?

25   A.    It was.

1  Q.   At some point during what we heard, your son

2  indicated he gave you something, and you told him

3  the call was being recorded.

4       What did he give you?

5  A.   I'm having a hard time understanding you.  I'm

6  sorry.

7  Q.   On that recording --

8  A.   Yes.

9  Q.   -- you heard your son say, as you heard last

10  week, he said, "Good thing I gave you -- never

11  mind."

12       Right?

13  A.   Yes.  And what is this in reference to?

14  Q.   Yes.  What did he give you?

15  A.   I don't recall.  What day was this supposed to

16  have occurred?

17  Q.   This was last Wednesday.

18  A.   Okay.  He gave me nothing on Wednesday.  He was

19  in custody of the FBI.

20  Q.   He said during that phone call, "I gave you --

21  never mind."

22       And you said in response, "Everything's being

23  recorded."

24       So you were concerned about what he gave you,

25  weren't you?

1  A.    I'm not sure I understand the question, sir.

2  Q.    You're telling the Court you don't remember

3  what your son was talking about last Wednesday, five

4  days ago?

5  A.    Last Wednesday?

6  Q.    When he talked to you on the phone --

7  A.    I thought I talked to him on Thursday, to be

8  perfectly honest.

9  Q.    During that call that you just heard, you're

10  telling the Court you don't remember what you told

11  him not to talk about on a recorded call.  Is that

12  right?

13  A.    I don't remember the subject matter, no.  Maybe

14  I'm just misunderstanding the question, I don't

15  know.

16  Q.    Do you want me to replay it?

17  A.    I don't think it's necessary.  I just don't

18  know the basis of your question.  If it's Wednesday

19  that we had the conversation, I don't think we

20  talked on the Wednesday.  I think we talked on

21  Thursday.

22  Q.    Okay.  Let's say that call happened on

23  Thursday.

24  A.    Yes, sir.

25  Q.    Fine.  When your son on that call said, "Good

87

1    thing I gave you -- never mind," you responded that
2    the call was being recorded.
3         What it is that your son gave you?
4    A.   I don't remember, quite frankly.
5    Q.   Was it something illegal?
6    A.   Oh, certainly it wouldn't have been illegal,
7    because I wouldn't have accepted anything illegal.
8    Q.   Why wouldn't you be able to talk about it on a
9    recorded phone call?
10   A.   I think that's just good legal advice, is you
11   don't talk on a recorded line, period.
12   Q.   Well, you talked at great length on that
13   recorded call.
14   A.   Yes, we did.
15   Q.   But there were things you were unwilling to
16   talk about, like what it was your son gave you that
17   you won't tell the Court about, right?
18   A.   I don't know.  It certainly wasn't illegal, if
19   he gave me something.
20   Q.   Did your son give you so many things that you
21   forget about them?
22   A.   No.
23   Q.   Well, then, what -- all right.
24        Let's move on to the social media passwords.
25        Why did you ask your son for his social media

1    passwords?

2    A.    Because it was my understanding that his

3    accounts were suspended.  And if after that

4    suspended period, they came back active, that they

5    should ultimately be closed.  And we would not be

6    able to do that without having the passwords for

7    that.

8    Q.    Did you get the passwords for those accounts?

9    A.    I don't think we did completely, but you would

10   have to ask my wife, because I didn't take any

11   additional information on passwords.

12   Q.    Are you aware that your wife obtained passwords

13   from Mr. Broden for these accounts?

14   A.    One more time, please?

15   Q.    Are you aware that your wife obtained these

16   passwords to the social media accounts that you

17   asked for?

18   A.    Was I aware that she was?

19   Q.    Did she get passwords to his social media

20   accounts?

21   A.    I'm not sure.  You will have to ask her.

22   Q.    We will.

23         Are you aware it is a crime to destroy

24   evidence?

25   A.    I'm certainly aware of that, yes.

```
 1   Q.   And certainly it was your intent to go to his
 2   social media accounts and close them down, correct?
 3   That's what you just said.
 4   A.   Not for that same justification that you are
 5   implying.
 6   Q.   But you wanted them to go away all the same,
 7   didn't you?
 8   A.   I wanted them not to be in the public domain,
 9   period.  Once those posts were put online, I don't
10   see how our interfering with the closing of the
11   accounts would have any -- have any bearing
12   whatsoever on what's already been posted.
13         MR. MAGLIOLO:  I have no further
14   questions, Your Honor.
15         MR. BRODEN:  Just a little redirect.
16              REDIRECT EXAMINATION
17   BY MR. BRODEN:
18   Q.   Sir, is it fair to say that your family talked
19   to other attorneys before they talked to me?
20   A.   Is it fair?
21   Q.   In other words, when your son was arrested,
22   y'all got advice from different lawyers before you
23   talked to me.
24   A.   Yes, sir.
25   Q.   I never told you anything about getting
```

1  passwords, did I?

2  A.    No.

3  Q.    I've never given you passwords, have I?

4  A.    No, sir.

5          MR. BRODEN:  That's all I have, Judge.

6          MR. MAGLIOLO:  Nothing further, Your

7  Honor.

8          THE COURT:  Thank you for being here.  You

9  can step down.

10         THE WITNESS:  Is there some confusion with

11  my testimony that has caused an uproar?

12         THE COURT:  I'm not confused.

13         THE WITNESS:  Okay.

14         (Pause.)

15         MR. BRODEN:  I'm sorry, Judge, are you

16  waiting for me?

17         THE COURT:  If you're ready.

18         MR. BRODEN:  We rest.

19         THE COURT:  Thank you very much.

20         MR. BRODEN:  Actually, Judge, let me just

21  say one thing as a proffer.  I never got any

22  passwords from anybody, and I resent the implication

23  that I might have.

24         THE COURT:  Do you have any rebuttal

25  evidence that you're going to put on?

1          MR. MAGLIOLO:  Nothing further, Your

2     Honor.

3          THE COURT:  All right.  Are you just going

4     to argue?

5          MR. MAGLIOLO:  Yes, Your Honor.

6          THE COURT:  All right.

7          MR. MAGLIOLO:  Your Honor, it's the

8     Government's position that not only does Mr. Miller

9     deserve to be detained, but that he is a domestic

10    terrorist.

11         On January 6th, we all witnessed one of

12    the worst days in this nation's history, when

13    Mr. Miller and his cohorts had the goal of nothing

14    less than undermining a free and fair election.

15         And I and almost everyone else who watched

16    that coverage that day was disgusted, infuriated,

17    angered, wondering how we could possibly get here.

18    Mr. Miller had a different reaction, and that is he

19    couldn't have been prouder.  He was bragging online

20    to almost anyone else who would listen.  "It was

21    beautiful."  He used that term over and over again.

22         He talked about storming the Capitol,

23    himself.  When someone suggested, "It might have

24    been ANTIFA," he said, "Absolutely not, it was me."

25    He couldn't possibly let someone else take the

1    credit for this event for which he was so deeply

2    proud.  He was so proud of it, that on inauguration

3    day he was wearing a shirt demonstrating that he was

4    there on January 6th.  That is not the action of a

5    man showing remorse, which has I suppose occurred in

6    the last 72 hours.

7            And on top of that, Your Honor, Mr. Miller

8    made threat after threat online to a congresswoman,

9    to a senator, and to a Capitol Police officer.

10           I'd like to talk about, before I get to

11   danger to the community, I would like to talk about

12   the possibility of destruction of evidence and the

13   flight risk and, frankly, the incapacity of his

14   parents to be suitable third-party custodians.

15           We saw a van that was outfitted with a

16   bed, looks like it has a heater, a sleeping bag, a

17   rolling armory, rope, a grappling hook.  He also

18   said that he was ready to potentially lay low.  And

19   so that's very concerning in terms of the

20   possibility of him fleeing.

21           But the reason his parents also can't be

22   third-party custodians is because of my concern

23   about the destruction of evidence.

24           Mr. Miller's father got up on the stand

25   and somehow managed to forget what he talked to his

1    son about just a few days ago.  What item did he

2    give him?  Well, we don't know yet, but I promise we

3    will be investigating.

4            We could not get straight answers as to

5    what his son gave him for the purpose of asking for

6    the social media passwords.  And the only reasonable

7    inference and, frankly, he just as much admitted it,

8    was to close those accounts down.  And that would

9    have the effect of keeping that evidence from the

10   Government, evidence which is crucial to our case,

11   given that a lot of this activity took place online.

12           As a result, in addition to being a danger

13   to the community, he is a flight risk, and he is a

14   danger to obstruct justice by destroying evidence,

15   including with his proposed third-party custodians.

16           In terms of danger to the community,

17   again, what is so striking in contrast to this claim

18   of jailhouse conversion that happened in the last

19   few days, where he purportedly felt remorse, well,

20   on that tape from just less than a week ago, there

21   wasn't a stitch of remorse.  "I don't know why I'm

22   in here.  I don't think I did anything wrong."

23   Those aren't the actions or the words of somebody

24   who had remorse.

25           You don't have remorse that on

1   January 20th you're wearing a shirt demonstrating

2   your participation in one of the worst days in

3   American history.  He would not stop bragging about

4   it.  He wanted better pictures of that event.  This

5   is a week after the event.  He wasn't feeling

6   remorse.

7           What I think he feels remorse for is being

8   caught, Your Honor.  But he has not demonstrated any

9   genuine remorse in terms of the activities that he

10  was involved in on January 6th or before or after.

11          Now, I detailed the threats against the

12  congresswoman and the senator.  The most troubling

13  set to me is when he's talking about the Capitol

14  Police officer.  He talked about this

15  African-American man, and he talked about using a

16  rope to hang him, and he talked about it again and

17  again and again.

18          And I don't need to remind the Court of

19  what a horrific history this country has when it

20  comes to extrajudicial killings of African-Americans

21  with ropes.  That's what makes his fixation and

22  determination to do that so dangerous.

23          Now, Mr. Broden's presentation comes down

24  to, this is a lot of hyperbole.  What we have seen

25  is this activity (inaudible) turning into action in

1   the real world.

2          Mr. Miller was talking online about

3   attending these sorts of things, and then he did it.

4   He said, "Chuck Schumer, we're coming for you," and

5   then he did it.

6          In November he says, "We're coming for

7   you."  On January 6th, he comes to the building

8   where he is.  And that's exactly where Congresswoman

9   Ocasio-Cortez was, as well.

10         So this is not just a person talking

11  online, this is a person who is putting a plan

12  together and putting it into action.  He's got this

13  armory of weapons, including one we believe to be

14  illegally possessed, which is a felony.  He's got

15  rifles, a shotgun, many of which were in a van ready

16  to go at 6 a.m. with him, wearing magazines in a

17  jacket, along with a mouthpiece.

18         Now, the notion that by a simple tweet

19  from -- or a simple message from President Trump --

20  and Mr. Miller has finally come around -- again,

21  there is no evidence to suggest there's any truth to

22  that whatsoever.

23         After that message came out, he continued

24  talking online, he continued talking about killing

25  that Capitol Police officer.  And none of the

factors that apparently animated his ascent into
this radicalism have changed.  He doesn't have a
job.  He hasn't indicated that he thinks the
election wasn't stolen.

All of these factors are still here.  so
What are we meant to do?  Do we have wait until he
actually makes good on one of these threats before
they detain him?  What happens if another political
leader gets on TV and says, "This was stolen," or,
"That was stolen."  Are we meant to think he's not
going to follow them, too?

Your Honor, Mr. Miller is a domestic
terrorist, and he is exceedingly dangerous.

Please, please detain this man.

MR. BRODEN:  Your Honor, this is a tough
case.  And it lends itself to making arguments like
my colleague from the U.S. Attorney's Office made,
because the tweets and the Facebook posts and the
actions in Congress, in the Capitol, work extremely
troubling, and that is an understatement.

But the one thing we have that perhaps the
people that stormed the Congress doesn't, is we
believe in the rule of law, and that's what guides
us today is the rule of law.  And even though they
weren't doing that in the Capitol Building, we've

97

1    got to do that today.

2            And there are certain standards the

3    Government has to meet, as they should, in order to

4    detain somebody.  You know, I want to talk briefly

5    and then go into specifics.

6            They talk about him and his cohorts.  So

7    when you talk about cohorts, I think we need to

8    start looking at what happened -- to treat people

9    similarly and fairly, what happened to the other

10   protestors who were arrested.

11           Mr. Miller stayed in the -- and the FBI

12   has absolutely no evidence to the contrary, and it

13   was proffered evidenced that wasn't rebutted.  He

14   stayed in the Rotunda.  He decided that he wasn't

15   (inaudible) there to -- to -- to get Senator

16   Schumer.  I understand what that sounds like to the

17   media.  But there were plenty of opportunities for

18   him to go to Senator Schumer's office.  We all saw

19   the pictures of the guy sitting in Pelosi's office.

20           So this notion that he was in Washington

21   to carry out the threat that was made back in

22   November.  As I said, it's a good sound bite, but

23   we're dealing with common sense in the rule of law,

24   and that's obviously not the case.  And that's

25   certainly not to defend his actions.

1          But when you talk about him and his

2    cohorts, and most of his cohorts being released on

3    conditions, Judge Cureton released somebody who was

4    actually in the halls of Congress with Zip Ties on

5    conditions of release.

6          The individual that stole representative

7    Pelosi's computer and was threatening to sell it to

8    the Russians was issued -- was granted release.  So

9    I think when we talk about cohorts and we talk --

10   you know, when we talk about sentencing, we talk

11   about disparity, I think disparity also needs to

12   apply in these cases when you have this type of

13   group we're dealing with.

14         And one of the things the Court should

15   look at, too, is the guidelines for these cases.

16   Counts 1 and 2 are misdemeanors.  Guidelines for

17   Count 1 is -- with acceptance of responsibility, is

18   offense level 4.  Number 2 doesn't have a guideline,

19   but it's a six-mandatory maximum sentence.

20         Count 3, the guideline is with acceptance

21   of responsibility and offense level of 12.

22         Count 5, it's an offense level of 10 with

23   acceptance of responsibility.  And there is no

24   guideline for -- Count 4.  I say "counts," but the

25   various allegations alleged in the criminal

99

```
1    complaint.

2              So we also have that to deal with.  And

3    I'm not -- you know, I think that's something that

4    the Court needs to take into account.

5              So let's look at whether the Government

6    has proven by clear and convincing evidence that he

7    is a danger to the community.  As I said, we do have

8    to follow the rule of law, and that is the burden

9    placed upon the Government.

10             There is no indication that he has harmed

11   anybody.  We know for a fact that when he came back

12   here on the 6th, or at least as of the 13th when

13   they had him under surveillance, he never left the

14   North Texas area.  I mean, if he was going to do

15   something, the inauguration date would have been the

16   time to do something, and he was laying in his bed

17   with his Trump concert T-shirt on.

18             There is no indication that he's a danger

19   to the community.  What he did was repulsive.  The

20   comments he made were repulsive.  But the Government

21   has not shown by clear and convincing evidence that

22   he's a danger to the community.  It doesn't sound

23   like Senator Schumer took the threat seriously.

24   Doesn't sound like representative Ocasio-Cortez took

25   the threat seriously, never reported to the FBI that
```

1    we know about.

2            Again, I couldn't come close to defending

3    the comments.  But whether he is -- whether the

4    Government has proven by clear and convincing

5    evidence that he's a danger to the community and

6    trying to scare the Court in that he may go out and

7    do something in the future, we know he was sitting

8    at home for the last seven or eight days.

9            You know, you can take what you want from

10   his brother's testimony.  It seemed very credible to

11   me that he has seen a change in his brother.  But be

12   that as it may, it's borne out by the evidence.  He

13   hadn't done anything since the 13th.  Since his

14   social media was shut down, he's been sitting at

15   home.  I mean, he sits behind that computer and

16   feels like a big man and tweets.  It's easy to do,

17   but there are conditions that are obviously set to

18   avoid that happening.

19           But the question is, he's a danger to the

20   community or an individual person.  And that, again,

21   is proof by clear and convincing evidence.  And the

22   Government has not met that standard in the sense

23   that the Court can set no conditions.

24           The Court can put him on electronic

25   monitoring.  The Court can have his father as his

1    third-party custodian.  And I don't know what to

2    make of that exchange between the prosecutor and

3    Mr. Miller's father regarding the passwords.  Again,

4    I didn't tell him to get the passwords.  Whether

5    some lawyer did and was telling his son that -- and

6    I think everybody knows now that just because you

7    take Facebook down or Twitter down, those things

8    don't disappear.  So this idea that the lawyer --

9    whatever lawyer he was talking to was scheming to

10   destroy evidence, again, it sort of makes a nice

11   argument, but there's no proof of that.  But we're

12   in the business of proof, and we're in the business

13   of rule law.

14          So you can set conditions where his father

15   is a third-party custodian.  I'm sure if you're not

16   satisfied with the father, his brother would be

17   willing to be a third-party custodian.

18          And as far as the flight risk, there is no

19   evidence that he is a flight risk.  He's the guy who

20   stupidly posted the pictures of him in the Capitol

21   basically saying come and get me.  He's there when

22   they come.  I mean, it's reported in the news over

23   and over again that the FBI was coming.  And they

24   were -- as soon as they identified people, they were

25   coming to get them.  And yet he's -- the FBI has him

```
 1    under surveillance, and he's just puttering around
 2    North Texas.  So there's absolutely no evidence that
 3    he's a flight risk.
 4            So I would submit if we do follow the rule
 5    of law and we follow the -- the precedence, you
 6    know, of how other similarly-situated -- or,
 7    actually, not similarly-situated, because they're
 8    there stealing computers, and they're there are in
 9    Congress -- in the Halls of Congress or in Congress
10    people's offices -- that the Court can fashion --
11    and they will be rigorous, and I would suggest along
12    the line that Judge Cureton set for the person who
13    was actually in the Hall of Congress, but conditions
14    can be set; onerous conditions, albeit, but
15    conditions can be set to secure his appearance and
16    to ensure the safety to the community.
17            THE COURT:  Thank you.
18            Anything further?
19            MR. MAGLIOLO:  I would just add, Your
20    Honor, that I believe the majority of the people who
21    have been left out on conditions, when it comes to
22    Capitol riots, have been charged solely with
23    misdemeanors, including the person in Fort Worth who
24    Judge Cureton let out, while Mr. Miller has been
25    charged by complaint with two felonies and another
```

1   investigation is ongoing to him.  So the notion that

2   he is similarly situated to those individuals, I

3   think, is completely wrong.

4           THE COURT:  All right.  Thank you.

5           The Court has before it the question of

6   the Defendant's detention pending his trial.  At the

7   beginning of this hearing, the Defendant waived his

8   preliminary hearing, and the Court found that there

9   is probable cause to believe that he committed the

10  offenses charged in the complaint.

11          Those offenses include:  Conduct that

12  occurred on January 6th arising out of the -- his

13  entry into the Capitol Building and then also a

14  violation of 18 United States Code Section 875(c),

15  which would be threats.  And as I understand the

16  complaint, those threats continued after the

17  Defendant had returned to Texas.

18          As defense counsel noted, this is a tough

19  case, and the Court intends to follow the rule of

20  law.  And so the question, the issue for the Court,

21  is whether there are any conditions or combinations

22  of conditions that will reasonably assure the

23  Defendant's appearance is required and the safety of

24  the community and any other person.  This is a

25  particularized inquiry specific to the Defendant and

1   the facts that are before this Court.

2          While there is some appeal to making sure

3   everyone is treated the same, I want to be clear

4   that this decision is based on the evidence related

5   to this case.  And I'm not trying to -- I don't want

6   to be unfair.  But I think, as I will explain, the

7   reasons why I'm coming to a different decision than

8   Judge Cureton did, is that I'm dealing with a

9   different defendant, different charges, different

10  behavior.

11         The burden is on the Government to prove

12  by a preponderance of the evidence that the

13  Defendant is not a flight risk and by clear and

14  convincing evidence that he's not a danger to the

15  community.  Based on all the evidence in front of

16  me, I find that the Government has met its burden,

17  first with respect to flight.

18         The evidence before the Court shows that

19  the Defendant is -- if he was not aware prior to

20  today, he is certainly aware now that he faces some

21  counts that have significant penalties and that he

22  is under investigation, perhaps, additional felony

23  counts that carry significant jail time.

24         He has made statements that perhaps he

25  should be difficult to find.  And he certainly had

1  means in the form of his van, which was outfitted to
2  be able to be off the radar.
3          I don't find that conditions such as
4  electronic monitoring or third-party custodian would
5  adequately guard against that.  The statements of
6  the Defendant about being hard to find suggest, at
7  least by a preponderance of the evidence, that he
8  would be willing to cut off a location monitor.
9          And his third-party custodian, while the
10  Court appreciates very much the support that his
11  family has shown today, his family was of little
12  influence to him before, when they were aware -- at
13  least tangentially by their own admission -- that he
14  was spiraling down this rabbit hole.  They were not
15  able to stop him.  And the phone call that was
16  played in court gives me a lot of concern that the
17  Defendant has not fully embraced the severity of
18  what he's facing and would not cooperate and appear.
19          With respect to danger, the nature and
20  circumstances of the offense and the intrusion into
21  the Capitol is only part of what we're looking at.
22  The threats that the Defendant made, specifically
23  the threats to the Capitol Police officer, are very
24  serious and pose a very high risk of danger to the
25  community and to people in particular, specifically

1    Capitol Police officers.  And threats, specific

2    threats against law enforcement are taken very

3    seriously.  And the Government proved by clear and

4    convincing evidence that you are a danger.

5            Mr. Broden made the point that you were at

6    home when you were arrested after Inauguration Day.

7    The Court shutters to think what would have happened

8    if someone had been able to identify for you exactly

9    who that police officer was, because I think the

10   evidence before me is clear and convincing that you

11   were hunting a Capitol Police officer, a law

12   enforcement officer, and you were prepared to commit

13   Capitol murder that you were going to assassinate.

14   So that threat is very serious.

15           I don't see any remorse.  I accept your

16   attorney's proffer but your own words, after you had

17   been arrested that were played in this court, cause

18   me to doubt that you have either been forthcoming

19   with your lawyer or that you were completely

20   forthcoming in that statement.

21           Again, I don't find that conditions can be

22   set to adequately offset this threat.  The pictures

23   that were admitted into evidence show that you had

24   numerous firearms.  And even if I prohibited you

25   from having a firearm, it's clear that you are armed

1    in other ways; that you had cross-bows, that you had
2    knives, that you had ropes; and specifically with
3    respect to the threat against the Capitol Police
4    officer, that you intended to murder him by hanging
5    him with a rope.
6              I'm not commenting on politics at all.
7    This has nothing to do with your First Amendment.
8    This has nothing to do on which side of the aisle or
9    who you may have supported in the last election.
10   This has everything to do with the Court's ability
11   to determine whether there are conditions that could
12   be set that will assure that you will show up for
13   your appearance in front of the D.C. Court and
14   whether you will be a danger pending your trial.
15             I find there are no conditions, that the
16   Government met its burden, and for all those reasons
17   you will be detained.
18             Mr. Broden, is there anything further?
19             MR. BRODEN:  Your Honor, it's been a while
20   since I have done a Rule 40.  I remember -- and
21   maybe I'm wrong -- that the Court can order that he
22   be kept here for a little while so we can explore
23   those opportunities.
24             THE COURT:  I believe he -- that is not
25   something I believe the Court gets involved in.

1   Perhaps that is a question more appropriately

2   directed to the prosecutor.

3           MR. MAGLIOLO:  I can't speak to the

4   logistics right now, Your Honor, though I'm happy to

5   speak with Mr. Broaden after this hearing to explore

6   the possibility one way or the other.

7           THE COURT:  I don't know when his next

8   appearance is.  I don't know when he is scheduled to

9   appear in D.C.  And the Court is not involved in

10  coordinating the transfer to that court, but perhaps

11  somebody in the U.S. Attorney's Office can assist

12  with that.

13          MR. BRODEN:  That's all we have, Judge.

14          THE COURT:  Anything further from the

15  Government?

16          MR. MAGLIOLO:  No, Your Honor.

17          THE COURT:  Thank you very much.

18          We are adjourned.

19          (Court in recess.)

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2          I, Shawnie Archuleta, CCR/CRR, certify

 3     that the foregoing is a transcript from the record

 4     of the proceedings in the foregoing entitled matter.

 5          I further certify that the transcript fees

 6     format comply with those prescribed by the Court and

 7     the Judicial Conference of the United States.

 8          This 8th day of March 2021.

 9

10

11                         s/Shawnie Archuleta
                           Shawnie Archuleta CCR No. 7533
12                         Official Court Reporter
                           The Northern District of Texas
13                         Dallas Division

14

15

16     My CSR license expires:  December 31, 2021

17     Business address:  1100 Commerce Street
                          Dallas, TX  75242
18     Telephone Number:  214.753.2747

19

20

21

22

23

24

25
```

# ATTACHMENT B

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | Case No. 3:21-mj-00052-BN *SEALED* |
| | § | Other Dist. Docket No. 1:21-mj-117 |
| v. | § | Charge Pending: |
| | § | U.S. District Court |
| GARRET  MILLER  (1) | § | District of Columbia |

### REPORT OF PROCEEDINGS UNDER RULES 5(c)(3) and 5.1
### AND ORDER ENTERED THEREON

The defendant is charged in the above-referenced district with the offense of 18 U.S.C. 1752(a)(1), (2)- Knowingly Entering or Remaining in any Restricted Buildings or Grounds Without Lawful Authority. Having been arrested in this district on a warrant issued on that/those charge(s), he/she appeared before me for proceedings as follows:

**Rule 5(c)(3)**      **Transfer**

   ☑    The government has produced a copy of the warrant, and

   ☑    The Court finds that the person before the Court is the defendant named in the indictment, information or warrant because:

       ☑    The defendant waived identity hearing.

       ☐    An identity hearing was conducted, and the defendant's identity was established.

   ☐    The Court finds, based on the evidence presented during an identity hearing, that the person before the Court is **NOT** the defendant named in the indictment, information or warrant.

**Rule 5.1:**      **Preliminary Hearing**

   ☐    No preliminary hearing is necessary because the defendant is charged by indictment.

   ☑    The defendant waived a preliminary hearing.

   ☐    The defendant elected to have a preliminary hearing in the district where the prosecution is pending.

   ☐    The defendant elected to have a preliminary hearing in this district, and based on the evidence presented during the hearing, the Court finds that:

       ☐    There is probable cause to believe that the defendant committed the offense(s) charged.

       ☐    There is NOT probable cause to believe that the defendant committed the offense(s) charged.

**Rule 5(d)(3)**      **Detention Hearing**

   ☐    No detention hearing is necessary because the government did not move to detain the defendant.

   ☐    The defendant waived a detention hearing.

□      The defendant elected to have a detention hearing in the district where the prosecution is pending.

      The defendant elected to have a detention hearing in this district, and based on the evidence presented during the hearing, the Court finds that:

         ☑      The defendant should be detained.

         □      The defendant should be released on bond.

---

### ORDER ENTERED ON THE FOREGOING REPORT

TO:  UNITED STATES MARSHAL

☑      You are commanded to transfer the above-named defendant forthwith to the district in which he/she is charged and there deliver him/her to the United States Marshal for that district or to some other officer authorized to receive him/her.

□      It is ORDERED that this defendant be released from custody on bond pending further proceedings.

□      It is ORDERED that this defendant be discharged.

DATE: January 25, 2021.

(Use Other Side for Return)                    United States Magistrate Judge

# ATTACHMENT C

7:26

**Home**
January 18, 2020  4:55 PM

Edit





7:26

← Home
January 18, 2020  12:13 PM
Edit







# ATTACHMENT D

Date: 3/16/21

From: Zane Stapp

To:  The Honorable Carl J. Nichols
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Subj: Garret A Miller

Honorable Judge Carl J. Nichols,

My name is Zane Stapp and I have spent 26 years as a teacher, coach, assistant principal, and
principal working in the public schools in the states of Oklahoma and Texas. It is through my
work as wrestling coach at Richardson High School that I met Garret Miller. While on my team
Garrett had an extreme work ethic, and wrestling was a natural fit for Garret. Combined with the
fact that Garret was of high character, a leader both in the classroom and in the wrestling room, I
named him as a captain his senior season. Garett was always helping the younger wrestlers feel
part of the team and was eager to share his wrestling knowledge with other team members. He
would help encourage his teammates when they lost and was like having an extra assistant coach.
He was one of the best team captains I ever had.

Through Garret wrestling for me I became lifelong friends with the entire Miller family. This
friendship includes Garret to this day. So much so that when my wife and I briefly moved to a
small town north of DFW I reached out to Garret and his brother Jason. They let my son Westin,
who was in community college in Dallas at the time, live with both Garret and Jason. Garret and
I share a love for many sports and frequently would call each other and hang out like old friends.
I am closer to Garret than any other student I have coached or taught in my career. So, I have
known Garrett well for over 20 years and consider Garett family.

To say that I was shocked, horrified, and even sick to my stomach when I found out that Garret
was accused of the charges that lie before you would be accurate. I could not believe it when my
wife called me into the bedroom to watch the news. I had to ask myself how in God's name
could this happen. I have many thoughts on that, but that is not what this letter is about. I would
like to tell you a story of why this is so unbelievable to me. In 2019 my wife was diagnosed with
metastatic breast cancer. I shared the news with Garret. Garett found out that I was reffing extra
wrestling matches to try to pay all her medical bills. On Christmas Eve 2019 Garret called me
and said,"Hey coach what are you doing?" I told him I am just pulling into my church for
service. He asked me if he could meet me after the service. So he met me and gave me $800 and
said he wanted to help pay for some of my wife's medical bills. It was not a loan, I did not ask
for it, but it was a gift from a kind and generous friend. I have many more stories I could share,
but this one means the most to me. Especially now that my wife recently passed away.

While Garret was at one of his detention locations in Texas I was able to talk to Garett on the phone. I knew I could not ask Garret about the case or what was true and what was not true from what little facts I knew. I will share two stories he told me of his time in DC that week. He shared with me the story of a homeless Jewish man he met while in Washington DC. He shared that the man was calling Jesus by a lot of different names. He also shared that he bought the man a hot dog lunch because he wanted to help him. He also shared that while in the capital an elderly woman was knocked to the ground and was in danger of being trampled. Garret quickly helped her to her feet so this did not happen. Garret was an Eagle Scout as I am sure others have shared with you. Even in that moment he had not lost the ability to know the right thing to do.

As I mentioned Garret and I were able to talk several times while he was in detention. I was always glad to take his calls. I was quite surprised with how Garret was spending his time. He was doing Bible reading, making cross necklaces and rings out of trash, and trying to run and exercise as much as was allowed. The exercise part was not the surprise, but focusing on bettering himself with Bible reading and making cross necklaces and rings with recycled materials fascinated me. He truly was making the most of a bad situation.

In closing, I know that he was detained originally because the Judge here in Dallas felt he was either a flight risk or a danger to others. I guess from someone who does not know Garret as I do, this might be a natural conclusion. I know that Garret Miller is still a man of character and has great remorse for his actions and words. Here is a quote from his previous trial I read online, "When it was time for Miller's defense, his lawyer began reading a prepared statement in which Miller said he was following the orders of former President Donald Trump and apologized to AOC and Capitol police, saying he takes responsibility for his actions. His lawyer pointing out there's no evidence Miller was violent or armed at the Capitol." I know he is ready to face the charges before your court and determine what he did or did not do. I also know that he is not a danger to anyone. Many people say things online and have no intention of doing what is said. In fact, my experience is that is the case for most people it is just rhetoric. Also, just because he had a van he was capable of living out of does not make him a flight risk. Garret will show up and face the charges before you. I thank you for taking the time to read my letter. I hope it helps you better understand who Garret Miller really is.


Sincerely,


Zane Stapp

17 March 2021

From: Barbara L. Miller

To: The Honorable Carl J. Nichols

U.S. District Court for the District of Columbia

E. Barrett Prettyman U.S. Courthouse

333 Constitution Avenue, NW

Washington, DC  20001

Subj: Garret A. Miller

Honorable Judge Carl J. Nichols,

I am Barbara Miller, Garret's step aunt. I founded a lactation practice in Houston in 2011 and have been an IBCLC for nearly 30 years. I also serve in my church as Primary President for children ages 18 months to 11 years old. In our blended family, my husband and I have 9 children, 29 grandchildren and 6 greatgrandchildren. In the community, I also work with a group who support recovery from addictions.

I married Garret's Uncle Tim in April 2002 and met Garret at our wedding when he was around 15 years old. I learned that he was a typical active teen who loved Scouting and wrestling. Over the past 19 years, we have seen each other many summers at Miller Family Reunions and sometimes throughout the year as we visited in Dallas or they came to Houston. I have ALWAYS been impressed with Garret's dedication to his family. Even as a young adult and through this past year, he has been present at all of the reunions. That is not really a priority for many young adults but it was to Garret. He loved reconnecting with aunts and uncles and cousins and helping with anything that was needed. At home, as his grandmother has aged (97 year old now), I know he has assisted with her care on an almost daily basis, including lifting her out of her chair and into the car and has done it out of love with no complaints. I have never seen or even heard of him being violent in any way or unkind to people. On the contrary, he has lived a life of service through his work in scouting and in helping with a dog care business.

Knowing Garret and his love and devotion to his family, I am certain that he will abide by any guidelines or restrictions placed on him by the court so that he does not jeopardize his family connection. There is no danger of any violence now any more so than there was in the past. He has told me that he did not participate in any violence at the Capital and I believe him as he has always been truthful to me and I have never heard otherwise about him. He did share that he had used threatening words on social media but I do not believe they were direct threats that he intended to act on, only him blowing off steam about a situation he had seen get out of hand. He has shared his remorse with me about his choice of words and totally understands now the error in his ways on that. I don't expect he will ever do that kind of thing again.

I've known a lot of young adults and have worked with many who have made mistakes and corrected their course. I believe Garret followed a course set by our then president and later learned that his choices were misguided. Knowing his heart and his love for his family, I can say without any doubt that he would not be any danger in the community and additionally that he would always follow the exact guidelines or requirements made for him by the court.

Respectfully,

Barbara L. Miller

Date: March 17, 2021

From: Judy Kingkaysone

To:  The Honorable Carl J. Nichols
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Subj: Garret A. Miller

Honorable Judge Carl J. Nichols,

I am Garret Miller's sister-in-law through marriage to his elder brother Jason Miller. I have known Garret for four years and lived in quarantine with him and his brother in the spring and summer of 2020.

I remember the first time that I met Garret Miller. I was over at the house that Garret shared with his brother Jason to play board games and in walks a guy wearing a sling. It was Garret. He had dislocated his shoulder skate boarding with a Doberman Pinscher. He had the injury because his concern for the dog was greater than his concern for himself. And, that is Garret in a nutshell.

Garret is kind and responsible. When my parents' elderly dog used to make messes in the house, Garret would clean up after her before I had even discovered her accidents.  When the new house that I had bought needed new flooring, he was there to help make it livable without me even asking him to help. When Jason needed help moving a fridge into our new home, he was there to help carry the refrigerator without question or any expectations. Whenever our families have mingled, Garret has always sought out my mother, conversed with her in her broken English and never once made her feel like she was lesser or different for not having perfect English; my parents were refugees from war-torn Laos. In fact, he so charmed my mother at my wedding to his brother that she could not help but send him off with large quantities of food at the end of our wedding reception, my mother's method of showing love.

Garret is honorable. When playing video games or board games with Garret, he will spot, call out, and put a halt to any forms of cheating nor does he like to play the role of the villain. I remember this fact one night while we were playing the board game Shadows Over Camelot. One can play the game using the character of the Evil Knight, who is secretly placed at random in the game. The first time that we tried to play the game with this evil knight option, Garret got the evil knight card and wanted us to reshuffle the cards and pass out roles again because he didn't want to be the antagonist in the story; I remember us laughing at him.

Garret is quiet. He speaks when he feels passionate about a topic. Thus, his sudden support of former President Trump beginning in the summer of 2020 was a surprise to everyone because Garret had never discussed politics in any capacity before the summer of 2020. To be honest, Garret's political leanings were also of great disappointment to me because I have and will always be a liberal. Having stated this, I do believe, though, that Garret regrets his actions on January 6, 2021 and his support of the former president.

As someone who has encountered people from most parts of the country and all over the world through her work as a collegiate or high school instructor in California, Pennsylvania, and Texas and as a current world history teacher, I can safely say that Garret is one of the more moral and honorable souls that I have met in my travels and through my studies. Garret is not a flight risk and not a danger to the community. In fact, he is a rule follower who took one very wrong and out-of-character turn. He will follow any rules that are laid out for him and so will his family. Keep in mind that I was not born into the Miller family. I chose to be a part of this family, after 30-some odd years of being single, because those qualities of kindness, honesty, and responsibility are qualities that I see not just in my husband and Garret but also in the people who helped to shape them into the people that they are.

Respectfully,

Judy Kingkaysone
Sister-in-law to Garret Miller

Date: March 18, 2021

From: Ryan Griffin
312 W 8th Street
Dallas, TX 75208

To: The Honorable Carl J. Nichols
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

   Re: Garret A Miller

Dear Judge Nichols,

I am writing to convey my belief that Garret Miller is not a flight risk and does not pose a danger
to the community.  I am an attorney in Dallas, Texas.  My practice is focused on patent and
technology-related litigation.  I have known Garret since the 1994-1995 school year when I met
his brother as a sophomore at Richardson High School in Richardson, Texas.  Garret's brother,
Jason, was one of my best friends in high school, a roommate for several years in college, and a
groomsman in my wedding.  He remains one of my good friends.

I have read the complaint charging Garret with crimes related to his presence in the Capitol on
January 6 and posts he made on social media.  Although I do not condone Garret's acts, I do not
believe he poses a danger to the community or is a flight risk.  My belief is based on my
interactions and observations of Garret over the past twenty-five years. I recall Garret as a
teenager giving his time to help others as a boy scout; I recall Garret in his 20s helping deliver
furniture to a family friend struggling with addiction and other personal problems; and I recall
Garret as a man in his 30s warmly welcoming me and my children into his home to share an
afternoon meal.  I have never felt threatened by Garret, and I am not aware of any instances in
the past twenty-five years where Garret acted with intent to harm any other person.

My belief that Garret is not a flight risk and poses no danger to the community is based, above
all, on Garret's love for his family.  I have always known the Millers to be a close, loving family.
I am confident that Garret understands the pain and hardship this matter has caused his family.  I
cannot imagine that Garret would put his family through the additional suffering that would
come from violating the terms of his release.

Thank you for your consideration.

Warm regards,

Ryan Griffin

March 17, 2021

From: Mary Buechner

To: The Honorable Carl J. Nichols
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Subject: Garret A. Miller

Honorable Judge Carl J. Nichols

My name is Mary Buechner. I am Garret's first cousin. I am a Registered Nurse working in Michigan.

I have known Garret his whole life. Although we live very far away from each other, our family has managed to have reunions every couple of years where multiple generations come together to enjoy each other's company and keep the family close. We usually find someplace to camp and I just want to mention that having a camping and or hunting vehicle is something that the Miller's commonly have. Most of the other family members also have similar vehicles. I don't believe that Garret's van was specifically outfitted for him to "hide out in". It is my understanding that this was a father-son project that he and his Dad have been working on. I also don't believe he would be a flight risk. He wouldn't put his family through that.

I would like to point out that the Garret I know, was once thinking of becoming a nurse. Because I am a nurse, we had many conversations about the job and why he was interested in this career. He has always shown such compassion for people and animals alike. It is very hard for me to believe that Garret would actually hurt anyone.

Unfortunately, we are living in a very politically charged environment right now and I feel like Garret got caught up in the chaos of the moment. Did he do something dumb? Absolutely. Is he prone to actual physical violence? I have never seen it.

I know you will give careful consideration to Garret's situation. Deep down I know that he regrets his actions and if given the chance, will prove that he is a better man than the one that went to the Capitol building that fateful day.


Respectfully,

Mary Buechner

Date: 03/18/2021

From: Mary Miller

To:  The Honorable Carl J. Nichols
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Subj: Garret A Miller

    Honorable Judge Carl J. Nichols

    I am Garret's Mom. I worked 36 years at Texas Instruments and 9 years at Luxottica
Retail, which makes prescription glasses. I am currently retired and the full-time caregiver for
my 97 year mom, Jane Norman.

I know Moms do not usually carry much weight in these matters so I will just say the following:

Garret is remorseful.
Garret will comply with all rules given to him by the court.
If you decide to let him stay with us until trial, he will help me care for my mom and get
counseling.
With permission from the court, we will get his broken shoulder treated.

Garret would never do anything to get my husband or myself in trouble. I can guarantee that he
be at his trial and take responsibility for his actions.

Respectfully,
Garret's Mom
Mary Miller

Date: March 18, 2021

From: Michael Edelstone

To: The Honorable Carl J. Nichols
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Subj: Garret A Miller

    Honorable Judge Carl J. Nichols

Thank you for considering my opinion regarding my friend, Garret Miller.

My name is Michael Edelstone. I'm 42 years old and I'm a professional software designer based in central Texas. I've lived here since 2005 and have known Garret and the Miller family for nearly that entire time. A big part of my job is observing human behavior and thinking holistically about the people I serve. So, while I was stunned to learn about Garret's recent actions, I'm confident they are not at all representative of his true character or what he will accomplish with his life in the future.

I've known Garret for nearly 15 years, as his brother Jason is my oldest and closest friend in the world. Garret is a hard-working, outgoing, and family-oriented sort of person. He is not involved with organized political groups or clubs of any type, and he has a very supportive, intact family who are all active in his life. I am certain he does not pose a risk to our community or any of our elected officials, and I have no doubt he will meet the expectations of the court and will promptly appear for any trial proceedings. He is genuinely contrite and prepared to face the consequences of his actions. I would stake my entire reputation on that, and if there's anything I can personally do to assist the court, I am happy to help.

2020 was a uniquely challenging and polarizing year for our country. Social isolation due to the pandemic caused a lot of problems for Garret and I believe his passion for justice briefly channeled itself into an expression of grief and resentment that wasn't typical or healthy. I've never known Garret or either of his brothers to be interested in political activism or protest; for the most part they are a normal, middle-class family with extensive roots in the Dallas area.

Your honor, I'm deeply sad for the Miller family and I hope you'll find them capable to have Garret back in their home soon, so we can begin to heal and prepare for this next phase of his life.

Respectfully,

Michael Edelstone

Date: 03/16/2021

From: Timothy H. Miller

To: The Honorable Carl J. Nichols
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Subj: Garret A Miller

Honorable Judge Carl J. Nichols

I am an uncle of Garret A Miller. His father is my younger brother. I served as a firefighter in the city of St. Petersburg, Florida but transitioned into computer programming from which I retired in 2012. As a father I also had the opportunity to serve as a volunteer leader in the Boy Scouts of America. I earned my Wood Badge leadership training and served as a Scout Master at times. I served in the U.S. Naval Reserves from 1965 to 1971 on the Destroyer USS Robert A. Owens, DD827 from September 1965 to September 1967. I was discharged with an Honorable Discharge.

I have known Garret his entire life. He was very active in his Troop in Richardson, Texas. I did not live close to my brother during Garret's younger years as I was raising my family in Florida. However, I was fortunate to relocate to Texas before Garret completed his Eagle Scout award and recognition. He was also active in his high school wrestling team. He and his father participated in many scouting activities and service projects.

I believe that Garret will comply with all guidelines and restrictions that the court may require as the court considers his detention appeal. I believe that Garret still lives by the words "On my honor I will do my best to do my duty to God and my country and to obey the Scout Laws". He may have had his compass deviated by a President's words, but now recognizes the truth in those words. "On my honor….".

What occurred at the Capital during the counting of the Electorial College was not patriotic, and should never have occurred. Much has been said about President Trump's role in provoking the tragic events of January 6, 2021. I believe that Garret was over zealous in participating in the riot. That macho verbosity continued upon returning to his home town. I do not believe Garret is an actual threat to anyone but that his words were transmitted to impress his other young friends who were likewise caught up in the hysteria of Trump's "we have won by a landside" hype.

Respectfully,

Timothy H Miller

17 March 2021

The Honorable Carl J. Nichols
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Re: Garret A Miller

Honorable Judge Carl J. Nichols:

My name is Marvin Benford Woolverton Jr. I reside in Kaufman County, Texas, and am a retired agriculture and farm equipment salesperson.  Currently, my wife and I own and operate Triple Cross Ranches which is a sanctuary for abused and neglected horses.  We also raise hay and beef cattle.

Garret A. Miller is my own nephew and I have known him all of his life.  He participated for many years in the Boy Scouts of America and attained the honorable recognition of Eagle Scout. He has lived with my sister and brother-in-law, his parents, in Richardson, Texas, for many years where he finished high school and attended nursing school.

It is my belief that Garret has established roots in Richardson, Texas, values his family relationship with his parents and is not a flight risk.  It is also my belief that Garret is apologetic for his recent actions and wants to make it right by service to his community.  As an Eagle Scout, honesty and integrity are key factors in Garret's personality and life.  He assists with the care of my mother who is Garret's 97-year old grandmother which, most importantly, allows her to still reside in her own home safely.

Further, it is my belief that Garret will comply with the court's guidelines and restrictions as the court considers his detention appeal.

Thank you for your consideration in this matter.

Respectfully submitted,

*Marvin B. Woolverton Jr.*

Marvin B. Woolverton, Jr.
PO Box 177
Kaufman, TX  75142
214.384.3554
bwoolverton@sbcglobal.net

17 March 2021

The Honorable Carl J. Nichols
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Re: Garret A Miller

Honorable Judge Carl J. Nichols:

    My name is Carrie Anne Wilson-Woolverton. I reside in Kaufman County, Texas, and am a paralegal and rancher. Currently, my husband and I own and operate Triple Cross Ranches which is a sanctuary for abused and neglected horses. We also raise hay and beef cattle.

    Garret A. Miller is my nephew and I have known him for 15 years. He participated for many years in the Boy Scouts of America and attained the honorable recognition of Eagle Scout. Because my brother is also an Eagle Scout, I know firsthand the dedication and commitment it takes to achieve that award. Garret committed much time and attention to the difficult details of the Eagle Scout achievement. He has lived with my sister-in-law and brother-in-law, his parents, in Richardson, Texas, for many years where he finished high school and attended nursing school.

    It is my belief that Garret has established roots in Richardson, Texas, values his family relationship with his parents and is not a flight risk. It is also my belief that Garret is apologetic for his recent actions and wants to make it right by service to his community. As an Eagle Scout, honesty and integrity are key factors in Garret's personality and life. He assists with the care of my mother-in-law who is Garret's 97-year old grandmother which, most importantly, allows her to still reside in her own home safely.

    Further, it is my belief that Garret will comply with the court's guidelines and restrictions as the court considers his detention appeal.

    Thank you for your consideration in this matter.

Respectfully submitted,

Carrie Anne Wilson-Woolverton
PO Box 177
Kaufman, TX  75142
214.498.7304
Honeycrek2@aol.com

Date: 3/17/2021

From: Jason Miller

To:  The Honorable Carl J. Nichols
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Subj: Garret A Miller

    Honorable Judge Carl J. Nichols,

I write to you on behalf and in support of Garret Miller, my younger brother and friend.  I have
spent most of my adult life as a high school teacher at public and charter schools as far flung as
Harlem but primarily in the Dallas area. Over the course of my career, I'd like to think I've
learned a thing or two about character.  It is my sincere belief that Garret, to his core, is of good
character.  I do not believe he poses a flight risk, nor do I believe he presents a danger to the
community.

Garret is a *gentle man* -- a protector by nature.  If he sees someone in need or distress, he helps
them.  There are countless once-stranded motorists and people living on the street that could
attest to this if given the chance.  It goes without saying that he's always been there for us and for
his friends.  But it's this kindness towards strangers that has always stuck with me.  So many of
us think we're too busy to help, or try to convince ourselves that it wouldn't do any good.
Garret's never allowed himself to do that; he's never become blind or numb to the suffering he
sees around him.

Before I got married, we were housemates.  He spent almost all of his free time dancing, taking
care of dogs, and skateboarding.  I don't remember him ever bringing up politics.  I know he
regrets saying the things he said online, and I understand how some might find them shocking
when viewed in isolation.  I also know I would not want to be judged based on the worst things
I've thought or said, nor do I believe many among us would come away unscathed under such
scrutiny.  This was an uncharacteristic moment in Garret's life.  If you had spent the time that I
have with him, I truly believe you would come away with the same conclusion.

My wife Judy and I are willing to act as third party custodians for the state.  We pledge to uphold
and comply with any conditions set forth, and promise to report any violations to the U.S
Probation Office should they occur.  Thank you for allowing me the opportunity to give a
broader view of Garret, and thank you for your consideration.

Respectfully,

Jason Miller

Date: 3/18/2021

From: Michael J. Reisinger

To:  The Honorable Carl J. Nichols
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Subj: Garret A Miller

   Honorable Judge Carl J. Nichols

   I would like to give you a little information about my background. My education in college
and graduate school was in physics. My career was in university teaching -physics- and 25 years
in the oil and gas industry with Schlumberger. Since retiring besides spending time with my 5
children and 18 grandchildren, I am involved with several organizations; my local Catholic
church, Boy Scouts – 39 years, and Living for Zachary.  I teach a variety classes for AARP.
American Heart, Boy Scouts, and ECSI – Emergency Care Safety Institute. I have receive the
Silver Beaver in Scouting, 100 classes taught for AARP, several awards from the Knights of
Columbus. After retiring I worked 8 summers at the Philmont Scout Ranch in NM as a manager
in the Logistics Department – where Garret was employed one summer.

   I have known Garret and his family for about 20 years. He along with his brother and father
were members of the same Boy Scout Troop 1001 as I was. Garret advanced through the ranks
achieving the highest rank,Eagle, which only 3-4 % of those starting the program achieve.
Garret worked hard to make it to the Eagle, including leading an excellent Eagle project. He was
a good scout for the 6 years in the troop following the Scout Oath and Law. I was one of
Garret's direct managers in the Logistics Department where he following all the rules and
procedures. He was always dependable and on time.

   I understand Garret had his van equipped for camping with him in Washington D.C. which
his father and him had convert for camping at the family hunting lease. I do not believe he
would be flight risk and/or a danger to the community if he would be released to stay with his
parents.  I believe he would follow the guidelines and restrictions the court would lay down for
his release.

   In closing, I believe I can say Garret would be a honor citizen while waiting for his trial in
court and would not be flight risk and/or danger to the community.

Respectfully,
Michael J. Reisinger

Richard L. Albright, Jr., D.D.S., M. Min., D. Min.

9065 Winterberry Drive

West Olive, Michigan 49460

To:  The Honorable Carl J. Nichols                              March 18,2021

U.S. District Court for the District of Columbia

E. Barrett Prettyman U.S. Courthouse

333 Constitution Avenue, NW

Washington, DC 20001

Subj: Garret A. Miller

Dear Honorable Judge Carl J. Nichols:

By way of introduction, I am Dr. Richard L. Albright, first cousin of Garret Miller.  I am a dentist (graduate of the University of Michigan School of Dentistry, with honors, Class of 1977.  Also, a member of Omicron Kappa Upsilon, Honorary Dental Society, awarded for graduating in the top 10% of my class), who values education, and has committed to a lifetime of service and learning.  My wife Marcia and I have helped lead and teach The Third Option classes at our local church for nearly 15 years.  The Third Option is a non-profit organization that offers an award-winning, ongoing skills-based program to help couples build better marriages.  This experience led me to seek additional training, resulting in a Master of Ministry Degree (summa cum laude) in Biblical Counseling, followed by a Doctor of Ministry Degree (summa cum laude) in Christian Counseling from Andersonville Theological Seminary in Camilla, Georgia. For the past 10 years, I have been the Administrator for a novel program in our church called Beyond Mentoring, which trains and supervises lay counselors, who work with individuals, in stressed marriages in order to improve the overall quality of that marriage.  Dr. John Gottman, perhaps the most accomplished marital researcher of our time, did a landmark study in 1999, and found that only 11-18% of those who participated in marriage counseling, saw lasting benefits to their marriages.  Yet, after 10 years, nearly 70% of the marriages that participated in Beyond Mentoring are still intact, and many are thriving.  Clearly, the counseling that has been provided is immensely effective, and our efforts have exceeded the rates of success typically seen in the mental health community-at-large.

Garret's father (Phillip Miller) and I are close in age, and we spent our early childhoods together as next door neighbors.  I have known Garret's mother (Cathy Miller) for more than 50 years.  Clearly, I know the family very well.  I understand their core values and fully grasp how they have raised their family. Garret has experienced an upbringing based upon moral and ethical standards which our society endorses and values. Garret participated with the Boy Scouts of America for many years, and achieved its highest honor, the rank of Eagle Scout.  This award is attained only infrequently in the scouting ranks.

Indeed, only those of the highest character, and the most dedicated and skilled, are able to become Eagle Scouts.  Though rare, this award is common in the backgrounds of many community leaders, successful business executives, and even among our country's astronauts.

Boy Scouts of America, by definition, is a value-based youth development organization, providing programs that build character.  The foundation of the scouting experience is reflected in the following three items:

1. Scout Oath: On my honor I will do my best to do my duty to God and my country and to obey the Scout Law, to help other people at all times, to keep myself physically strong, mentally awake, and morally straight.
2. Scout Law: A Scout is trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, friendly, brave, clean, and reverent.
3. Scout Mission: The mission of the Boy Scouts of America is to prepare young people to make moral and ethical choices over their lifetimes by instilling in them the values of the Scout Oath and the Scout Law.

Boy Scouts of America also emphasizes outdoor experiences, such as camping and hiking, and even provides Merit Badges to promote these activities.  The existence of an outfitted, family camping van is therefore consistent with Garret's upbringing and scouting experiences.  Indeed, I have been aware of the existence of this van, through the family network of communication, for several years.  Considering this set of facts, then, it is therefore more logical to see this van for what it is, a normal outgrowth of Garret's upbringing, than it is to believe that this is a hastily thrown together plot to do mischief, and then simply disappear.  The evidence, taken as a whole, does <u>not</u> support the idea that Garret is a flight risk.  In addition, the values acquired by Garret in his upbringing, and especially emphasized in his scouting experience, support the idea that Garret is not a danger to himself, or others.

The question may be asked, if Garret was raised with lofty values, and if he flourished in a program that subscribed to these values, what happened on January 6, 2021?  What would cause an upstanding, high-character young man, such as Garret Miller, to participate in the infiltration of the Capitol?  The answer is that he became a victim of the "mob mentality."  Mob mentality is defined in Wikipedia as a phenomenon in which "people can be influenced by their peers to adopt certain behaviors on a largely emotional, rather than rational, basis.  When individuals are affected by mob mentality, they make different decisions than they would have individually."

Neurologically, in the face of an activating event (the rally in Washington, D.C.), the amygdala in the limbic system of the brain, becomes activated.  We then experience an emotion.  Depending on the intensity and duration of the emotion, the rational, or thinking part of the brain (the neo-cortex) becomes dissociated, or excluded, from the decision-making process.  At this point, our degree of awareness evaporates, and we choose a behavior that has consequences.  This is what happened to Garret.  Because Garret did not understand the process that he was experiencing, and this experience was so foreign to his upbringing and previous life-experiences, he was ill-prepared to manage the emotional overwhelm that he experienced.

I believe that Garret needs counseling.  The sooner he is released from custody, the sooner he can begin to receive the treatment that he needs.  This will allow him to return to his status as an upstanding

member of our society.  With therapy and additional training, I believe it is reasonable to assume that Garret would not be found in this situation again.

<u>My proposal</u> is that upon Garret's release from custody, I be allowed by the Court to provide that counseling and training which he requires, in conjunction with his father who will serve as Garret's immediate source of accountability.  As the Court is aware, numerous on-line programs are available to assist in this process, many of which are nationally recognized by state and local courts.  Modern technology allows virtual counseling sessions to take place (especially important during the pandemic), and prevents physical distance from compromising the efficacy of treatment. Progress reports will be provided at the Court's discretion.

Finally, who is Garret Miller as a person?  He has focused on self-improvement during his time in custody, having read almost the entire Bible during that time.  He is contrite and remorseful for his activities on January 6.  I am told that during the time he was in Washington, D.C., Garret spent time feeding a homeless man and discussing the Bible with him.   Clearly, Garret is a compassionate young man who made a tragic mistake.  With counseling and proper training, Garret can overcome this mistake and be a valuable member of society.  I respectfully ask the Court to allow his release from custody, in order to commence this treatment as quickly as possible, and that I, Dr. Richard L. Albright, be allowed the opportunity to provide that treatment.

Respectfully,

Dr. Richard L. Albright

Date: 03/17/2021

From: Dustin Pham

To:  The Honorable Judge Carl J. Nichols
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Subj: Garret A Miller

     Honorable Judge Carl J. Nichols

     My name is Dustin Pham and I am a first generation Vietnamese American who
has known Garret Miller since the fourth grade. I joined the U.S. Army Reserve
while working on my nursing degree and subsequently found myself in Iraq as an
army medic. After Iraq, I finished my nursing degree and started playing video
games at least once a week with Garret. At first, we had to type everything during
gaming sessions but the technology advanced and we moved on to headsets and
microphones due to ease of use. We usually played video games in the afternoon or
evening times almost daily until my daughter was born this last year. The types of
games we played were not the typical games you would think a single adult male
would play. We didn't play the typical first-person shooters that you could find on
gaming consoles like Xbox or Playstation. We played real time strategy games like
Starcraft or role-playing games like Diablo. In between games or during loading
times we would have normal conversations which usually consisted of what was
going on during our day, video game strategy or even brainstorming ideas on how to
make money. At one point, we used to mountain bike on the trails in Dallas, but I
couldn't keep up. He taught me how to skateboard and I helped him walk his dogs
for his business. If I ever needed someone to watch my dog, I could just ask Garret.
If he wasn't spending time with his family, helping someone out or working, he
would be available. Garret Miller has been a long time friend of mine and I
understand that people can change but I truly believe that Garret is still the kid I
knew from next door as a child.

Thank you for taking the time to read and consider the comments in this letter.

Very respectfully,

Dustin Pham

Date: 03.18.2021

From: Tyler Morgan Knauss

To:  The Honorable Carl J. Nichols
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Subj: Garret A Miller

   Honorable Judge Carl J. Nichols

My name is Tyler Knauss. I have been a resident of Richardson, Texas all my life.  In the fall of 2009, I followed my dreams and moved to Lubbock, Texas and attended Texas Tech University. In May of 2015 I graduated with 2 Master's degrees (Master of Architecture) & (Master of Business Administration). I have since moved back to the Richardson area and now work at a large local Architecture firm.

I have known Garret Miller and his family for most of my life. I consider the Miller's as a second family.  Garret and I both went through Cub scouts and Boy Scouts together. Garret is 2 years older than his brother and I and we would look up to him as a guide. Even though we were not related by blood I always viewed Garret as an older brother. Garret was raised in a household where honor and integrity are the utmost importance in the foundations of their upbringing. Garret has two brothers, Logan Miller and Jason Miller. All four of us are Eagle Scouts in the Boy Scouts of America program.   Phil Miller (Garret's father) was a childhood mentor of mine, and one of the major lessons he would teach us that I feel is applicable to this letter today is "not running away from adversity even when it is a hard thing to do."  One story I think is a good example of Garret's character happened back at Philmont Scout Ranch in New Mexico. Garret was a camp guide and would assist scout groups. Unfortunately, when my group went out there, we were not assigned Garret as our camp leader.  However, not even being asked to meet up with us Garret hiked 20 miles (one way) to bring our group milk and cookies. He sat there and enjoyed them with us then after about an hour hiked the 20 miles back to base camp, all in one day. Garret went way out of his way to make us feel special and cared for.  Garret would literally climb a mountain to be there for his friends and family.  That's why I think Garret is not a risk for the courts while he awaits trial. To run away from the courts or to continue down the path that brought me here today to write you this letter would simply go against everything of who he is. Garret clearly went down a path that he should never have gone, but now he is just looking to get his life back on track, pay his dues to the courts and make us all proud of him again.  I personally support him in his integrity and honesty in complying with the court's guidelines and restrictions as the court considers his detention appeal. It would go against every value his family has taught him and raised him with to break the court's guidelines.  Garret's love for his friends and family and principles of his upbringing I believe are the major reasons why Garret can be trusted by the courts. It would simply go against everything who he is to break that trust.

The events that occurred in January have truly been heartbreaking for everyone involved. I know

Garret went down a rabbit hole that has gotten him in a bunch of trouble and has truly hurt not just the nation but his family as well. I know Garret will do right by his family and "not run away from adversity even when it is a hard thing to do."

I want to thank you for your time in reading my letter and considerations for Garret Miller.


Respectfully,

Tyler Morgan Knauss

From: Sterling Glass

Date: 03/17/2021

To: The Honorable Carl J. Nichols

U. S. District Court for the District of Columbia

E. Barrett Prettyman U. S. Courthouse

333 Constitution avenue, NW

Washington, D. C., 20001

Subj: Garret Miller

Honorable Judge Carl J. Nichols,

Hello Sir my name is Sterling Pierce Glass I am an Uber driver, amautar fighter and was a current roommate of Garret Miller during the time he was arrested. I am 32 years old and have been friends with Garret for 20 years. We met when I was 13 years old, enrolled in RHS's little league wrestling program. Garret was a few years older than me at the time. Since the first time we met Garret mentored and looked after me through the years and he is someone I look up to to this very day.

As I reach out to you sir my Intentions is not to argue his case. But to appeal to your empathy. by offering a testament to Garret's integrity of character. I understand that there are alot of negative allegations that have presented Garret in the worst case. I assure you that they're completely false. In the time I've known Garret has been very generous, Humble, patient and Hardworking.

He is super optimistic and very easy going. Everyone from all walks of life adores and loves Garret . From myself and my family to all of his previous roommates when he studied at TWU to the people he worked with and dated. Many of which were included myself were African American, or who were Latino and who were homosexual. Garret is someone who believed in treating everyone he met with respect and dignity. He is a god fearing man. He has made mistakes as we all have, but he has respect for the law. The greatest lesson he taught me was how to lead by example. Not by word but by simply being himself. This is why I know he won't be a flight risk. I know he wants to do the right thing.

Thank you for your time.
Takecare and Godbless.

Sterling Glass

From: Logan Miller

Date: 03/17/2021

To: The Honorable Carl J. Nichols

U. S. District Court for the District of Columbia

E. Barrett Prettyman U. S. Courthouse

333 Constitution avenue, NW

Washington, D. C., 20001

Subj: Garret Miller

Honorable Judge Carl J. Nichols,

My Name is Logan Miller, and Garret is my older brother. Throughout my life my brother has always represented himself as a person who goes out of his way to help others. He has a really big heart and he always puts my well being and others above his own. There were several times in my life where he has been a good role model. He's been there for me for nearly every move, new venture, and breakup I have ever had in my life. He would drop everything and come to help me even when I didn't deserve it. He did it out of the goodness of his heart and he believes it's his duty to help others. We both were in the same Boy Scout Troop and when I was 14. When I was getting bullied by some of the other boys and wanted to quit Scouts he was there for me. Well after he moved on from scouts and into his 20's, (and I was 17), I was more interested in girls cars and football, he encouraged me to see it through and to stay on the right path and finish. At 4 am on Jan. 20th I heard a knock, 15 seconds passed, and the door was busted down as I was mere feet from opening it. A tank was on our front lawn. When 15-20 heavily armed agents pointed Ar-15's at me in the middle of the night, again Garret exemplified his care for me. Garret walked, did not resist, and put himself between me and the soldiers fully complying. I remember thinking and later expressing to the Agents that there has to be a mistake. When I was handcuffed over the course of the next 2 hours, I briefly saw Garret being put into a transport and he again expressed concern for me, and I told him it will be alright.

Moving on to the present, and moving forward. One of the most telling things I can say about his recent phone calls with me, is that rather than complain about his situation, he is still looking out for me. He encourages me to go to Church, get on the right path, and keep trying to get a job and not give up. That is who Garret is, he worries for his friends and family above himself. He is not a flight risk simply because he is not selfish. He is not a danger simply because he is compassionate. He is not without fault, but he is contrite and looking to change. He is furthering himself from the online hoopla. Furthermore, what was said in anger does not exemplify his character. What was done on Jan 6th was wrong, and he intends to make penance

and is remorseful. If I could just appeal to you, that many young people often speak regretful things on social media, especially in these divisive times. And that of the many present that day, many were non-violent, but they all were swayed by the former President leading up to this. Please allow Garret to come home, and safely see this through. I tell you now, with absolute assurance, he will comply with everything he needs to do, as so ordered by you; Honorable Judge Nichols.

Respectfully,

*Logan Miller*

Logan Miller

From: Mahomed Rafeek

Date: 03/17/2021

To:     The Honorable Carl J. Nichols

        U. S. District Court for the District of Columbia

        E. Barrett Prettyman U. S. Courthouse

        333 Constitution avenue, NW

        Washington, D. C., 20001

Subj:   Garret Miller

        Honorable Judge Carl J. Nichols

        I am the owner of a car repair shop here in Dallas for over 20 years having started the business after leaving South Africa. After many years myself and my family have become United States Citizens and are proud to be American Citizens. The Miller family have been our friends for close to twenty years. Garret and my Son, Zaire, went to High School together and have been close to this day.

        Many times Garret would come to my shop with his Father to work on his old van. The van was given to him after sitting for about ten years and needed many repairs to even run again. The van took months to get running and together it became a project that we all worked on from time to time.

        Garret has been employed for over six or seven years working at a glasses factory here in Dallas every weekend Friday thru Monday on the 7 pm to 7 am shift. Not everyone could work that shift but Garret stuck it out. During the week days he would come with his Dad to help out in the garage. He is a very hard worker and often went out of his way to help me out.

        Garret's whole family and friends are in the area and he would never leave for any reason. He is not a flight risk nor any danger to anyone in the community. He will be responsible with any restrictions that you will require him to follow. I have found him to be very honest and trustworthy and would be an asset to his neighbors, family, and friends.

        Garret got caught up in the political social media that occurred during the election and understands now that many mistakes were made by many people. Some of his actions were influenced by former peers and Adults in his life at the time. He is sorry for all the pain and worry that he has caused to his family and would never do anything to make this situation worse.

Thank you,

Mahomed Rafeek

Date: March 17th, 2021

From: Casey Trout

To:  The Honorable Carl J. Nichols
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Subj: Garret A Miller

    Honorable Judge Carl J. Nichols

My name is Casey A. Trout. I am an assistant store manager for Ross Dress for Less. I am
writing this letter on behalf of Garret's character. I've known Garret a little over 2 years. In those
two year I've only know Garret to be a gentle and kind person. When I first met Garret he was in
the process of modifying his daily driver- a van  be able to be self sufficient and more
economically friendly. He  worked over nights so  he would rest in his van  by making
modifications he was able to save money when he traveled. When Garret wasn't working he was
watching dogs to earn additional income. For as long as I've know garret he has always been a
family person. Going often  to visit family. He's always been the type of person to help you if
you needed it no matter the cost. In the last two years that I've known him Garrett has never
disobeyed any type of government/police. He has a close family tie and has never gone too far
from them. Which would make him want to stay and not be a flight risk. Garret is a homebody
he enjoys making/fixing things. Garret has always ensured that I have gotten safe to wherever I
have gone or just making sure I've gotten home safely after our dog walk meets. He is
compassionate for others and has never shown any reason to be considered a danger to the
community as he always try to be a part of it.


    .

Respectfully,
Casey Ann Trout

To The HONORABLE CARL J. NICLS
US DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
E BARRETT PRETTYMAN U.S COURT HOUSE
333 CONSTITUTION AVE NW
WAShington DC 2001

Sub: GARRET A MILLER
HONORABLE Judge CARL J NICHOLS

I AM JEFF WOOLVERTON & GARRET
MILLER is my NEPHEW HE IS A EAGLE
SCOUT & HAS Always conducTed HIMSELF
IN A good & PROPER MANNER IN ALL The
YEARS THAT I have KNOWN HIM. I believe
THAT he & MANNY otHers WERE caught
up IN ALL THE FALSE NEWS THAT WAS
going on. I FEEL FEEL THAT IF he
hAD IT TO do OVER he would NOT
be INVOLVED IN All THIS MESS
     I believe THAT his PAST conduct
should EARN HIM A chance TO FUNCTION
IN SOCIETY IN A MANNER ThAT his PAST
conduct hAS Shown HIM TO be

               Sincerly
               Jeff Woolverton

3/16/21

Sheila Woolverton

To The Honorable Carl J. Nichols
   U.S. District Court for the District of Columbia
   E. Barrett Prettyman U.S. Courthouse
   333 Constitution Avenue. N.W.
   Washington D.C. 2001


   Subj: Garrett A Miller
   Honorable Judge Carl. J. Nichols


   My name is sheila Woolverton and my Husband
and I have Rent Property. Garett is my nephew
he is a good and honest person. He comes from
a good family. I believe that Garrett and a lot
of others just got caught up with what some of
the others was doing and it got out of hand
Garrett is a good person thats never been in trouble
and I think that should count for something

                              Sincerely
                              Shila Woolverton

# ATTACHMENT E

2021 WL 918255
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

UNITED STATES OF AMERICA,
v.
BURNO JOSEPH CUA, Defendant.

Criminal Action No. 21-107 (RDM)
|
Filed 03/10/2021

### MEMORANDUM OPINION AND ORDER

RANDOLPH D. MOSS United States District Judge

**\*1** This matter is before the Court on Defendant Bruno Joseph Cua's Emergency Motion for Release from Custody. Dkt. 11. Cua was arrested on February 5, 2021 for his role in events at the United States Capitol on January 6, 2021. He was ordered detained pending trial by Magistrate Judge Alan J. Baverman of the United States District Court for the Northern District of Georgia and now moves "for an order releasing him to the third-party custody of his parents," subject to certain conditions including location monitoring. *Id.*

For the reasons that follow, Cua's Emergency Motion for Release from Custody, *id.*, is **GRANTED**, subject to the conditions provided herein and in Attachment A to this Memorandum Opinion and Order. The Court will **STAY** Cua's release from custody, however, until March 16, 2021, the date proposed by Cua's counsel (consistent with CDC guidelines) in light of Cua's recent positive test for COVID-19.

### I. BACKGROUND

The following background is taken from the government's charging instruments, the parties' briefing, and the exhibits tendered to the Court thus far. It does not represent the Court's findings of fact on the merits of the case, which are the province of the jury.

On January 5, 2021, Bruno Joseph Cua ("Cua"), his mother Alise, and his father Joe, left Georgia for Washington D.C., to

protest the congressional certification of the 2020 presidential election results. Dkt. 12-1 at 52–53 (Ex. 1). After attending President Trump's speech at the Ellipse, Cua and his parents "walked over to the Capitol." *Id.* at 54. Cua then told his parents that "[h]e wanted to get a closer look," *id.* at 55, and asked his father's permission to climb the scaffolding affixed to the observation deck that had been constructed for President Biden's forthcoming inauguration, Dkt. 12-2 at 25 (Ex. 2). Cua's father said "okay," and Cua proceeded to climb the scaffolding and headed toward the Capitol building. *Id.*

Cua then breached the Capitol building, no later than 4:20 p.m. Dkt. 12 at 8 n.2. Upon entering the building, he marched through it carrying (and, at times, twirling) a black baton,[1] attempting to open doors to various rooms. *Id.* at 4, 14. Cua eventually made his way to the foyer of Senate Chamber. *Id.* at 4. There, he and a group of others shoved aside an officer guarding the entrance, and then entered the Senate Chamber. *Id.* at 8–13. Once inside, Cua sat "atop the Senate dais, in the chair previously occupied by former Vice President Mike Pence, with his feet up on [ ] the desk." *Id.* at 11. The government also alleges that Cua used "his cellphone to document the papers of the U.S. Senators present that day to certify the electoral college vote for the 2020 Presidential election." *Id.* at 4. Later that night, Cua and his parents drove back to Georgia. Dkt. 12-2 at 6 (Ex. 2) (J. Cua). On the car ride home, Cua told his parents that he had entered the Capitol building and indicated that he had been involved in "some pushing and shoving" against "a guy in a suit jacket or something." *Id.* at 7–8 (J. Cua).

**\*2** Roughly one month later, on February 5, 2021, Cua was arrested pursuant to a criminal complaint. During a search of his vehicle, home and person, law enforcement recovered three black batons, the physical appearance of which matched the one that Cua carried with him on January 6. Dkt. 12 at 16; Dkt. 12-1 at 10 (Ex. 1) (Buchanan). On February 10, 2021, Cua was indicted by a grand jury on twelve counts: civil disorder, in violation of 18 U.S.C. § 23*l*(a)(3); obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(l); entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(l) and (b)(l)(A); disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(l)(A); engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(l)(A);

entering and remaining on the floor of Congress, in violation of 40 U.S.C. § 5104(e)(2)(A); entering and remaining in the gallery of Congress, in violation of 40 U.S.C. § 5104(e)(2)(B); entering and remaining in certain rooms in the Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(C); disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D); an act of physical violence in the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(F); and parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).

The same day that he was indicted, Cua appeared before Magistrate Judge Baverman. Dkt. 12 at 16. At the hearing, the government argued for Cua's pretrial detention under the Bail Reform Act of 1984, 18 U.S.C. § 3142 et seq., principally on the ground that he poses a threat to community safety. The government explained that Cua had several previous encounters with law enforcement (although none resulted in any legal action beyond the imposition of a fine on one occasion) and that his social media posts in late 2020 and early 2021 called for the execution of public officials, glorified violent protest, and exalted a call to arms against the government. In response, Cua argued that he has disavowed his prior social media posts and that he should be released to the custody of his parents, who expressed a willingness to "put [their] home on the line if that were required to secure [Cua's] bond." Dkt. 12-1 at 43 (Ex. 1) (J. Cua).

After argument and testimony, including cross examination of the defendant's father, Joseph Cua, Magistrate Judge Baverman granted the government's motion, concluding that "Mr. Cua is a danger, and that there are no conditions or set of conditions that have been proposed that will reasonably assure the safety of the community."[2] Dkt. 12-2 at 48 (Ex. 2). Magistrate Judge Baverman also concluded that Cua's parents were not suitable custodians because they "were maybe not instigators but aiders and abettors [in Cua's alleged crime] and didn't take steps to stop their child from going off the rails." Id. at 45–46. Magistrate Judge Baverman, accordingly, ordered Cua detained pending trial. Id.

On February 26, 2021, Cua filed an emergency motion in this Court seeking his release pending trial. Dkt. 11. The government filed its opposition on March 2, 2021. Dkt. 12. Cua then filed additional supplemental authority for the Court to consider. Dkt. 13; Dkt. 15. The Court held a hearing on March 3, 2021, at which Cua was arraigned—pleading not guilty on all counts—and at which the Court heard argument on Cua's pending motion for release. After the hearing,

Cua filed additional materials for the Court's consideration, including a letter from Cua. Dkt. 16; Dkt. 17. In response to the Court's inquiry, Pretrial Services indicated that, in its view, Cua's parents are not appropriate third-party custodians. Dkt. 18. Cua then proposed that the Court consider alternative third-party custodians and submitted a letter from a family that has agreed to serve in that capacity. Dkt. 20. Three days later, on March 8, 2021, Cua brought to the Court's attention that he was assaulted while incarcerated and had recently tested positive for COVID-19. Dkt. 21 at 1. In light of Cua's positive test result and the Court's inquiry about how best to proceed, Cua's counsel proposed that the Court stay his release until March 16, 2021—ten days after his positive COVID-19 test. Id. In response, the government reiterated its position that Cua should not be released, but agreed that, if he is released, March 16, 2021 would be an appropriate date. Dkt. 22 at 2. The following day, the government filed a compilation of direct messages that Cua had sent and received on Instagram, which had also been shared with Magistrate Judge Baverman during Cua's initial detention hearing. Dkt. 23.

**\*3** Cua's Emergency Motion for Release from Custody, Dkt. 11, is now ripe for decision.

## II. LEGAL STANDARD

Under 18 U.S.C. § 3145(b), a defendant ordered detained by a magistrate judge may file "a motion for revocation or amendment to the order" with "a court having original jurisdiction over the offense." 18 U.S.C. § 3145(b). Although the D.C. Circuit has yet to opine on the question, substantial precedent supports the view that a magistrate judge's detention order is subject to de novo review by the district court, see United States v. Hunt, 240 F. Supp. 3d 128, 132 (D.D.C. 2017) (identifying cases supporting this proposition from the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits), and this Court has adopted that view, United States v. Taylor, 289 F. Supp. 3d 55, 66 (D.D.C. 2018).

The question for the Court is whether any "condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). If not, the Court "shall order the detention of the [defendant] before trial." Id. In determining whether Cua should be detained, the Court must consider: (1) the nature and circumstances of

the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *Id.* § 3142(g). "The facts the judicial officer uses to support a finding ... that no condition or combination of conditions will reasonably assure the safety of any other person and the community [must] be supported by clear and convincing evidence," and the government bears the burden of proof as to that evidence. *Id.* § 3142(f)(2)(B). That is because "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno,* 481 U.S. 739, 755 (1987); *see also Taylor,* 289 F. Supp. 3d at 62 ("The default position of the law ... is that a defendant should be released pending trial.") (internal quotation marks and citation omitted).

## III. ANALYSIS

The Court will consider each of the § 3142(g) factors in turn.

### A. Nature and Circumstances of the Offense
The nature and circumstances of Cua's alleged offenses weigh in favor of his detention. As Magistrate Judge Baverman observed, "what the defendant was involved in was effectively an attempt to overthrow the lawful processes of the United States." Dkt. 12-2 at 47 (Ex. 2). That is, if anything, an understatement of the gravity of what allegedly occurred. Cua and hundreds of others took over the United States Capitol; caused the Vice President of the United States, the Congress, and their staffs to flee the Senate and House Chambers; engaged in violent attacks on law enforcement officers charged with protecting the Capitol; and delayed the solemn process of certifying a presidential election. This was a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building —but of our democracy itself.

**\*4** There is no reason to believe that Cua was a leader in organizing the attack. But there is evidence that he acted knowingly and with an intent to undermine the lawful transfer of power. As explained further below, before coming to Washington, Cua expressed a desire to use force to breach the Capitol and to prevent Congress from certifying that President Biden, in fact, won the election. Although Cua did not carry a firearm, he did carry a baton, and he cannot plausibly maintain

that he carried this weapon into the Capitol to protect himself from some unprovoked attack; he did so either to injure or to intimidate others. Fortunately for Cua and the public, there is no evidence at this time that Cua hit anyone with his baton or physically injured anyone. He did, however, shove a plain-clothed police officer three times in his effort to force his way into the Senate Chamber. He did so, moreover, as part of uncontrolled mob that overwhelmed law enforcement by violence and intimidation.

The Court, accordingly, concludes that Cua's alleged crimes are serious and weigh in favor of pretrial incarceration.

### B. Weight of Evidence Against the Defendant
The second factor—the weight of evidence against the defendant—also weighs in favor of detention. The government's evidence of Cua's guilt involves video and photographic evidence, as well as social media posts by Cua in which he admits to breaching the Capitol on January 6. *See generally* Dkt. 12; Dkt. 23-1 (Ex. 1). There is also direct video evidence of the more serious crimes with which Cua is charged—assaulting, resisting, or impeding officers, in violation of 18 U.S.C. § 111(a)(l), and engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(l)(A).

In light of the strength of the government's evidence against Cua, the second factor weighs against Cua's release.

### C. History and Characteristics of the Defendant
The third factor—the history and characteristics of the defendant—weighs in favor of release. In considering Cua's history and characteristics, the Court must "take into account the available information concerning" Cua's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A).

Here, Cua has strong ties to his family and his community, as shown by the many letters submitted on his behalf. *See generally* Dkt. 11-4 (Ex. 4). Moreover, he is only 18 years old and, apparently, is the youngest defendant charged to date in attack on the Capitol. In addition, although contrition is not a defense, it has some bearing on the character of the defendant, and the Court credits Cua's representations that he is "deeply

remorseful and regretful;" that he knows that his media "posts were foolish, unnecessary, and untrue;" that those posts do not represent "who [he is] or ever want[s] to be;" that he has "completely lost those aggressive feelings;" and that he knows that he "was wrong." Dkt. 17-1 at 1 (Ex. 1). He also assures the Court that he will "diligently abide by any and all conditions the [C]ourt places on [him]." *Id.*

Cua's criminal history is not spotless, but neither is it substantial. The only criminal action ever taken against him was a municipal citation he received from local police for distributing the peace by blowing an airhorn. Dkt. 12-1 at 33 (Ex. 1) (Parmer). Cua has, however, exhibited a reluctance to abide by the rules and to follow the directions of law enforcement and other authorities. As Cua's father acknowledged in his testimony before Magistrate Judge Baverman, Cua "has had ... interaction[s] with law enforcement" on more than ten occasions "prior to January 6th, 2021." Dkt. 12-2 at 11–12 (Ex. 2) (Buchanan). Those interactions involved, by way of example, warnings for trespassing in a private neighborhood to go fishing, Dkt. 12-1 at 47 (Ex. 1) (J. Cua), and multiple warnings for driving all-terrain vehicles on roads on which they did not belong, Dkt. 12-2 at 12 (Ex. 2) (J. Cua). It therefore may be true, as the government contends, that the frequency of Cua's interactions with the police suggest that his willingness to abide by law enforcement's commands is less than ideal. But the Court cannot conclude that Cua's noise violation or other misconduct weighs in favor of pretrial detention.

**\*5** Overall, the Court concludes that Cua's young age, family and community ties, expressed remorse, and lack of a significant criminal history weigh in favor of his pretrial release.

## D. Danger to the Community

The final factor that the Court must consider is "the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release." 18 U.S.C. § 3142(g). "Consideration of this factor encompasses much of the analysis set forth above, but it is broader in scope," requiring an "open-ended assessment of the 'seriousness' of the risk to public safety." *Taylor*, 289 F. Supp. 3d at 70. In making that assessment, moreover, the Court may consider all relevant indicia of risk to the community, including evidence that would not be admissible at trial. *Id.* Because this factor substantially overlaps with the ultimate question whether any conditions of release "will reasonably assure ... the safety of any other person and the community," 18 U.S.C. § 3142(e), it

bears heavily on the Court's analysis. On the facts of this case, the question is not an easy one, but the Court is ultimately unpersuaded that Cua poses a substantial risk to any person or the community.

As discussed above, Cua engaged in violent, albeit not life threatening, activity at the Capitol—he repeatedly shoved an officer guarding the entrance to the Senate Chamber in order to breach the Chamber. That, however, is the only violent act—before, during, or after the assault on the Capitol—that the government has proffered in support of Cua's pretrial detention. But that is far from the end of the matter. Even more concerning to the government and the Court are Cua's many social media posts—before and after the attack on the Capitol—threatening political violence. His posts on Parler and direct messages on Instagram reveal that he was, at least as of early January 2021, angry, hostile, and bitter about the 2020 Election and ardent that the use of violent force was necessary to correct what he perceived to be an injustice. Just three days after the election, Cua inquired about purchasing an "AR ... under the table," Dkt. 12-1 at 13 (Ex. 1), and as early as mid-December he appeared committed to taking the "fight" to Congress, *id.* at 13; Dkt. 12 at 2, 4, 20. In Cua's view, violence was justified on the same terms as the American Revolution. Dkt. 12 at 3.

His public Parler posts included the following:

December 19, 2021

On JAN 6th congress will open their blinds and see MILLIONS OF ANGRY #PATRIOTS. OPEN CARRY MISSON. If they vote for sleepy joe and commie KAMALA, we BREAK DOWN THEIR DOORS AND TAKE OUR COUNTRY BACK BY FORCE

January 1, 2021

I hear chatter of DC having "firearm checkpoints", where they will stop you, search your car (without a warrant) and arrest you for having a gun. Which is an unconstitutional felony in DC. Bring other weapons if you prefer, like pepper spray, tasers, baseball bats, whatever you want. Although may I remind you that that is EXACTLY what they want from us, to lay down our weapons and be sheep! They know they cannot control us if we are armed and dangerous! I don't know who needs to hear this, but they can't arrest all of us. Do not back down and do not be discouraged. Show up and be ready to fight. This really is out #1776. Please echo to spread awareness.

**\*6** January 7, 2021

The tree of liberty often has to be watered from the blood of tyrants. And the tree is thirsty.

Violent protests against the capital (NOT SMALL BUSINESS'S) are well within our constitutional rights

Dear Swamp Rats, The events at the capital were a reminder that WE THE PEOPLE are in charge of this country and that you work for us. There will be no 'warning shot' next time.

Everyone who works in congress is a traitor to the people and deserves a public execution.
*Id.* at 1–3. Although less public, his Instagram direct messages express similar, violent sentiments:

November 9, 2020

I'm trying to find an AR to buy under the table. Know anybody?

December 14, 2020

I don't want to sit here in GA and watch I want to fight

December 22, 2020

[T]his [January 6, 2021] could possibly be one of the most important days in American history ... because we can storm the freaking senate/house ... That's why I keep saying to bring guns ... Holding signs is useless ... We have to forcefully take our freedom back on Jan 6

January 7, 2021

In response to a message stating "You know if trump really doesn't get in because of the traitors all I can say is he exposed the swamp," Cua writes "If Trump doesn't get Im we will be back in DC for a blood bath"

January 8, 2021

Trump or not, our fight against the government is far from over ... I would lay down my life for him but I'm gonna keep fighting

January 9, 2021

I want a bloody war I'm ready to start shooting and I'm ready to die before I watch America crash and burn ... I'll

be on the front lines ... I want to lock the swamp rat tyrants in the capital and burn the place to the ground
Dkt. 23-1 at 5, 6, 9, 12 (Ex. 1).

Three things standout about these posts and messages. First, they are chilling and violent. They are not mere political rants; they are calls for violent revolution against the duly elected representatives of the People. Second, Cua threatened to "storm" the Senate and House of Representatives and to "break down their doors" to "take our Country back by force" long before he traveled to Washington on January 6, 2021. Dkt. 12 at 2. As a result, he cannot plausibly maintain that he was merely swept up by the fervor of the crowd of adults who were present. He came to Washington planning to participate in a violent attack that, in fact, occurred. Most Americans could never have imagined that the U.S. Capitol, our elected officials, and the certification of a presidential election would be subject to such an assault. Cua not only foresaw those tragic events, he looked forward to participating in them. Third, Cua had no regrets in the days shortly after the attack. The day after the attack, for example, he wrote a Parler post declaring that those who work for the United States Congress are "traitor[s]" and "deserve[ ] a public execution." *Id.* at 3. He clearly was not chastened by anything that his parents may have said to him during the ride home from the District of Columbia, and he continued to express his desire for "a bloody war" three days later. Dkt. 12-1 at 17, 47 (Ex. 1) (Buchanan).

**\*7** In the government's view, these posts and messages demonstrate a propensity to commit horrifying acts of political violence. In Cua's view, in contrast, they merely reflect a young man who became intoxicated with social media while never intending to act on any of his admittedly disturbing posts and messages. Although what Cua was actually thinking—and what he was actually prepared to do—eludes any certain answer, in the Court's view, the truth likely lies somewhere between these poles. There is no evidence that he ever purchased an "AR," and, to the Court's knowledge, Cua has never intentionally injured anyone. Although he shoved a law enforcement officer on January 6, there is no evidence that he hit him with his baton or injured that officer or anyone else. At the same time, the evidence does show that Cua did, indeed, act on some of his posts and messages, refuting any contention that they were mere fantasy or idle chatter. Cua repeatedly threatened to come to the District of Columbia, breach the Capitol, and to "take [the] Country back by force,"—and he, in fact, made his way into the Senate Chamber by force and, in doing so, he (and others) unlawfully

obstructed the democratic process. Dkt. 12 at 2. That is all deeply troubling, but the government likely goes too far in arguing that Cua actually intended to kill anyone or to engage in "bloody" revolution.

Although Cua did not condemn his posts and messages until after he was arrested and indicted on several, serious federal charges, his own account of what he was thinking bears consideration. To start, Cua appears genuinely remorseful for his actions and has disavowed the violent views reflected in his social media history. In a letter filed with the Court, Cua states:

> I understand that you [*i.e.*, the Court] are concerned that I may be a danger, that I may act upon things I said. Given how inappropriate my social media activity was, I truly understand your worries, and I appreciate you taking time to really consider the options. I would like to strongly assure you that I am not a danger to anyone, and I will absolutely never act on what I said.... My posts were foolish, unnecessary, and untrue, that[']s not who I am or ever want to be[.] ... I have completely lost those aggressive feelings and moved on from the entire political idea.

Dkt. 17-1 at 1 (Ex. 1). To be sure, Cua's regret came only after he was caught, which minimizes its value. Nevertheless, the Court concludes that his remorse (even if late in coming) reduces the likelihood that Cua will engage in any violent political activity in the future.

That conclusion is buttressed by the Court's observation of Cua's contrite demeanor at the March 3rd hearing and the fact that conditions can be fashioned to minimize the risk that Cua will pose a danger to others: He will, among other things, be restricted from accessing social media, will be confined to his home, will be placed on GPS monitoring, and will have no access to firearms or other weapons. Cua's young age and the absence of a significant criminal record or a history of violent behavior further support the Court's conclusion.

To be sure, Cua's parents will play an important role in ensuring that Cua complies with the Court's conditions, and, in particular, that he does not access social media while on pretrial release. And it is true that Cua's parents bear some responsibility for Cua's actions—they were the ones that drove him to Washington D.C., permitted him to bring and carry a baton to the Capitol, and allowed him to scale the scaffolding, leading to Cua's breach of the Capitol building. With that said, though, Dr. Cua has agreed under oath to ensure that her son complies with the Court's conditions, and she will be required to provide the Court with a declaration,

signed under the penalty of perjury, every week attesting to Cua's full compliance. The Court is convinced, moreover, that Dr. and Mr. Cua deeply regret permitting their son to act as he did and that—for his sake—they will do all that they can to ensure that he does not take any action that might risk revocation of his pretrial release or other criminal exposure. As Dr. Cua stated at the March 3rd hearing:

> I will say that since [Cua] has been arrested, everything has changed for us. We ... really just hope for ... mercy, that we would just have a chance to show that.
>
> And we are prepared to do absolutely anything the Court wants. I—I—we know that it's not just being parents now. It's being custodians, and there's a legal—very serious legal responsibility with that, and we're just asking for a chance, Your Honor. We—you will not be disappointed. You will not be disappointed, and I just ask for your forgiveness, whatever you decide.
>
> **\*8** I ask for your forgiveness for just my failures as a mom, and I am very well aware of them, and I just—I'm really just hoping that we get a chance to prove that this is behind us. We just want our family together.... [W]e are completely broken and completely just, honestly and truthfully, remorseful to the core of our beings, and we're asking for a chance.

Tr. 36 (A. Cua). Based on these representations and the record as a whole, the Court is convinced that Dr. and Mr. Cua will safeguard their son's interests by ensuring that he does not breach the conditions of his pretrial release and end up again where he is now.[3]

\* \* \*

Cua's violent social media posts and messages are disquieting, to put it mildly, particularly when viewed alongside his actions on January 6. The Court is granting Cua pretrial release only by the slimmest of margins, guided by the default rule favoring liberty. Cua's posts reveal him to rank that virtue —liberty—above all others. He can do well to honor it by fastidiously following the Court's orders.

**CONCLUSION**

For the foregoing reasons, Defendant Bruno Joseph Cua's Emergency Motion for Release from Custody, Dkt. 11, is **GRANTED** subject to certain conditions; it is further

**ORDERED** that Cua shall be released from custody on March 16, 2021 and shall immediately upon his release abide by the conditions set forth below and in Attachment A to this Memorandum Opinion and Order; it is further

**ORDERED** that Cua shall report to the United States Probation Office for the Northern District of Georgia ("N.D. Ga. Probation Office") immediately upon his return to Georgia, and in no event later than March 17, 2021; it is further

**ORDERED** that the N.D. Ga. Probation Office shall, at its initial meeting with Cua, provide him a copy of Attachment A; it is further

**ORDERED** that Cua shall, at his initial meeting with the N.D. Ga. Probation Office, sign Attachment A and provide the signed copy of the Attachment to the N.D. Ga. Probation Office; and it is further

**ORDERED** that Cua's mother, Dr. Alise Cua, shall on Monday of each week beginning March 22, 2021, complete, sign, and (through her son's counsel) submit to the Court Attachment B, attesting under penalty of perjury to Cua's compliance with the conditions of his pretrial release.

**SO ORDERED**.

**ATTACHMENT A**

AO 199A (Rev. 12/11) Order Setting Conditions of Release

**ORDER SETTING CONDITIONS OF RELEASE**

IT IS ORDERED that the defendant's release is subject to these conditions:

    (1) The defendant must not violate federal, state, or local law while on release.

    (2) The defendant must cooperate in the collection of a DNA sample if it is authorized by 42 U.S.C. § 14135a.

    (3) The defendant must advise the court or the pretrial services office or supervising officer in writing before making any change of residence or telephone number.

    (4) The defendant must appear in court as required and, if convicted, must surrender as directed to serve a sentence that the court may impose.

    The defendant must appear at: <u>at all court hearings or matters at a time, place, and manner as directed by the</u>*Place*<u>Court.</u> on

*Date and Time*

**\*9**  (5) The defendant must sign an Appearance Bond, if ordered.

Tabular or graphical material not displayable at this time.

**ADDITIONAL CONDITIONS OF RELEASE**

IT IS FURTHER ORDERED that the defendant's release is subject to the conditions marked below:

(X) (6) The defendant is placed in the custody of:

    Person or organization <u>Dr. Alise Cua (Defendant's mother)</u>

    Address *(only if above is an organization)*

    _____

    City         and        state

    _____

    Tel. No. _____

who agrees to (a) supervise the defendant, (b) use every effort to assure the defendant's appearance at all court proceedings, and (c) notify the court immediately if the defendant violates a condition of release or is no longer in the custodian's custody.

Signed: <u>Acknowledged on the record</u>

*Custodian*

<u>03/09/2021</u>

*Date*

(X) (7) The defendant must:

(X) (a) submit to supervision by and report for supervision to the US Probation NDGA as directed telephone number (404) 215-1950, no later than Immediately upon Return to Georgia but in no event later than

( ) (b) continue or actively seek employment. 03/17/2021

( ) (c) continue or start an education program.

((X) (d) surrender any passport to: US Probation Office for the Northern District of Georgia

(X) (e) not obtain a passport or other international travel document.

(X) (f) abide by the following restrictions on personal association, residence, or travel: Stay Out Of Washington DC except for Court or PSA business or meetings with attorney. Travel Restricted to Fulton County, GA.

( ) (g) avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including:
_____
_____

( ) (h) get medical or psychiatric treatment:
_____
_____

( ) (i) return to custody each _____ at _____ o'clock after being released at _____ o'clock for employment, schooling, or the following purposes:
_____

( ) (j) maintain residence at a halfway house or community corrections center, as the pretrial services office or supervising officer considers necessary.

(X) (k) not possess a firearm, destructive device, or other weapon.

(X) (l) not use alcohol (X) at all ( ) excessively.

(X) (m) not use or unlawfully possess a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.

(X) (n) submit to testing for a prohibited substance if required by the pretrial services office or supervising

officer. Testing may be used with random frequency and may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing. The defendant must not obstruct, attempt to obstruct, or tamper with the efficiency and accuracy of prohibited substance screening or testing.

**\*10**  ( ) (o) participate in a program of inpatient or outpatient substance abuse therapy and counseling if directed by the pretrial services office or supervising officer.

(X) (p) participate in one of the following location restriction programs and comply with its requirements as directed.

( ) (i) **Curfew.** You are restricted to your residence every day ( ) from _____ to _____, or ( ) as directed by the pretrial services office or supervising officer; or

(X) (ii) **Home Detention.** You are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities approved in advance by the pretrial services office or supervising officer; or

( ) (iii) **Home Incarceration.** You are restricted to 24-hour-a-day lock-down at your residence except for medical necessities and court appearances or other activities specifically approved by the court.

(X) (q) submit to location monitoring as directed by the pretrial services office or supervising officer and comply with all of the program requirements and instructions provided.

(X) You must pay all or part of the cost of the program based on your ability to pay as determined by the pretrial services office or supervising officer.

(X) (r) report as soon as possible, to the pretrial services office or supervising officer, every contact with law enforcement personnel, including arrests, questioning, or traffic stops.

(X) (s) Comply with any and all conditions as directed in the supervising jurisdiction. Def't is not restricted from

his home's curtilage and surrounding 3 acre property, but must always be under supervision of 3rd party custodian.

Defendant may not use any social media--including, but not limited to, Parler, Gab, Reddit, Facebook, Instagram, Discord, Twitter, SnapChat, TikTok, and any similar platform--on any electronic device (e.g, phone, table, computer, laptop). Defendant must permit ND Ga Probation Office to monitor his compliance with this condition.

Tabular or graphical material not displayable at this time.

**ADVICE OF PENALTIES AND SANCTIONS**

TO THE DEFENDANT:

YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

Violating any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention, a forfeiture of any bond, and a prosecution for contempt of court and could result in imprisonment, a fine, or both.

While on release, if you commit a federal felony offense the punishment is an additional prison term of not more than ten years and for a federal misdemeanor offense the punishment is an additional prison term of not more than one year. This sentence will be consecutive (*i.e.*, in addition to) to any other sentence you receive.

It is a crime punishable by up to ten years in prison, and a $250,000 fine, or both, to: obstruct a criminal investigation; tamper with a witness, victim, or informant; retaliate or attempt to retaliate against a witness, victim, or informant; or intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the court. The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.

 **\*11**  If, after release, you knowingly fail to appear as the conditions of release require, or to surrender to serve a sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed. If you are convicted of:

(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more – you will be fined not more than $250,000 or imprisoned for not more than 10 years, or both;

(2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years – you will be fined not more than $250,000 or imprisoned for not more than five years, or both;

(3) any other felony – you will be fined not more than $250,000 or imprisoned not more than two years, or both;

(4) a misdemeanor – you will be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender will be consecutive to any other sentence you receive. In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

**Acknowledgment of the Defendant**

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and surrender to serve any sentence imposed. I am aware of the penalties and sanctions set forth above.

_____

*Defendant's Signature*

_____

*City and State*

**Directions to the United States Marshal**

( ) The defendant is ORDERED released after processing.

( ) The United States marshal is ORDERED to keep the defendant in custody until notified by the clerk or judge that the defendant has posted bond and/or complied with all other conditions for release. If still in custody, the defendant must

be produced before the appropriate judge at the time and place specified.

Date: 3/10/2021

_____

*Judicial Officer's Signature*

Randolph D. Moss, United States District Judge

*Printed name and title*

DISTRIBUTION: COURT DEFENDANT PRETRIAL SERVICE U.S. ATTORNEY U.S. MARSHAL

Tabular or graphical material not displayable at this time.

**ATTACHMENT B**

**DECLARATION OF DR. ALISE CUA**

Under 28 U.S.C. § 1746, I, Dr. Alise Cua, state the following:

1. I am the third-party custodian for Mr. Bruno Joseph Cua. By order of the Court, Mr. Cua is confined to my home in Fulton County, Georgia.

2. From the period of _____, 2021 to _____, 2021, I attest that Bruno Joseph Cua has fully complied with each and every condition of his pre-trial release.

3. I attest that if I become aware or have reason to believe that Bruno Joseph Cua has violated or will violate any conditions of his release, I will immediately report this information to the Pretrial Services Agency at (202) 442-1000.

I so declare, under penalty of perjury, that the foregoing is true and correct.

Executed on: _____, 2021

_____

Dr. Alise Cua

**All Citations**

Slip Copy, 2021 WL 918255

---

Footnotes

1   Cua's counsel at the time described the baton to Magistrate Judge Baverman as follows: "It's an ASP baton, Judge. It is one that you carry on your belt. Police use it. A lot of people have them for self-defense.... The ones I've seen are made out of aluminum.... [I]f it was used defensively in a manner to cause death or serious bodily injury, yes, it would be a dangerous weapon." Dkt. 12-1 at 26 (Ex. 1) (Morgan). Cua's father was aware that Cua had brought the baton from Georgia and that he was carrying it with him when he approached the Capitol. *Id.* at 58 (J. Cua); *see also* Dkt. 12-2 at 6 (Ex. 2) (J. Cua).

2   Magistrate Judge Baverman did not find that Cua presented a risk of flight. *See* Dkt. 12-1 at 30 (Ex. 1).

3   The government argues, albeit only cursorily, that Cua "poses a serious risk of flight." Dkt. 12 at 18. The Court disagrees. Cua's young age, family and community connections, and the conditions described herein and in Attachment A—including, for example, GPS location monitoring and home detention—are sufficient to ensure Cua's presence at future court proceedings.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# ATTACHMENT F

     *1. United States v. Chad Jones*, 1:21-mj-00076-ZMF – ███████████████

███████████████████████████████████████████ Mr. Jones

was charged under section 111(b), which requires the additional element of either use of a deadly

or dangerous weapon or infliction of bodily injury. Mr. Jones was also filmed using a flagpole to

repeatedly and forcefully strike and break the glass of the now infamous doorway where Ashley

Babbitt was shot and killed as she climbed through a broken pane. Just before Mr. Jones started

breaking down the glass, lawmakers and staff were seen on the other side of the doors from the

angry mob, being evacuated. Below is a still shot from the complaint against Mr. Jones in a red

jacket in which he is shown breaking the glass with the pole moments before Babbitt is shot.[5]



As described in the complaint, "[a]n officer inside the Speaker's Lobby, facing the door with a

gun raised, can be seen at the [left] side of the video in the close vicinity of the doorway," as

shown below.



[5] It is difficult to grasp the violent and reckless conduct undertaken by Mr. Jones without
watching the full video, which can be viewed at
https://www.washingtonpost.com/investigations/2021/01/08/ashli-babbitt-shooting-video-
capitol/.

As the officer points the gun and fires at Ms. Babbitt, Jones could still be seen next to the door with the pole, just to the left of where Ms. Babbitt was shot. The government did not request Mr. Jones's detention and Magistrate Judge Harvey released him on special conditions.

　　*2. United States v Vitali Gossjankowski*, 1:21-cr-00123-PLF – According to the Indictment, Mr. Gossjankdowski (pictured in a royal blue jacket below) has been charged under 18 U.S.C. § 111(b) for assaulting a federal officer with a dangerous weapon (a Taser) after being videotaped trying to forcefully and violently enter a restricted area of the Capitol and activating the Taser multiple times, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[6]



The complaint describes that an officer near Mr. Gossjankowski suffered a heart attack and was hospitalized after being Tased multiple times on the back of his neck. While Mr. Gossjankowski said he recognized the officer during an interview, he denied using the Taser on him. He is also charged with section 1752 offenses for being in restricted areas of the Capitol while carrying or using a dangerous weapon. The government did not object to his release.

---

[6] The full video is available at https://www.youtube.com/watch?v=cJOgGsC0G9U. Mr. Gossjankowski can be seen entering the scene at the 2:25 mark as he pushes his way to the front of the crowd and discharges the Taser multiple times before reaching the front and the line of the officers attempting to stop the crowd, eventually passing a police shield taken from an officer back over the crowd.

   *3. United States v. Matthew Miller*, 1:21-cr-00075-RDM – Your Honor ordered Mr. Miller to be released subject to special conditions. As the Court knows, Mr. Miller was charged with ten offenses, including assault on a federal officer under section 111(b), ████████ ████████████████████ based on his assault by discharging a fire extinguisher, as captured in the image below. He is also accused of using a crowd barrier fence as a makeshift ladder to scale the walls of the Capitol. Mr. Miller was also charged with offenses under section 1752 involving use or carrying of a dangerous weapon.



   *4. United States v. Rachel Powell*, 1:21-mj-00197-GMH – Ms. Powell, known in the press as the "bullhorn pink hat lady" in the press, was filmed using a battering ram to break a large window of the Capitol valued at approximately $1,000 so that she and the rioting crowd could force their way into the Capitol, as shown in the image below from her complaint.

14



Ms. Powell was also filmed using a bullhorn to direct rioters inside the Capitol toward lawmakers, seeming to have detailed knowledge of the floor plan, as shown below.



Among other charges, Ms. Powell is accused of entering or remaining in a restricted area with a dangerous weapon, ██████████████████ Ms. Powell was released by a magistrate judge in the Western District of Pennsylvania. The government appealed the release order, but Chief Judge Howell denied the appeal.

5. *United States v. Robert Packer*, 1:21-cr-00103-CJN – Mr. Packer was infamously photographed inside the Capitol wearing a "Camp Auschwitz" t-shirt, suggesting anti-semitic beliefs and endorsement of the Holocaust, an obviously horrific and violent event, as shown in the image below from his complaint.



Mr. Packer was charged with entering or remaining in a restricted building and violent entry and disorderly conduct on Capitol grounds. ████████████████████████████████

████████████████████████████████████████████████████████████████████

████ The government did not request pretrial detention of Mr. Packer.

    *6. United States v. Mark Leffingwell*, 1:21-cr-00005-ABJ – ████████████ Mr. Leffingwell was charged with assault on a federal officer under section 111, as well as several counts under 18 U.S.C. § 1752(a) and 40 U.S.C. § 5104(e)(2). ████████████ however, Mr. Leffingwell allegedly pushed past a wall of law enforcement officers who were attempting to keep people out of the Capitol and then repeatedly punched an officer with a closed fist. In other words, he was part of the mob who actually breached the Capitol. The government did not object to Mr. Leffingwell's release on conditions.

    *7. United States v. Joseph Biggs*, 1:21-mj-00126-RMM – Mr. Biggs is an admitted member of the Proud Boys, an extremist group described in Mr. Biggs's by the government as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western chauvinists." Mr. Biggs posted a plan on social media for the Proud Boys to go to D.C. on January 6, 2021, but not to wear their distinctive black and yellow, saying "we are

16

going to blend in like you" (referencing Antifa). He is alleged to have been at the front of the crowd who breached the Capitol and to have entered the Capitol within 20 seconds of its breach. He appeared to have been wearing an earpiece and carrying a walkie-talkie for communication purposes (and presumably coordination with other Proud Boys) during the riot. He was released in the Middle District of Florida and it does not appear that the government appealed his release.

       8. *United States v. Matthew Capsel*, 1:21-mj-00122-RMM – ███████ Mr. Capsel was charged with assaulting a federal officer. Mr. Capsel was captured on video fighting against National Guardsmen attempting to hold a boundary with riot shields, as shown below in an image from his complaint. Mr. Capsel persisted in fighting until he was pepper sprayed.



The government's oral motion to detain Mr. Capsel was denied in the Southern District of Illinois. It appears that the government did not appeal Mr. Capsel's release.

*9. United States v. Josiah Colt*, 1:21-cr-00074-TFH – Mr. Colt went to the rally on January 6 wearing tactical assault gear, including a helmet█ He was infamously photographed scaling down the wall of the gallery in the Senate chamber, as shown below in an image from his complaint.



According to the complaint, Mr. Colt claimed in a Facebook video that he was the first person to sit in Speaker Pelosi's chair (which was actually Vice President Pence's chair) and calls her a traitor. The government did not seek Mr. Colt's detention.

*10. United States v. Christopher Alberts*, 1:21-cr-00026-CRC – Mr. Alberts was stopped on Capitol grounds on January 6, 2021, after the emergency curfew, when a law enforcement officer noticed a bulge on his hip that turned out to be a handgun fully loaded with 13 bullets. He

also carried a spare magazine in a holster on his other hip and was wearing a bullet-proof vest. In his backpack, he was carrying a gas mask, a military-style meal-ready-to-eat (MRE), and a first aid kit. The government's oral motion to detain Mr. Alberts was denied and he was released by Magistrate Judge Harvey.

   *11. United States v. Nicholas DeCarlo and Nicholas Ochs*, 1:21-cr-00073-BAH – Messrs. DeCarlo and Ochs are charged with conspiring with each other and other persons to stop Congress's certification of the election results. Mr. Ochs is a founding member of the Proud Boys Hawaii chapter with the group's name tattooed on his arm. They engaged in planning, fundraising, and forcibly stormed past barricades. In a video on social media, DeCarlo stated that he came to DC to stop the vote counting. Another video of the two of them is titled "Twas the Night Before REVOLUTION!!!" They are alleged to have defaced the Memorial Door of the Capitol with the words "Murder the Media," as shown below in an image from Mr. DeCarlo's complaint.



Ochs is charged with stealing flex cuffs from a Capitol police officer. Ochs posted a picture of them on social media showing them smoking cigarettes in the Capitol. The government did not seek their pretrial detention.

12. *United States v. Matthew Council*, 1:21-mj-00008-GMH – Mr. Council is alleged to have forced his way through a police line inside the Capitol during which process he pushed a female uniformed Capitol police officer and had to be pepper sprayed. The government did not seek Mr. Council's detention. Among his conditions of release, Mr. Council was ordered to participate in mental health treatment, including medication compliance.

13. *United States v. Gina Bisignano*, 21-cr-00036-CJN – As the government emphasized in its appeal of a release order entered in the jurisdiction of arrest, Ms. Bisignano is accused of being an "instigator, a director, and an active participant in the violence, destruction and obstruction at the Capitol" on January 6. ECF No. 12 at 1. On the front lines of the crowd pushing against the police line, as pictured below, she allegedly shouted through a bullhorn things like: "Everybody, we need gas masks! We need weapons! We need strong, angry patriots to help our boys!"



Among her eight charges, she is charged in her Indictment with destruction of government property. After she was released in her home district, Judge Nichols denied the appeal and ordered Ms. Bisignano to be released.

*14. United States v. Jenny Cudd*, 21-mj-00068-TNM – Ms. Cudd is alleged to have been inside the Capitol without authorization. According to the Complaint, after leaving the Capitol, Ms. Cudd livestreamed a video in which she stated, "I was here today on January 6th when the new revolution started in the Capitol." In describing her entrance, she further stated, "we just pushed, pushed, and pushed, and yelled go and yelled charge." Showing no regret after the fact, she also said, "fuck yes, I am proud of my actions, I fucking charged the Capitol today with patriots today. Hell, yes, I am proud of my actions." She later told a local news station during an interview, "Yes, I would absolutely do it again." The government did not seek Ms. Cudd's detention. Moreover, on February 4, 2021, the Court granted Ms. Cudd's motion to travel to Mexico to participate in a work-related retreat, which neither the government nor Pretrial Services opposed.