# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CRIMINAL ACTION NO.** |
| | ) | |
| **Plaintiff,** | ) | **1:21-CR-00119-CJN** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GARRET MILLER,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT'S MOTION TO REOPEN DETENTION HEARING

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS..........................................................................................2

I.  INTRODUCTION.............................................................................................3

II. LEGAL STANDARDS FOR DETENTION............................................................4

III. PRETRIAL DETENTION SHOULD NOT BE PUNISHMENT. IF NOT RELEASED, MR. MILLER WILL SPEND LONGER IN PRETRIAL DETENTION THAN ANY LIKELY SENTENCE THAT WILL BE IMPOSED AND HE HAS DONE SO UNDER ONEROUS CONDITIONS............................................................5

    A. Timing.....................................................................................................5

    B. Mr. Miller Has Been Incarcerated Pre-trial Under Onerous Conditions........7

        1. The Dirty Reality..............................................................................7

        2. The Result......................................................................................10

    C.  It Is Doubtful That Mr. Miller Would Be Sentenced to More than 24 Months Imprisonment Even After a Conviction.................................................11

    D. Conclusion.............................................................................................20

IV. THE PROLONGED PRETRIAL DETENTION HAS DEPRIVED MR. MILLER THE ABILITY TO ASSIST IN HIS OWN DEFENSE................................................21

V. PROPOSED RELEASE PLAN............................................................................21

VI. PROPOSED RELEASE PLAN...........................................................................22

CERTIFICATE OF SERVICE.................................................................................24

Defendant, Garret Miller, pursuant to 18 U.S.C. § 3145(f), hereby moves this Court to reopen the detention hearing in this case based on the staying of the case.

## I. INTRODUCTION

Mr. Miller has been continuously incarcerated since on or about January 20, 2021.

This Court, on April 1, 2021, heard argument on Mr. Miller's Motion to Revoke the Detention Order entered by the Magistrate Judge in the Northern District of Texas where Mr. Miller was arrested. Like at the original hearing in the Northern District of Texas, the government argued to this Court that Mr. Miller was a flight risk and also a danger to the community based upon his entry into the Capitol on January 6, 2021, and his social media posts thereafter. *See* April 1, 2021 Transcript at 9-10. While this Court ultimately concluded that the government had *not* established that Mr. Miller was a flight risk, it did conclude, based upon the government's arguments, that Mr. Miller was a danger to the community. *Id*. at 15-21.[1]

---

[1]Mr. Miller later filed a Motion to Reopen the Detention Hearing based upon a newly produced report dated January 18, 2021 from the FBI Counterterrorism Division. The Counterterrorism Division concluded that Mr. Miller was not a threat to members of Congress, or the community. Nevertheless, the Court denied Mr. Miller's release based on this motion to reopen.

## II.  LEGAL STANDARDS FOR DETENTION

Generally, pretrial release should only be denied for "the strongest of reasons." *Truong Dinh Hung v. United States*, 439 U.S. 1326, 1329 (1978) (citation omitted). "Detention until trial is relatively difficult to impose." *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999).

"[T]he default position of the law . . . is that a defendant should be released pending trial." *United States v. Taylor*, 289 F. Supp. 3d 55, 62 (D.D.C. 2018) (*quoting United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010)).  Indeed, "[i]n our society liberty is the norm and detention prior to trial or without trial is the carefully limited exception."  *United States v. Salerno*, 481 U.S. 739, 755 (1997)

In order to justify detention based upon grounds of dangerousness, the government must establish by clear and convincing evidence "that *no* condition or combination of conditions will reasonably assure the safety of any other person and the community." 18 U.S.C. § 3142(f)(2).  In other words, the government must prove that pretrial detention is the *only* means by which the safety of the community can reasonably be assured.  *United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir 1996).[2]

---

[2]It is important to recognize, of course, that it is not required a court be able to set conditions that *guarantee* the safety of the community only that it be able to set conditions that "reasonably assure" them.  *See United States v. Fortna,* 769 F.2d 243, 250 (5th Cir. 1985);*United States v. Orta*, 760 F.2d 887,891-92 (8th Cir. 1985) (*en banc*).

**The evidence must prove that the defendant actually poses a danger, not that he does so in theory**.  *United States v. Patriaca*, 948 F.2d 789 (1ˢᵗ Cir. 1991).

A court must consider *all* available conditions under the Bail Reform Act before it orders a defendant detained.  *Orta*, 760 F.2d at 891-92.

### III. PRETRIAL DETENTION SHOULD NOT BE PUNISHMENT.  IF NOT RELEASED, MR. MILLER WILL SPEND LONGER IN PRETRIAL DETENTION THAN ANY LIKELY SENTENCE THAT WILL BE IMPOSED AND HE HAS DONE SO UNDER ONEROUS CONDITIONS

#### A. Timing

Pursuant to this Court's order, Mr. Miller's trial is stayed as a result of the government's decision to take an interlocutory appeal of the Court's order dismissing Count 3 of the Second Superseding Indictment.[3]  The Court of Appeals has consolidated the appeal in Mr. Miller's case with two similar appeals.  The Court of Appeals has set a briefing date which, if none of the four parties move for any extensions, will conclude the briefing on September 28, 2022.  Contrary to the government's suggestion at the August 5, 2022 status hearing, the briefing schedule was not expedited.

Of course, there is no time limit for the Court of Appeals to rule on the appeal.  Nevertheless, given the complexity of this issue, it should be noted that it took this

---

[3]Ironically, Mr. Miller may wind up serving more time in custody than if he had moved this Court to dismiss Count 3 of the Second Superseding Indictment.

Court approximately six months to resolve the issue after the government filed its response to Mr. Miller's motion.  Using that estimate, it might be assumed the Court of Appeals would issue its opinion in March 2023.  By then, Mr. Miller will have spent approximately 26 months in pretrial custody even though he is presumed innocent of the charges against him.

From there, it could reasonably be expected that at least one of the four parties would seek *en banc* review.  Even if *en banc* review was denied, that would likely add at least two months to the process.  Meanwhile, if *en banc* review was granted on this very complicated issue of statutory construction, it would likely add approximately a year to the process.

Then, there is the likelihood that at least one of the four parties would file a Petition for *Writ of Certiorari* with the United States Supreme Court.  While *certiorari* is rare, this issue is of such national importance that it is impossible to foreclose the possibility that the Supreme Court would grant *certiorari.*  In any event, this would likely add a minimum of five months onto the process even if *certiorari* was denied.  If *certiorari* was granted, the interlocutory appeal of this case sought by the government would almost certainly not be resolved until the year 2024 at the earliest.

Of course, as the Court indicated and assuming it believes it has the power to

do so,[4] the Court could resume a trial schedule after only the panel decision by the Court of Appeals.  If one assumed for the point of discussion that the panel decision was to occur in March, it is likely that a trial in this case would take place no earlier than June 2023- after Mr. Miller had been held in pretrial detention for approximately **29 months**.[5]

Finally, it must be noted that the government could have waited and appealed this Court's decision following the judgment in this case.  While it is understandable that this would cause more work for the government in the event this case had to be tried twice, this burden to an expansive Department of Justice pales in comparison to the burden sustained by Mr. Miller by the government's decision to appeal interlocutory while he sits in pretrial detention.

### B.  Mr. Miller Has Been Incarcerated Pre-trial Under Onerous Conditions

#### 1.  The Dirty Reality

The conditions under which Mr. Miller has already served more than 19

---

[4]The government appeared to suggest at the August 5th conference that it believed the case in this Court was automatically stayed pending resolution of the appeal.  It is uncertain if the government will similarly claim this Court is without jurisdiction to proceed to trial until the appeal is finally resolved through the complete appellate process.

[5]Of course, when comparing this to a post-conviction sentence, one must be mindful that Mr. Miller would only serve 85% of a post-conviction sentence and he would likely be eligible for further reductions under the First Step Act.

months and could continue to serve many more months if not released while the government's interlocutory appeal is resolved bears mention.

Before arriving at the CTF facility in Washington, D.C., Mr. Miller was denied any medical attention for the broken collar bone he sustained while in custody in Texas.  Indeed, he was forced to live with the broken collar bone for two months before surgery was finally performed.

Upon his arrival at the CTF facility, CTF inmates were not allowed any visitors from the time he arrived (in approximately April 2021) until February 14, 2022.  Moreover, CTF inmates were not given access to any video visitation during that time.  In short, Mr. Miller was isolated for over a year as a result of the jail conditions.

Even more concerning, CTF inmates were confined to their cells for 23 hours a day from the time Mr. Miller arrived until approximately June 13, 2021; 22 hours from approximately June 13, 2021, to approximately October 2021; and again for 22 hours from December 22, 2021, to February 28, 2022.  In other words, for approximately half of the time Mr. Miller has been at the CTF, he has been confined to his cell for between 22-23 hours per day.  The psychological strain that puts on an individual cannot be seriously debated and is closely akin to the dangers of solitary confinement.

As noted by former Justice Kennedy:

The human toll wrought by extended terms of isolation long has been understood, and questioned, by writers and commentators. Eighteenth-century British prison reformer John Howard wrote "that criminals who had affected an air of boldness during their trial, and appeared quite unconcerned at the pronouncing sentence upon them, were struck with horror, and shed tears when brought to these darksome solitary abodes." The State of the Prisons in England and Wales 152 (1777). In literature, Charles Dickens recounted the toil of Dr. Manette, whose 18 years of isolation in One Hundred and Five, North Tower, caused him, even years after his release, to lapse in and out of a mindless state with almost no awareness or appreciation for time or his surroundings. A Tale of Two Cities (1859). And even Manette, while imprisoned, had a work bench and tools to make shoes, a type of diversion no doubt denied many of today's inmates.

One hundred and twenty-five years ago, this Court recognized that, even for prisoners sentenced to death, solitary confinement bears "a further terror and peculiar mark of infamy." *In re Medley*, 134 U.S. 160, 170, 10 S.Ct. 384, 33 L.Ed. 835 (1890); *see also id.*, at 168, 10 S.Ct. 384 ("A considerable number of the prisoners fell, after even a short [solitary] confinement, into a semi-fatuous condition ... and others became violently insane; others, still, committed suicide"). The past centuries' experience and consideration of this issue is discussed at length in texts such as The Oxford History of the Prison: The Practice of Punishment in Western Society (1995), a joint disciplinary work edited by law professor Norval Morris and professor of medicine and psychiatry David Rothman that discusses the deprivations attendant to solitary confinement. *Id.*, at 184, 10 S.Ct. 384.

*Davis v. Ayala*, 567 U.S. 257, 287-88 (2015) (Kennedy, J., concurring)  Moreover,

Justice Kennedy noted:

[D]espite scholarly discussion and some commentary from other sources, the condition in which prisoners are kept simply has not been

9

a matter of sufficient public inquiry or interest.  To be sure, cases on prison procedures and conditions do reach the courts. Sentencing judges, moreover, devote considerable time and thought to their task . *There is no accepted mechanism, however, for them to take into account, when sentencing a defendant*, whether the time in prison will or should be served in solitary.

*Id*. at 288 (citations omitted) (emphasis added)[6]

### 2.  The Result

In light of the foregoing, it is not a surprise that Mr. Miller has suffered psychological damage as a result of his spending more than 19 months in pretrial incarceration; a large portion of it in almost solitary confinement.  Undersigned counsel has personally witnessed the deterioration in Mr. Miller's mental health. Likewise, a letter from Mr. Miller's mother is attached hereto as Attachment A.  Mrs. Miller explains:

My husband and I can see the psychological toll this type of imprisonment has had on Garret.  I fully believe that Garret would benefit most from intensive psychological counseling, but, of course, that is not available to him while in jail.  It is that type of therapy that I firmly believe would benefit Garret and society the most.  Honestly, at this point I feel like I may be losing my son.

As will be further discussed below, Mr. Miller's pretrial detention has crossed the

---

[6] Of course, Mr. Miller understands that pretrial detainees "cannot expect the amenities, conveniences and services of a good hotel." *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir.1988).  Still, there is pretrial confinement and there is pretrial confinement.

rubicon into punishment.   Moreover, the punishment is being meted out under particularly onerous conditions that are truly dangerous to Mr. Miller's psychological well being.

### C.  It Is Doubtful That Mr. Miller Would Be Sentenced to More than 24 Months Imprisonment Even After a Conviction

The most serious charges against Mr. Miller are the assault charge, in violation of 18 U.S.C. § 111 and the Interstate Threats charges, in violation of 18 U.S.C. § 1752.  While not to make light of Mr. Miller's actions on January 6, 2021, even as described by the government, the "assault" involved:

> Body-worn camera video from MPDs shows Miller inside the Rotunda at about 3:07 p.m.   A large crowd had formed and officers were attempting to control the crowd. **Miller went to the police line, at the front of the crowd, and refused to move.  When officers attempted to push him back Miller fell to the ground but quickly got up and again refused to move.  He yelled, "Hooah! Hooah!" at the officers. He then got into a fighting stance with one of his legs in front of the other and yelled, "OOOH! OW! OW! OW!" Officers eventually pushed him back.**

Government's Opposition to Defendant's Motion to Revoke Magistrate Judge's Detention Order at 4 (emphasis added) [Doc. 16].

Mr. Miller understands that the threat charges are vile and more concerning. Nevertheless, there is absolutely no indication that he took any steps to carry out the threats and that they did not simply reflect how low we have taken political discourse

and hyperbole in our country.[7]  In the end, there is no evidence that Mr. Miller, who has no criminal history, engaged in any actual acts of violence either before, during, or after January 6, 2021.

With that in mind, in determining whether Mr. Miller should really spend more time in pretrial detention, absent his release, than he likely would if convicted, it is helpful to review the only 14 rioters who received sentences greater than 24 months[8] imprisonment.[9]  It is submitted that Mr. Miller's conduct is significantly less serious:

(1) *United States v. Fairlamb*, No. 1:21-CR-00325-CKK **41 months incarceration**

•Shoved and Punched an MPD officer.

•Climbed the scaffolding.

•Entered the Capitol carrying a stolen police baton.

(2) *United States v. Chansley*, No. 1:21-CR-0003-RCL **41 months incarceration**

•Q-Anon Shaman and the very face of the events of January 6.

---

[7]*See, e.g.,* "GOP candidate says call for Garland's death was 'facetious,'" *Washington Post* (August 18, 2022) at
https://www.washingtonpost.com/politics/gop-candidate-says-call-for-garlands-death-was-facetious/2022/08/18/41307286-1f55-11ed-9ce6-68253bd31864_story.html

[8]Again, when comparing this to an actual post-conviction sentence, one must be mindful that Mr. Miller would only serve 85% of such a post-conviction sentence and he would likely be eligible for further reductions under the First Step Act.

[9]List believed to be complete as of July 31, 2022.  Descriptions of the cases taken from the government's sentencing memorandums in the respective cases.

•Climbed the scaffolding.

•Entered the Capitol and roamed the second and third floors of the building.

•Entered the Senate gallery and screamed obscenities.

•Scaled the Senate dias "taking the seat that Vice President Mike Pence had occupied less than an hour before" and took pictures of himself on the dias.

•Called other rioters up to the dias and lead them in an incantation including to be thankful for the "opportunity 'to allow us to send a message to all the tyrants, the communists, and the globalists, that this is our nation, not theirs, that we will not allow American, the American way of the United States of America to go down.'"

•Gave a *60 Minutes* interview falsely claiming that he was let into the Capitol by law enforcement and was merely intending to bring divinity, to bring God back into the Senate.

(3) *United States v. Meredith*, No. 1:21:CR-00159-ABJ **28 months incarceration**

•Did not arrive in Washington, D.C. until January 7, 2021 as a result of car trouble.

•While in Washington, he texted that he was "thinking about heading over to Pelosi Cunt's speech and putting a bullet in her noggin on live TV."

•While in Washington, he texted that he "may wander over to the Mayor's office and put a 5.56 in her skull, FNG cunt."

•In his trailer, which he drove to Washington D.C., the FBI agents found a Glock 19, nine-millimeter handgun, and a model IWI Tavor X95 rifle, approximately 2,500 rounds of ammunition, and 10 large capacity

ammunition feeding devices.  Those rounds included:

>    *Approximately 856 loose and boxed 9 mm cartridges;

>    *Approximately 320 loose, green tipped, LC17 rifle cartridges;

>    *Approximately 1001 loose, copper-color tipped, 5.56 mm rifle cartridges;

>    *Approximately 94 loose 30-30 rifle cartridges;

>    *Two 15-capacity 9 mm magazines containing approximately 29 total cartridges;

>    *Two 31-capacity 9 mm magazines containing approximately 62 total cartridges;

>    *One 50-capacity 9 mm drum magazine containing approximately 53 total cartridges;

>    *Five 5.56 mm rifle magazines containing a total of 118 cartridges (110 copper-color tipped cartridges and 8 green tipped cartridges); and

>    *One 9 mm expended cartridge case.

(4) *United States v. Palmer*, 1:21-CR-0328-TSC **63 months incarceration**

•Was on the steps leading to the LWT tunnel and, having acquired a wooden plank, he threw the plank like a spear at police officers.

•He picked up a fire extinguisher and sprayed police with its contents. Then, once it was empty, he threw it at police officers.

•He then "cast around for additional items with which he could assault the police."  He took hold of a long piece of scaffolding wrapped in

canvas and pushed it at the legs of the police.

•He then picked up the fire extinguisher he previously used to assault police and again threw it at police.

•Also, at some point, he picked up an orange traffic barrier and threw it towards the police.

(5)   *United States v. Thompson*, No. 1:21-CR-00461-RCL **46 months incarceration**

•Joined rioters as they actively assaulted police.

•Armed himself with a police baton and incited violence outside of the Capitol. Also stayed in the heart of the violent zone, watching *hours* of attacks against law enforcement. Indeed for nearly two hours he stood "in the vicinity of some of the most violent conduct on January 6, observing, commenting and occasionally chanting while windows were smashed, and the police line was repeatedly attacked."

•Provided rioters with riot shields to use against the police which had previously been stolen from the police.

•Assisted in throwing a large audio speaker at police.

•Assaulted a police officer with a baton when the officer was trying to assist a rioter needing medical attention.

(6) *United States v. Languerand*, No. 1:21-CR-00353-JDB **44 months**

•Threw a piece of wood at police.

•Just a few minutes later, he and another rioter threw a heavy black audio speaker at the police.

•A minute later, threw two sticks in rapid succession at officers.

•Three minutes later, threw another stick at officers.

•A few seconds later, threw a large orange traffic bollard which ricocheted off the riot shield of an officer before colliding with multiple officers inside the archway.

•A minute later, threw a pepper spray container followed by a bottle of liquid.

•Approximately 30 seconds later, threw a piece of wood,

•Then threw another stick at the police.

(7)   *United States v. Wilson*, No. 1:21-CR-00345-RCL **51 months imprisonment**

•Physically engaged with officers by punching, shoving and kicking them, as well as attempting to steal their riot shields.

•Picked up a several feet long white cylindrical object, believed to be a thin polyvinyl chloride (PVC) pipe, and indiscriminately struck at officers with it.

•"[E]ngaged multiple officers with whatever means he had available."

(8)   *United States v. Coffman*, No. 1:21-CR-00004-CKK **46 months imprisonment**

•Drove to Washington on January 6 from Alabama in a pickup truck containing loaded firearms, including a 9mm handgun, a rifle, and a shotgun.  Also, inside the pickup truck and in its covered bed were hundreds of rounds of ammunition, large-capacity ammunition feeding devices, a crossbow with bolts, machetes, camouflage smoke devices, a stun gun, cloth rags, lighters, a cooler containing eleven mason jars with holes punched in the lids, and other items.  The eleven mason jars each contained a mixture of gasoline and Styrofoam. The mason jars and their contents, along with the lighters and cloth rags, made up the

16

component parts of bottle-based improvised incendiary weapons (*i.e.* Molotov cocktails).

•The Styrofoam in the Molotov cocktails was designed to have a napalm effect of adhering to the skin of its victims.

•A month before January 6, he had traveled to Washington and attempted to drive to the residence of a United States Senator.

(9) *United States v. Creek,* No. 1:21-CR-00645-DLF **27 months incarceration**

•"Violently pushed and hit" a police officer in the face.

•Then made a "beeline for a U.S. Capitol Police (USCP) officer who was attempting to protect himself behind a bike rack barrier and a police shield.  He went around the barrier, gave [the Officer] a hard shove in the shoulders, and then kicked him, causing [the Officer] to fall backwards to the ground."

•Then picked up a thick strap with a heavy metal buckle and threw it at officers.

(10)  *United States v. Miller*, 1:21-CR-00075-RDM **33 months imprisonment**

•While on restricted ground of the Capitol, draped in a Confederate flag, threw a full beer can at law enforcement.

•Used a bike rack to scale the Capitol wall.

•Threw batteries at officers.

•Sprayed officers located in the Lower West Terrace tunnel with the contents of a fire extinguisher as other rioters assaulted officers with bats, flagpoles and riot shields.  The contents of the fire extinguisher sprayed at least a dozen police officers.

(11) *United States v. Rubenakcer*, No. 1:21-cr-00193-BAH **41 months**

•One of the first people to breach the Capitol, entering the Senate Wing Doors within 60 seconds of the initial breach of the building.

•After entering, he and others chased United States Capitol Police Officer Eugene Goodman through part of the Capitol to near the entrance to the Senate Chamber while the crowd was yelling "where to they count the votes."

•After finally being ushered out of the Capitol by law enforcement, he nevertheless reentered the Capitol and headed toward the Senate Chamber.

•Assaulted police officers by throwing liquids at them and swinging a bottle at one of them hitting the officer's head.

•Spent approximately an hour inside the Capitol building and, at times, smoking marijuana in the building. While in the building, he interacted with Senator Romney.

(12) *United States v. Mault*, No. 1:21-cr-00657-BAH **44 months**

•Traveled from New York to Washington with his co-defendant with batons, pepper spray, "ass kicking boots," a helmet and eye protection.

•"Led the mob that penetrated the police line in the West Plaza, forcing officers to retreat to the Lower West Terrace. Later, with great personal effort, Mault made his way to the mouth of the Lower West Terrace tunnel and used chemical spray against the police officers who refused to yield to Mault and his confederates. Mault then obtained another canister of pepper spray that he gave to another rioter who used it to attack officers in the tunnel. The officers already had endured more than an hour of violent attacks before Mault assaulted them and helped others assault them."

•"After committing these offenses, Mault lied to FBI agents, minimized and denied his unlawful conduct, parroted baseless conspiracy theories, and, incredibly, portrayed himself as a victim of the events of January 6."

(13) *United States v. Mattice*, No. 1:21-cr-00657-BAH **44 months**
•Traveled from New York to Washington with co-defendant Mault and engaged in the same behaviors as Mault including personally using chemical spray to assault police officers

14) *United States v. Ponder*, No. 1:21-cr-00259-TSC **63 months**

•Assaulted Police not once, but twice

•"Ponder charged at U.S. Capitol Police Sergeant A.G. with a long, thin pole.  He waved that pole aggressively and then attacked Sgt. A.G. by swinging the pole at him.  A.G. defended himself by raising a round, clear riot shield in front of his face.  Ponder struck the riot shield with such force that the pole snapped and broke apart as it made contact with the shield, and the top portion of the pole flew off to the side.  Ponder then retreated back into the crowd."

•Approximately 15 minutes later, "Ponder swung his striped pole at officers like a baseball bat, striking Metropolitan Police Department Officer J.C. in the left shoulder."

•Despite being escorted off Capitol grounds by law enforcement and being ordered not to return, he did return.  He then "found his way into the densest crowd where the worse fighting was taking place."  There he used his riot shield to "either block police as they fought back against the crowd or to use the shield to push into police."

•"In all, video captured defendant Ponder on Capitol Grounds between 2:08 p.m. and 5:00 p.m. (even after being detained for a portion of that time and told to leave), spending most of that time in locations that had some of the most active opposition to police."

•Moreover, he had a long criminal history including several violent crimes.  His prior criminal history included a bank robbery and the car jacking of a taxi driver where he ultimately "drove into a second vehicle and then reversed, driving the stolen taxi backwards and up onto a police cruiser."  In addition, he had separate convictions for domestic

assault, attempted possession of cocaine,  attempted possession with intent to distribute cocaine, attempted burglary, and carrying a dangerous weapon.

## D. Conclusion

At some point, a protracted pretrial detention becomes punishment.  This, in turn, can effectively deny a person his Sixth Amendment right to trial and result in pleas out of practical necessity.  Moreover, here it is not even certain that the government would agree to any plea agreement while its appeal is pending so Mr. Miller's only recourse to ensure that he does not spend more time in pretrial custody than his ultimate sentence might be would be to plead to the all of the remaining counts.  Even then, it is likely Mr. Miller's pretrial detention would surpass any ultimate sentence he might receive.  Simply put, if the trial does not take place until next summer (which assumes that the Court would have jurisdiction to proceed without an appellate mandate), Mr. Miller will have served **approximately 29 months in pretrial custody** (and, of course, if he is convicted, he will likely spend another three months in custody).  When one factors in good time credit, a 29-month "sentence" is actually the equivalent of a **34-month sentence** (and again, this does not account for any sentencing reductions now available under the First Step Act).  Given the past sentences in the cases of January 6 defendants, it is certainly probable that Mr. Miller's pretrial detention will exceed any sentence ultimately imposed.  In

any event, Mr. Miller's pretrial detention has certainly reached the point where it has become punishment

## IV. THE PROLONGED PRETRIAL DETENTION HAS DEPRIVED MR. MILLER THE ABILITY TO ASSIST IN HIS OWN DEFENSE.

As the Court is aware, the government has dumped an unprecedented amount of discovery on the January 6 defendants and the haystack must be searched to find the needles.  At one of the pretrial conferences held in this case, Mr. Miller's ability to review the discovery was discussed, and the Court was assured by the government that the government believed that Mr. Miller would be given regular access to the discovery databases in order to review the voluminous (although that word does not really do it justice) discovery so that he could assist in his own defense.  The reality, however, has proven far different.

In reality, Mr. Miller has only been given sporadic access to a laptop computer to review the discovery since this matter was first discussed.  Other times he was given a laptop computer but no charging cord.  In short, to date, Mr. Miller's ability to access discovery has been extremely limited, resulting in an inability to assist counsel in his defense.

## V. PROPOSED RELEASE PLAN

As discussed in Mr. Miller's Motion to Revoke Detention Order filed 17

months ago, Mr. Miller submits the Court *can* set conditions or a combination of conditions that would reasonably assure the safety of the community and his appearance as required. *See* 18 U.S.C. § 3142(e-f). The conditions can, and in at least some cases should, include:

1. No internet access

2. No access to firearms

3. Appropriate counseling

4. Home monitoring

5. Travel restrictions limited to the Northern District of Texas and the Eastern District of Texas except for court appearances

6. Home detention

7. Third party custodians

8. Turning over his van to a third-party during the pendency

## VI. CONCLUSION

With no trial date in sight and the likely sentence Mr. Miller would receive if convicted exceeding the time he has spent in pretrial custody despite being presumed innocent, it is evident that his pretrial detention has turned into punishment and that such punishment might continue with no firm end date in sight. This effectively extinguishes Mr. Miller's Sixth Amendment right to trial. Moreover, his pretrial

detention to date has deprived him of his right to assist in his own defense and has had a severe psychological impact.

On the other hand, there are release conditions that this Court can impose that will "reasonably assure" the safety of the community and Miller's appearance as required.  Mr. Miller should not be forced to endure further "pretrial punishment" while the wheels of the appellate system grind away.

Respectfully submitted,

/s/ F. Clinton Broden
F. Clinton Broden
TX Bar No. 24001495
Broden & Mickelsen
2600 State Street
Dallas, Texas 75204
214-720-9552
214-720-9594 (facsimile)
clint@texascrimlaw.com

LOCAL COUNSEL:
Camille Wagner
DC Bar No. 1695930
Wagner PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(202) 630-8812
law@myattorneywagner.com

Attorneys for Defendant
Garret Miller

## **CERTIFICATE OF SERVICE**

I, F. Clinton Broden, certify that, on August 22, 2022, I caused a copy of the

above document to be served by electronic means on:

United States Attorney's Office
555 4th Street, N.W.
Washington, DC 20350

/s/ F. Clinton Broden
F. Clinton Broden