# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-119-CJN** |
| **GARRET MILLER** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Garret Miller to 48 months' imprisonment, $2,000 restitution, a 3-year term of supervised release, and a mandatory special assessment of $605. This custody recommendation is an upward variance from the range as calculated by the government and probation's Final Presentence Report (PSR), and accounts for Miller's intent to influence governmental action through violence as well as his threat to assassinate a member of Congress, neither of which are fully accounted for in the Sentencing Guideline Range.

## I.     INTRODUCTION

Garret Miller, an unemployed 36-year-old from Richardson, Texas, traveled to Washington, D.C. on January 6, 2021, for one reason and one reason only: to stop Congress' certification of the 2020 presidential election. He brought with him rope, a grappling hook, a mouth guard, and a bump cap – tools that he referred to as "riot gear" – and stated that he "looked forward"

to fighting what he called the "soft" law enforcement officers in Washington, D.C.

Miller was obsessed with the results of the 2020 presidential election and his belief that it had been stolen. In addition to becoming a keyboard warrior – using social media to threaten everyone from Senator Charles Schumer to Mark Zuckerburg and Jack Dorsey – Miller began to consider himself a revolutionary. Miller traveled to multiple political events, including the November 14, 2020, protest in Washington, D.C., and a January 3, 2021, rally in Georgia, before coming to Washington, D.C. for the Stop the Steal rally.

Miller did more than just participate in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1] Miller was at the forefront of every barrier overturned, police line overrun, and entryway breached within his proximity that day. He was so disruptive on the East Front of the building that he was *twice* detained, the second time resulting in him being put in handcuffs. After being released and vowing to leave, Miller instead stayed at the riot, initially filming himself talking about a revolution.

Miller then forced his way past the United States Capitol Police ("USCP") and entered the Rotunda, making it to the old Senate Chamber before being turned back to the Rotunda. As the

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

line of USCP and Metropolitan Police Officers ("MPD") attempted to remove the rioters, Miller stayed on the front lines, assaulted an MPD Sergeant, and engaged in a physical altercation with no fewer than six officers. Following his ejection from the building, Miller then made his way to the West Front, where he watched the violent encounter at the Lower West Terrace tunnel until finally leaving the Capitol grounds after 5:00 p.m.

But Miller still wasn't done. At 7:26 p.m., in response to Congresswoman Ocasio-Cortez's social media post to "Impeach," Miller directly responded: "Assassinate AOC." Following the riot and up until his arrest, Miller continued to discuss his desire to "start assassinating," bragged to his friends about how he "terrified [c]ongress," and openly discussed his desire to doxx[2] the officer who shot Ashli Babbitt and "hug his neck with a nice rope." Miller was so proud of his conduct, that when he was arrested on January 20, 2021, he was found wearing a shirt with an image of the former president and the words "I was there, Washington, D.C., January 6, 2021:"

---

[2] To "doxx" someone refers to the act of search for and publishing private or identifying information about a particular individual over the internet, typically with a malicious intent.



Government's Trial Exhibit 602[3]

At the time of his arrest, Miller was in possession of an AR-style rifle with an illegal barrel that the FBI has found to be a machinegun: a charge for which he was recently indicted in the Northern District of Texas.[4]

The government recommends that the Court sentence Miller to 48 months' incarceration for 5

---

[3] Most exhibits referenced here include the exhibits prepared for trial and organized in the Government's Exhibit List attached to its Trial Brief, ECF No. 120, Exhibit A. Additional Exhibits not included in the Trial Exhibit List will be referred to as "Sentencing Exhibits" and be included in the 800 Series of exhibits.

[4] Miller was indicted on February 7, 2023, in Case No. 3:23-cr-041-S, Northern District of Texas – Dallas Division, for a single count of Possession of an Unregistered Firearm, 26 U.S.C. § 5861(d). This offense carries a maximum punishment of 10 years imprisonment, a $250,000 fine, and a three-year term of supervised release. *See* Government's Sentencing Exhibit 804. Although the Court should be aware of the recent, unsealed indictment, for reasons discussed below and at sentencing, we are asking the Court not to consider this new charge in fashioning the appropriate sentence.

felony and 6 misdemeanor convictions, including an assault on law enforcement, a direct threat to assassinate a member of Congress, and 3 convictions for interfering with police officers during a civil disorder. This recommendation is a 2-month upward variance from the advisory Guidelines' range of 37 to 46 months, which the government submits is the correct Guidelines calculation. A 48-month sentence reflects the egregious nature of Miller's conduct surrounding the Capitol riot and accounts for Miller's planning, preparation, and intent on occupying the Capitol, stopping the Certification, and terrorizing both members of Congress and law enforcement.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021, Attack on the Capitol

The government refers to the court to the paragraphs of the Affidavit accompanying the Complaint filed in this case, ECF No. 1, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.     Garret Miller's Role in the January 6, 2021, Attack on the Capitol

#### *The Leadup to January 6*

Miller's intent to terrorize lawmakers and create political havoc was formed well before January 6, 2021. Shortly after the November 2020 election, and in anticipation of his upcoming trip to Washington, D.C. a week later, Miller sent the following direct message to the Instagram account of Senate Majority Leader Chuck Schumer on November 7, 2020:

| | |
|---|---|
| **Sent** 2020-11-07 17:09:54 UTC | |
| **Body** Hey we are coming for you chick | |
| **Author** garrmill (Instagram: 1039711967) | |
| **Sent** 2020-11-07 17:09:58 UTC | |
| **Body** Chuck | |
| **Author** garrmill (Instagram: 1039711967) | |
| **Sent** 2020-11-12 05:06:42 UTC | |
| **Body** We got you! | |
| **Author** garrmill (Instagram: 1039711967) | |
| **Sent** 2020-11-26 19:12:06 UTC | |
| **Body** I celebrate it with family, without a mask, and with a loaded gun in my pocket. Just in case you show up. God bless America globalist coward. | |
| **Share** | **Date Created** Unknown |

Government's Trial Exhibit 501 at Page 31

The threat on Senator Schumer's life was serious enough that it eventually resulted in a referral from the USCP to the FBI, who by that point were already investigating Miller for his crimes at the Capitol on January 6.[5]

Miller then traveled to Washington, D.C., to attend a November 14, 2020, protest against the 2020 presidential election results. Miller posted several pictures from the rally on social media, including a photograph of the East Front of the Capitol building, which he would later attack on January 6.[6] The next day, Miller messaged a friend and told him that "[every] patriot had a gun tonight and we still didn't shoot [Black Lives Matter].[7] He later admitted in a message on January 3, 2021, that he brought "a lot of guns" with him to Washington for the November protest.[8] Miller also relished the violence that occurred at the November 2020 protest:

---

[5] *See* Government's Trial Exhibit 508R.
[6] *See* Government's Trial Exhibit 504.3 at Page 8.
[7] Government's Trial Exhibit 504R, at page 237.
[8] Government's Trial Exhibit 505.4, at page 3.

Author kmcarr85 (Instagram: 979489418)
    Sent 2020-11-15 18:30:19 UTC
    Body You ok out there? I heard it turned into riots!

Author garrmill (Instagram: 1039711967)
    Sent 2020-11-15 18:32:18 UTC
    Body It's wonderful

Author garrmill (Instagram: 1039711967)
    Sent 2020-11-15 18:32:49 UTC
    Body Proud boys and police smashed them now trumpers are vacationing in the capital

Author kmcarr85 (Instagram: 979489418)
    Sent 2020-11-15 18:37:51 UTC
    Body Awww that's so awesome! I love it!

Author garrmill (Instagram: 1039711967)
    Sent 2020-11-16 20:12:04 UTC
    Body We did great 😊

Share        Date Created Unknown

Government's Trial Exhibit 505.1

The next day, he texted his mother, "[t]his is uhh yes a real revolution."[9]

By December 28, 2020, Miller planned to attend a pollical rally in Dalton, Georgia on January 3 before continuing to D.C. for the January 6 Stop the Steal rally.[10] Before leaving Texas, Miller made it clear that his intent in traveling to Washington was to stop Congress' certification of the presidential election, and that he planned to engage in violence. On January 1, he texted his mother that he would be out in D.C. on January 5, 2021, conducting "[r]econ."[11] The following day, he wrote to a friend, "[t]hings could get real dicey this week," and that "[m]aybe I need to write a will and testament."[12] He told another friend that he was "[f]ighting for freedom," and that "I think it comes down to [Vice President Mike P]ence. He can choose which electors."[13] He stated to another person that he was going for "[o]ccupation," and that "[w]e are taking that city

---

[9] Government's Trial Exhibit 702F, at page 63.
[10] *See* Government's Trial Exhibit 702G, at page 5.
[11] Government's Trial Exhibit 702F, at page 76.
[12] Government's Trial Exhibit 505.6.
[13] Government's Trial Exhibit 505.7.

over."[14] He predicted that, "I think [Vice President P]ence will certify the republication electors but might take till Friday. Then anarchy."[15]

Miller also discussed what tools and materials he planned to bring to the January 6 Capitol riot:

> Garret Adam Miller (Facebook: 1108874739)
> **Sent** 2021-01-03 20:06:39 UTC
> **Body** I have a grappling hook and rope and a level 3 vest. Helmets mouth guard and bump cap

Government's Trial Exhibit 505.4 at page 2

In response to a friend telling him to "go armed," Miller responded by telling him, "[i]f I get put in cuffs it's better to not be armed."[16] Miller then immediately added, "these people are soft," and that "I look forward to fighting them."[17] Miller also told this friend that he wasn't going to bring firearms to D.C. this time, except for perhaps a single "hidden" firearm, because he "found out about the laws and it's a federal crime:"

---

[14] Government's Trial Exhibit 505.2.
[15] Government's Trial Exhibit 502.3
[16] Government's Trial Exhibit 505.4, at page 2.
[17] *Id*. at page 3.

> **Author** Garret Adam Miller (Facebook: 1108874739)
> **Sent** 2021-01-03 20:11:38 UTC
> **Body** Uhh maybe.... if I get put in cuffs it's better to not be armed then.

| Facebook Business Record | Page 34 |
|---|---|

> **Author**
> Garret Adam Miller (Facebook: 1108874739)
> **Sent** 2021-01-03 20:12:13 UTC
> **Body** These people are soft
>
> **Author** Garret Adam Miller (Facebook: 1108874739)
> **Sent** 2021-01-03 20:12:26 UTC
> **Body** I look forward to fighting them
>
> **Author** Garret Adam Miller (Facebook: 1108874739)
> **Sent** 2021-01-03 20:14:25 UTC
> **Body** Plus this is the third time. First time I had a lot of guns with me so I was very cautious
>
> **Author** Garret Adam Miller (Facebook: 1108874739)
> **Sent** 2021-01-03 20:14:40 UTC
> **Body** But found out about the laws and it's federal crime
>
> **Author** Garret Adam Miller (Facebook: 1108874739)
> **Sent** 2021-01-03 20:15:12 UTC
> **Body** So might just keep 1 hidden one and store the rest in Virginia

Government's Trial Exhibit 505.4 at pages 2-3

In the same conversation, Miller stated he had "[b]een prepping, testing, training, etc. I'm ready."[18] Just as he had stated two days earlier to his mother, Miller told this individual that he would be getting to D.C. early on January 5 and that he "will recon."[19]

### *Approach to the Capitol*

Miller attended the January 3, 2021, political rally in Georgia before traveling to Washington, D.C. From 8:30 a.m. to approximately 12:30 p.m. on January 6, Miller was at the

---

[18] *Id*. at page 5.
[19] *Id*.

Ellipse for the Stop the Steal rally.

Following the rally, Miller traveled to the Capitol and entered the restricted perimeter. By the time he made it onto the grounds, and as he later told his mother, Miller intended to "flank" the Capitol.[20]  At approximately 1:45 p.m., Miller was on the northwest side of the Capitol grounds running towards the East Front of the building:



Screenshot of Government's Trial Exhibit 208 at 5:31

At 1:55 p.m., Miller was the first rioter to approach the bicycle racks on the northeast side of the Capitol. Two minutes later, Miller began waiving to the crowd behind him and encouraging them to come toward the barrier. By 1:58 p.m., Miller was leading the way as the crowd removed the barriers and began running to the stairs on the East Front of the Capitol:

---

[20] *See* Government's Trial Exhibit 702F, at pages 80-81.



Screenshots of Government's Trial Exhibit 209 at 0:43, 2:12, and 3:11

### *Miller's Detention on the East Front of the Capitol*

Miller continued to lead the charge as the mob swarmed the East Front of the building.
While the police retreated from the fencing perimeter to the stairs leading up to the Rotunda doors,
Miller ran toward the stairs and yelled at the police:

 

Government's Trial Exhibit 201 at 1:22 and 1:55

Over the next few minutes, as the police held the crowed back at the bottom of the steps,
Miller helped lead the crowd by jumping the police line – *twice*.  The first time, Miller was
detained by the police for less than 20 seconds before they released him back into the crowd.[21]

Less than three minutes later, at 2:04:25 p.m., Miller jumped the police line a *second* time.
This time, according to Officer J.S., he observed Miller struggling with another officer after Miller
had broken through the police line. Officer J.S. ran towards Miller and assisted the other officer in
restraining Miller a few feet behind the police line. USCP Officer J.S. handcuffed Miller, who by
that point was wearing the mouthguard he brought to the Capitol.[22]

---

[21] *See* Government's Trial Exhibit 202.2 from 0:55 to 1:40.
[22] UCSP Officer J.S.'s version of events is summarized in an FBI 302 previously provided
through discovery.



Government's Trial Exhibit 205



Government's Trial Exhibit 203.1 at 0:26

Officer J.S. found Miller's wearing a mouthguard to be extremely odd and caused him to believe that Miller had come to the United States Capitol "ready to fight."

Officer J.S. led Miller to the top of the Capitol steps, where he was detained for just over a minute. At 2:06:10 p.m., the mob pushed past the line of police and made their way up the stairs, and Officer J.S. led Miller off to the side of the terrace as the mob swarmed the Rotunda doors. Officer J.S. and his supervisor, USCP Lieutenant P.K., made the tactical decision to release Miller. The officers told Miller that they were going to cut Miller a "huge break" and release him from custody. Miller responded by apologizing and telling the officers, "I just want to go home." Miller was released from police custody at exactly 2:10 p.m.

Despite Miller's apology and assurances, he had no intention of leaving the Capitol. Less than a minute later, Miller joined the mob at the Rotunda door and was proudly recording video.[23] At 2:17 p.m., Miller stood on a landing outside the East Front of the Capitol and declared: "We stormed Congress. We got stopped at the door right now, but we might get in in a minute. This is a real revolution, right? Yeah buddy."



Screenshot from Government's Trial Exhibit 712

---

[23] *See* Government's Trial Exhibit 711.

For the next thirty minutes, Miller remained outside the Rotunda doors, watching as the mob assaulted, sprayed, and attacked police. From 2:24 p.m. until 2:34 p.m., Miller took seven videos of himself and the mob as they attempted to open the Rotunda doors.[24] Miller was present near the front of the mob and was able to observe the violence being inflicted by the mob on the police officers guarding the outside of the doors.[25]

### *Conduct Inside the Capitol*

At 2:38 p.m., with the help from of the rioters already inside the building, the Rotunda doors were breached.[26] Officers were briefly able to secure the door, and at 2:42 p.m. were in the middle of a standoff with the mob on the outside, including Miller. At 2:43:00 p.m., the force of the mob pushed past the officers, and the rioters swarmed the building. Miller was among the first of these rioters and entered the Capitol eight seconds later.[27] CCTV captured the moment that Miller and the crowd surged past USCP officers, while Miller stopped to pick up a flagpole near the entryway.

---

[24] *See* Government's Trial Exhibits 713-719.
[25] *See* Government's Trial Exhibit 302 and 304.
[26] Government's Trial Exhibit 307 at 3:25-3:40.
[27] Government's Trial Exhibit 307 at 7:50-8:20.



Screenshot of Government's Trial Exhibit 305.1 at 0:02

After briefly pausing to film the breach of the Rotunda doors from the inside,[28] Miller

joined the mob in the Rotunda. He then proceeded towards the Senate side of the Capitol, where

he recorded a video in the small Senate Rotunda and stated, "a little bit of tear gas never stopped

nothing."[29] Miller made it as far as the old Senate Chamber, depicted below and in a recording

taken by Miller, before he and the rioters were stopped by police:

---

[28] *See* Government's Trial Exhibit 720.
[29] Government's Trial Exhibit 722.



Government's Trial Exhibit 723 at 0:02          Government's Trial Exhibit 113

At 3:02 p.m., Miller was carrying a flagpole in that area as the police urged Miller and the other rioters to leave:



Screenshot of Government's Trial Exhibit 406 at 14:10

Miller then retreated into the Rotunda, where at 3:05 p.m., he took a selfie photograph of himself and another rioter. Less than one minute later, officers with the USCP and MPD formed a line to force the rioters from the building. While some rioters left willingly and without incident, Miller was not one of them. Instead, Miller remained on the front lines and engaged with multiple

17

officers as they attempted to eject the mob from the building. As Officer T.C. stated during his trial testimony, Miller showed signs of aggression and appeared to be "psyching himself up." During their encounter.[30]



Screenshot of Government's Trial Exhibit 407 at 3:20

At 3:07 p.m., Officer T.C. ordered Miller to back up. Miller twice stated, "I will not back up." Sargent Q.C. attempted to intervene, and a minute later, Miller grabbed at an officer's baton and forcibly resisted Sargent Q.C.:

---

[30] *United States v. Miller*, 21-cr-119 (CJN), Transcript of Trial, Dec. 9, 2022 (testimony of Officer T.C., at Page 72).



Government's Trial Exhibit 407 at 3:48

Miller continued to remain at the front of the police line and refused to give ground. It took two officers to knock Miller off his feet and get him to back up in compliance with their instructions. Even after getting knocked over, Miller returned to the police line where he continued to ignore police officers' commands and resisted multiple officers' efforts to push him towards the exit. After officers again attempted to push him back, Miller had to be restrained by another rioter as he screamed in the direction of officers and banged his flagpole into the floor of the Rotunda:



Government's Trial Exhibit 407 at 5:36

19

Officer T.C. testified about this interaction that "[t]he crowd, as a whole, is giving but [Miller's] actions are stating that he's willing to stand out on the island by himself. He's pulling against his own people. So he wants to be on that island by himself. He wants to show that he's willing to take it up a notch."[31]

Miller's actions in the Rotunda involved his physical contact with no less than six officers:[32] Officer T.C. testified that officers had to put hands on Miller to force him back approximately 13 to 15 times:[33]



Screenshots of Government's Trial Exhibit 401 at 1:53, 2:43, 2:57, and 3:11

---

[31]*United States v. Miller*, 21-cr-119 (CJN), Transcript of Trial, Dec. 9, 2022 (testimony of Officer T.C., at Page 72).

[32] *See also* Government's Trial Exhibit 403 from 7:30 to 8:10

[33] *United States v. Miller*, 21-cr-119 (CJN), Transcript of Trial, Dec. 9, 2022 (testimony of Officer T.C., at Page 74).

Miller was eventually ejected from the Capitol, and at 3:36 p.m. he took this selfie on the northwest side of Capitol grounds:



Government's Trial Exhibit 726

### *The West Front*

Even after getting twice detained by police, resisting officers, and having to be forcibly removed from the building, Miller did not leave Capitol grounds. Instead, by 4:14 p.m., Miller had traveled to the West Front of the Capitol, where, above him on the Lower West Terrace, other rioters were engaged in a violent assault against police guarding the entrance to the Capitol known as the "tunnel." From 4:14 until 5:07 p.m., Miller remained on the West Front where he filmed the riot. At 5:05 p.m., Miller filmed the moment when what appears to be a flash bang grenade went off near the entrance to the tunnel:



Government's Trial Exhibit 735 at 0:08

### *Miller's Death Threats and Calls for Violence*

Even then, Miller's involvement in the Capitol riot was far from over. By 6:51 p.m., Miller began collecting images of the riot and saving them to his phone.[34] More importantly, Miller took to social media to threaten the life of a United States Congresswoman. That evening, Congresswomen Ocasio-Cortez posted on Twitter a single word: "Impeach." At 7:26 p.m., after commenting falsely that "[w]e where [*sic*] gentle with the police," he responded directly to the lawmaker, "Assassinate AOC."

---

[34] *See* Government's Trial Exhibits 737-744.



Government's Trial Exhibit 511

Miller intended his tweet to be perceived as a serious intent to commit violence against the Congresswoman, and he knew that his participation in the attack on the Capitol was viewed as a threat of violence towards members of Congress.[35] The next day through social media, he continued to discuss how "we will start assassinating."

Author **kmcarr85** (Instagram: 979489418)
Sent **2021-01-07 02:02:04 UTC**
Body **Oh wow... this is insane. I'm glad you're ok. Poor woman.**

**I just fear this is going to end bad for us trump supporters**

Author **garrmill** (Instagram: 1039711967)
Sent **2021-01-07 02:02:34 UTC**
Body **I think we will start assassinating**

Government's Trial Exhibit 502 at page 14

Rather than express any remorse, Miller was overjoyed with what he and the other rioters accomplished that day. On January 7, Miller bragged to a friend about having "terrified

---

[35] *See* Factual Basis for Guilty Pleas to Counts 4 and 5, ECF No. 130, at 2.

[C]ongress:"



From: +12147285392 Garret Miller (owner)
Dude we uhh terrified congress
Status: Sent
Delivered: 1/7/2021 2:43:55 PM(UTC+0)

1/7/2021 2:43:55 PM(UTC+0)

Source Info:
DL114130_files_partial-afu.zip/private/var/mobile/Library/SMS/sms.db : 0x33BB213 (Table:
message, chat, Size: 70737920 bytes)

Government's Trial Exhibit 702B at page 3

He followed up by stating that it was "really beautiful."[36]   In another exchange on January 12,
Miller stated, "Bro [C]ongress is terrified. This is incredible."[37]  A few days later, Miller told
another individual how "glorius" [sic] it was and stated that it was fun watching lawmakers
scared in the Capitol:



2021-01-16 01:21:08 UTC
**Body** its fun watching them be scared in the chambers

**Author** Garret Adam Miller (Facebook: 1108874739)
**Sent** 2021-01-16 01:21:24 UTC
**Body** dam man this shits glorius

Government's Trial Exhibit 506 at pages 153-154.

Later in the same exchange, Miller stated that he was "[s]o fucking proud" of "scar[ing]
the shot [sic] out of members of Congress.[38]

Miller also became fanatical with finding out the identity of and threatening to execute the
USCP officer who shot Ashli Babbitt. On the evening of January 6, after threatening the life of

---

[36] Government's Trial Exhibit 702B at page 5.
[37] Government's Trial Exhibit 702D at page 2.
[38] Government's Trial Exhibit 506 at page 170.

Congresswoman Ocasio-Cortez, Miller began saving numerous social media posts from the Proud Boys and others memorializing the rioter's death.[39]  Less than a week later, Miller saved the below image to his phone suggesting that Babbitt, who had been shot as she climbed through a window in an attempt to reach fleeing legislators, was a martyr:



Government's Trial Exhibit 762

But Miller didn't just want other rioters and himself to "have Ashli in our hearts."[40] He wanted revenge. In a Facebook message on January 10, 2021, Miller said that he and others were going to find the officer and "hug his neck with a nice rope:"

---

[39] *See* Government's Trial Exhibits 751-755.
[40] Government's Trial Exhibit 702F at page 80.

**Author** Garret Adam Miller (Facebook: 1108874739)
**Sent** 2021-01-10 17:05:56 UTC
**Body** He's everyone's favorite cop now

**Author** Garret Adam Miller (Facebook: 1108874739)
**Sent** 2021-01-10 17:06:23 UTC
**Body** We going to get a hold of him and hug his neck with a nice rope

**Author** Josh DuBose (Facebook: 100003929842412)
**Sent** 2021-01-10 17:07:43 UTC
**Body** Didn't you say you were a Christian or some lie?

**Author** Garret Adam Miller (Facebook: 1108874739)
**Sent** 2021-01-10 17:07:56 UTC
**Body** Justice

**Author** Garret Adam Miller (Facebook: 1108874739)
**Sent** 2021-01-10 17:08:01 UTC
**Body** Not murder

**Author** Garret Adam Miller (Facebook: 1108874739)
**Sent** 2021-01-10 17:08:08 UTC
**Body** Read the commandment

**Author** Garret Adam Miller (Facebook: 1108874739)
**Sent** 2021-01-10 17:08:13 UTC
**Body** theres a difference

Government's Trial Exhibit 506 at page 114

That same day, Miller stated that he "just want[ed] Ashli's [k]iller" and posted a photograph of a noose:



Government's Trial Exhibit 503 at page 110

By January 11, Miller was circulating photographs of the officer who he believed shot Babbitt.[41]  He also began sharing an article from a conspiracy theory-laden website ("the Article") that claimed to have identified the officer. From January 16 until his arrest four days later, and

---

[41] *See, e.g.,* Government's Trial Exhibit 503 at pages 51, 53, 76, 80-81, 92, and 94.

despite being banned from posting on nearly all his social media,[42] Miller shared the Article through social media and in text message.[43]  In one exchange on January 15, Miller laughed about making death threats following the lifting of his Twitter suspension, which got him suspended a second time:

> **Author** Garret Adam Miller (Facebook: 1108874739)
> **Sent** 2021-01-15 01:25:22 UTC
> **Body** This block was for telling someone who made an Ashli Babbit joke that I wanted to beat there ass.
>
> **Author** Jamie Glen Est (Facebook: 100025584581263)
> **Sent** 2021-01-15 01:25:38 UTC
> **Body** Wow
>
> **Author** Jamie Glen Est (Facebook: 100025584581263)
> **Sent** 2021-01-15 01:25:49 UTC
> **Body** Shits getting crazy
>
> **Author** Garret Adam Miller (Facebook: 1108874739)
> **Sent** 2021-01-15 01:26:09 UTC
> **Body** My Twitter ban lifted then I was happy to make death threats so I been just off the rails tonight lol
>
> **Author** Jamie Glen Est (Facebook: 100025584581263)
> **Sent** 2021-01-15 01:26:14 UTC
> **Body** Fuck fact checker
>
> **Author** Garret Adam Miller (Facebook: 1108874739)
> **Sent** 2021-01-15 01:26:18 UTC
> **Body** And then got suspended
>
> **Author** Jamie Glen Est (Facebook: 100025584581263)
> **Sent** 2021-01-15 01:26:25 UTC
> **Body** Damn
>
> **Author** Garret Adam Miller (Facebook: 1108874739)
> **Sent** 2021-01-15 01:26:50 UTC
> **Body** But I'm happy to be banned now. If they want me to be a radical they got it.

Government's Trial Exhibit 506 at page 15

In another exchange, Miller told a friend that "we got the traitor cop as a target" and that "his execution [is] justified:"

---

[42] *See*, e.g., Government's Trial Exhibit 503 at pages 84-86, 116-118.
[43] *See, e.g.,* Government's Trial Exhibits 702D at page 3, Exhibit 702F at page 94, and Exhibit 506 at page 7.

**Author** Garret Adam Miller (Facebook: 1108874739)
**Sent** 2021-01-16 21:08:04 UTC
**Body** Well we got the traitor cop as a target and as long as we don't
shoot him we don't get accused of firing the first shot. He shot first.
His death prevents civil war by liberal history teller arguments.

**Author** Josh DuBose (Facebook: 100003929842412)
**Sent** 2021-01-16 21:08:08 UTC
**Body** Most of the country just wants crazy people to stop acting acting
crazy

**Author** Josh DuBose (Facebook: 100003929842412)
**Sent** 2021-01-16 21:08:33 UTC
**Body** But if this continues people will get more crazy

**Author** Garret Adam Miller (Facebook: 1108874739)
**Sent** 2021-01-16 21:08:34 UTC
**Body** Well what goes around comes around 🤷🏻‍♂

**Author** Garret Adam Miller (Facebook: 1108874739)
**Sent** 2021-01-16 21:08:43 UTC
**Body** Kharma is a wheel

**Author** Josh DuBose (Facebook: 100003929842412)
**Sent** 2021-01-16 21:08:53 UTC
**Body** It will come around

**Author** Josh DuBose (Facebook: 100003929842412)
**Sent** 2021-01-16 21:08:56 UTC
**Body** Trust me

**Author** Garret Adam Miller (Facebook: 1108874739)
**Sent** 2021-01-16 21:10:04 UTC
**Body** I'm not guilty of shit. My kharma pure

**Author** Garret Adam Miller (Facebook: 1108874739)
**Sent** 2021-01-16 21:10:04 UTC
**Body** His execution justified

Government's Trial Exhibit 506 at page 176

That same day, Miller told another friend, "that cops not going to survive long" and that

he deserved to die.[44]

### *Miller's Arrest and Items Recovered*

By January 16, 2021, Miller was worried about being arrested. After again sharing the

Article, Miller told a Facebook friend that "[i]t might be time for me to…be hard to locate."[45] Two

days later, Miller sent another individual a link to the FBI January 6 page for wanted rioters and

---

[44] Government's Trial Exhibit 506 at page 138.
[45] Government's Trial Exhibit 506 at page 25.

commented, "[w]hat a waste of time fir [*sic*] federal employees:"



Government's Trial Exhibit 702D at page 6

Two days after sending this message, the FBI arrested Miller at his home in Richardson, Texas. In addition to recovering the January 6 memorial shirt discussed above, agents recovered Miller's grappling hook, rope, mouth guard, bump cap, and clothing he brought to the Capitol on January 6. On his desk, Miller's calendar entry for January 6, 2021, mirrored the former president's December 19, 2020, tweet calling for a "big" and "wild" protest in D.C. that day:

Government's Trial Exhibit 610 at page 2

In his closet, agents recovered an illegal AR-style rifle equipped with an 8.5 inch barrel.[46]
Agents recently test-fired the rifle and discovered that it was actually a machinegun.[47]  A records
check revealed that Miller had purchased the lower receiver of the firearm in 2017 but did not have
a license to possess either a short-barred rifle or a machinegun.[48]

## III.     THE CHARGES AND PLEA AGREEMENT

On November 2, 2022, a federal grand jury returned a Third Superseding Indictment
charging Miller with 13 Counts. Two of those counts were dismissed by the Court prior to trial,
with one–Count 3–remaining on interlocutory appeal before the D.C. Circuit Court of Appeals.[49]
On the morning of trial, Miller pleaded guilty to the following charges:

- Count 1, Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. § 231(a)(3);

- Count 2, Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. § 231(a)(3);

- Count 7, Entering or Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1);

- Count 8, Disorderly or Disruptive Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2);

- Count 9, Impeding Ingress and Egress in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(3);

---

[46] Government's Sentencing Exhibit 801 at page 2.
[47] Government's Sentencing Exhibit 802.
[48] Government's Sentencing Exhibit 801 at page 2.
[49] Count 3 of the Third Superseding Indictment included the charge of Obstruction of an Official Proceeding and Aiding and Abetting, 18 U.S.C. § 1512(c)(2). The Court granted the defendant's motion to dismiss this Count first on March 7, 2022, and again on November 21, 2022.   ECF No. 73; *see* 11/21/22 Minute Order. Count 6 of the Third Superseding Indictment charging Interstate Threats to Injure, 18 U.S.C. § 875(c), was dismissed by the Court following the government's motion.   *See* ECF No. 122; 12/05/22 Minute Order.

- Count 10, Engaging in Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D);

- Count 11, Impeding Passage Through the Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(2)(E);

- Count 12, Parading, Demonstrating, or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G); and

- Count 13, Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. § 231(a)(3).

Miller elected to go to trial on his two remaining counts: Count 4, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1); and Count 5, Interstate Threat to Injure or Kidnap, 18 U.S.C. § 875(c). Trial commenced on December 9, 2022. Following a break during trial, Miller elected to plead guilty without a plea agreement to the remaining two counts. On December 12, 2022, the Court accepted Miller's guilty plea to Counts 4 and 5.

## IV.   STATUTORY PENALTIES

Miller now faces sentencing on eleven offenses, including five felonies. He faces sentencing on a single count of Assaulting, Resisting, or Impeding Certain Officers (Count 4), a single count of Interstate Threat to Injure or Kidnap (Count 5), and three counts of Interfering with Law Enforcement Officers During a Civil Disorder (Counts 1, 2, and 13). Miller also faces sentencing on the misdemeanor offenses of Entering or Remaining in a Restricted Building or Grounds (Count 7), Disorderly or Disruptive Conduct in a Restricted Building or Grounds (Count 8), Impeding Ingress and Egress in a Restricted Building or Grounds (Count 9), Engaging in Disorderly Conduct in a Capitol Building (Count 10), Impeding Passage Through the Capitol Grounds or Buildings (Count 11), and Parading, Demonstrating, or Picketing in a Capitol Building

(Count 12).

As noted by the Final Presentence Report, Miller faces the following statutory maximum terms of incarceration for each count:

| Count | Term of Imprisonment | Term of Supervised Release | Fine | Mandatory Special Assessment |
|---|---|---|---|---|
| 1 | 5 years | 3 years | $250,000 | $100 |
| 2 | 5 years | 3 years | $250,000 | $100 |
| 4 | 8 years | 3 years | $250,000 | $100 |
| 5 | 5 years | 3 years | $250,000 | $100 |
| 7 | 1 year | 1 year | $100,000 | $25 |
| 8 | 1 year | 1 year | $100,000 | $25 |
| 9 | 1 year | 1 year | $100,000 | $25 |
| 10 | 6 months | N/A | $5,000 | $10 |
| 11 | 6 months | N/A | $5,000 | $10 |
| 12 | 6 months | N/A | $5,000 | $10 |
| 13 | 5 years | 3 years | $250,000 | $100 |

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). U.S.S.G. Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to

"[a]pply" the grouping analysis as set out in Chapter 3.

The initial PSR did not follow these steps. Instead, it attempted to combine the counts into five groups, and then conducted a Guidelines analysis for each group, not each individual count. *See* Initial PSR, ECF No. 132, at ¶¶ 41-94. A correct Guidelines analysis follows:

Count 1: 18 U.S.C. § 231

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(a) | Offense Involved Physical Contact | +3 |
|  | **Total** | **13** |

Miller objected to the 6-level adjustment under U.S.S.G. § 3A1.2 applied to all three 18 U.S.C. § 231 convictions–Counts 1, 2, and 13. He referenced Application Note 2 to U.S.S.G. § 2A2.4 which explicitly states that the base offense level already "incorporates the fact that the victim was a governmental officer performing official duties" and, therefore do *not* apply § 3A1.2. The government agrees with Miller's objection, and the Final PSR adopted Miller's position. Counts 1, 2, and 13 should be calculated with a base offense level of 10 under U.S.S.G. § 2A2.4 and without the 6-level adjustment under U.S.S.G. § 3A1.2(b) for the status of the victims as governmental officers or employees.

On the other hand, as explained below, the 3-level enhancement for physical contact under U.S.S.G. § 2A2.4(a) applies to each of the Section 231 convictions. The Final PSR agrees with the government's position.[50] Count 1 involved Miller's act of pushing past officers guarding the entryway into the Capitol through the Rotunda doors. He did so as part of a mob

---

[50] *See* Final PSR, ECF No. 139, at ¶¶ 61, 90, and 94c.

that physically forced themselves past police officers guarding that door.[51] Even if Miller did not personally make contact with an officer, his position in the crowd and their collective use of force against the line of officers supports application of the enhancement on an aiding and abetting theory under U.S.S.G. § 1B1.3(a)(1)(A), and under a joint enterprise theory under § 1B1.3(a)(1)(B).

Count 2: 18 U.S.C. § 231

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(a) | Offense Involved Physical Contact | +3 |
| | **Total** | **13** |

The 3-level enhancement for physical contact under U.S.S.G. § 2A2.4(a) also applies to Count 2, which involved Miller's conduct in the Rotunda. From 3:07 until 3:10 p.m., Miller grabbed at an officer's baton, forcibly resisted Sargent Q.C., refused officers' commands to back up, and engaged in physical contact with no fewer than six officers that had to put hands on Miller to force him back approximately 13 to 15 times.[52] Miller's conduct forming the basis for this Count should include the physical contact adjustment.

Miller's objection to the 6-level adjustment, as described above, should be sustained.

Count 4: 18 U.S.C. § 111(a)(1)

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |

---

[51] Government's Trial Exhibit 307 at 7:50-8:20.

[52] Government's Trial Exhibit 403 from 7:30 to 8:10; Government's Trial Exhibit 407 from 3:20 to 5:48; *United States v. Miller*, 21-cr-119 (CJN), Transcript of Trial, Dec. 9, 2022 (testimony of Officer T.C., at Page 74).

34

Count 5: 18 U.S.C. § 875

|  | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | | 12 |
| | | **Total** | **12**[53] |

Count 7: 18 U.S.C. § 1752(a)(1)

|  | | | |
|---|---|---|---|
| U.S.S.G. § 2B2.3(a) | Base Offense Level | | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Trespass in Capitol Building | | +6 |
| | | **Total** | **6** |

Count 8: 18 U.S.C. § 1752(a)(2)

|  | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | | 10 |
| U.S.S.G. § 2A2.4(a) | Offense Involved Physical Contact | | +3 |
| | | **Total** | **13** |

Although U.S.S.G. § 2B2.3 is the applicable guideline for 18 U.S.C. § 1752(a)(1) because it is a trespass offense, U.S.S.G. § 2A2.4 should be applied to Count 8. U.S.S.G. §§ 2A2.4 and 2B2.3 are the two Guidelines listed in the Statutory Index for a 1752 offense. The government has consistently taken the position that a conviction under 18 U.S.C. § 1752(a)(2) is most appropriately analyzed under U.S.S.G. § 2A2.4. The elements of 18 U.S.C. 1752(a)(2) are as follows:[54]

1. First, that the defendant engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds.

---

[53] Miller makes two objections to the guidelines calculations for Count 5–his threat to assassinate Congresswoman Ocasio-Cortez. He first objects to the 6-level enhancement under U.S.S.G. § 2A6.1(b)(1) because he did not engage in "any conduct evidencing an intent to carry out such threat." U.S.S.G. § 2A6.1(b)(1). Miller also objects to the 4-level adjustment under U.S.S.G. § 2A6.1(b)(4), arguing that his threat to assassinate the Congresswoman did not result in the substantial disruption of governmental functions. The government agrees that both enhancements are inapplicable, and the Final PSR adopts Miller's position.

[54] *See also* Government's Trial Brief, ECF No. 120, at page 17.

2. Second, that the defendant did so knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions.

3. Third, that the defendant's conduct occurred when, or so that, his conduct in fact impeded or disrupted the orderly conduct of Government business or official functions.

"Disorderly conduct" is conduct that tends to disturb the public peace, offend public morals, or undermine public safety, as well as conduct where a person is behaving riotously in a lawless or unruly way and in manner that is not according to order or rule. "Disruptive conduct" is a disturbance that interrupts an event, activity, or the normal course of a process.[55]

The gravamen of the offense is the impediment of police officers. Therefore, Count 8 should be analyzed under U.S.S.G. § 2A2.4, not § 2B2.3, with a base offense level of 10 and a +3 adjustment for Miller's physical contact with law enforcement.

Count 9: 18 U.S.C. § 1752(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Trespass in Capitol Building | +6 |
| | **Total** | **6** |

Count 13: 18 U.S.C. § 231

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(a) | Offense Involved Physical Contact | +3 |
| | **Total** | **13** |

The enhancement for physical contact under § 2A2.4(a) applies to the Count 13 offense as well. Miller's Count 13 conduct involves his jumping a police line, struggling with an officer, and getting handcuffed. USCP Officer J.S. saw another officer struggling with Miller after Miller had broken through the police line and had to assist that officer in restraining Miller. Miller cooperated

---

[55]*United States v. Rivera,* 2022 WL 2187851, *5 (D.D.C. June 17, 2022).

only after being brought to the ground when he was then handcuffed and detained. His conviction for this count plainly involved physical contact with law enforcement making the 3-level adjustment appropriate.

Grouping Analysis

The government contends that the counts should be placed into four groups, not six, as the Final PSR suggests. *See* Final PSR ¶¶ 59, 66, 73, 81, 88, and 94a.

Group One consists of Counts 1, 2 and 13, because they involve the same victim: the police officers defending the Capitol. U.S.S.G. § 3D1.2(a). The Final PSR separates these counts into Groups One, Five, and Six, "because the Count groups involve different victims and separate and distinct harms." Final PSR ¶ 56. As to the 18 U.S.C. § 231 convictions only, the government believes this is incorrect. The harm involved in Miller's conduct for these three Counts is indistinguishable, and Miller's actions in committing all three offenses was connected by a common criminal objective: stopping the Congressional certification of the 2020 election. And, although they were each separate events occurring within a 70-minute timespan, the government has alleged a single collective victim within the same, common event on January 6. The Offense Level for Group One is 13.

Group Two consists of Count 4, which the Final PSR has adopted. Final PSR ¶ 66. Instead of being placed with Count 2, as the Initial PSR did, Count 4 should be placed in its own group because it involves a single officer-victim: Sargent Q.C. Sargent Q.C.'s status as a victim in Count 4 is distinguishable from the collective victims of Counts 1, 2, and 13. Miller's conduct forming the basis for his assault of Sargent Q.C. is also more specific than his broad conduct and common

scheme or plan involved in Counts 1, 2, and 13. Miller admitted to "forcibly resisting [Sargent Q.C.] by putting [his] hand on her hand and forearm." *See* Factual Basis for Guilty Pleas to Counts 4 and 5, ECF No. 130, at 1. In contrast, Miller's conduct forming the basis for Count 2 involved his inference and impediment of the line of MPD officers in the Rotunda–not just Sargent Q.C.– and their efforts to herd the defendant and other protesters back through the entrance. *See* Factual Basis for Guilty Pleas to Counts 1, 2, 7, 8, 9, 10, 11, 12, and 13, ECF No. 128, at 2. The Offense Level for Group Two is 20.

Group Three consists of Count 5, consistent with the Final PSR's analysis. PSR ¶ 88. The Offense Level for Group Three is 12.

Group Four consists of Counts 7, 8, and 9, also consistent with the Final PSR's analysis. PSR ¶ 81.   The Offense Level for Group Four is 13.

The U.S. Sentencing Guidelines to not apply to Counts 10, 11, and 12. The multiple count adjustment calculations result in a total of 2.5 units and an increase of 3 levels pursuant to U.S.S.G. § 3D1.4:

| Group | Counts | Highest Offense Level | Units |
|-------|--------|----------------------|-------|
| 1 | 1, 2, and 13 | 13 | .5 |
| 2 | 4 | 20 | 1 |
| 3 | 5 | 12 | .5 |
| 4 | 7, 8, and 9 | 13 | .5 |
|   |   |   | **TOTAL: 2.5** |

Two and one-half units translates to an additional 3 offense levels, yielding a Combined Adjusted Offense Level of 23. U.S.S.G. § 3D1.4. Following a 2-level reduction for acceptance of responsibility, Miller's Combined Offense Level is 21, not 19 as proposed by Miller. With a Total Offense Level of 21 and a Criminal History Category of I, Miller's Guideline Sentencing Range

is 37 to 46 months. U.S.S.G., Chapt. Five (Sentencing Table). The Final PSR calculates a total of 3 units, also resulting in a 3-level increase. *See* Final PSR ¶ 95. It also calculates the same Sentencing Range as the government. Final PSR ¶ 148.

A 2-month upward variance to a custodial sentence of 48 months is appropriate in Miller's case. First, this Court should consider Miller's intent to corruptly obstruct the Electoral College certification, even though the Court concluded that, as a matter of statutory construction, Miller could not be convicted of obstructing a Congressional proceeding under 18 U.S.C. § 1512(c)(2). Miller's stated purpose in traveling to Washington was to disrupt the pillar of American democracy at a time when Congress was performing one of its most important Constitutional duties.

That criminal purpose is not captured by the advisory Guideline Range as calculated above. Miller planned his assault on the Capitol well before January 6. He performed "recon" when he got to Washington, D.C., and had a well-formed plot to "flank" the building by being one of the first rioters to penetrate barriers on the East Front of the building. He interfered with police officers who were guarding the Capitol building at least three times that day.

This Court should also vary above the Guidelines range because Miller committed another serious crime, a written public threat to assassinate a Member of Congress on the very day of a riot that implicitly threatened the lives of all members. Similarly, Miller's public threats and calls to other, like-minded persons to execute the police officer who shot and killed Ashley Babbitt was additional heinous conduct that, although not resulting in a separate conviction, merits additional punishment.

### VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

#### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Miller's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of Miller's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 48 months.

#### B.  The History and Characteristics of the Defendant

On January 6, 2021, Miller was unemployed 34-year-old Texan relying on family for financial support. Final PSR ¶¶ 118, 129. Despite obtaining an undergraduate degree and being physically able to work, Miller stopped working in 2020 prior to attending various political rallies and the Capitol riot. Final PSR ¶¶ 122-23, 133. He has never suffered from mental or emotional health problems or mental illness and was raised in a loving, stable home in the Dallas suburbs. Final PSR ¶¶ 114-117, 124. He has one arrest for public intoxication and another for allegations of domestic abuse, but neither of those events resulted in a criminal conviction. Final PSR ¶¶ 109-112.

Despite having no criminal history, Miller's crimes on January 6 were not an isolated event in an otherwise law-abiding life. It was the culmination of Miller's consistent and escalating desire to stop the certification of what he believed to be a fraudulent presidential election. While Miller

has pleaded guilty, it is clear he has no remorse and does not believe he committed any crimes. Instead, Miller considers himself a political prisoner. While being housed in the D.C. Jail, Miller signed an open letter filed in another case on September 30, 2022, where he and other detainees referred to themselves as:

> …Political Prisoners on American Soil who have been unjustly and unfairly incarcerated, relentlessly burdened by selective prosecution slandered and vilified by mainstream and social media, deliberately accosted with death threats from within the jail and received death threats upon our homes and families through the mail, ALL extending from a political nature or affiliation.[56]

The letter, signed by Miller, requests that, should the government continue to hold him and others captive "unconstitutionally," he be transferred to the American detention facility at Guantanamo Bay, Cuba.

Miller's history and characteristics, including his planning and "recon" in anticipation of attacking the Capitol on January 6, his lack of remorse, and his violent online rhetoric calling for assassination of a Congresswoman and the execution of a USCP officer, weigh heavily in favor of a lengthy term of incarceration.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Despite an otherwise law-abiding life, on January 6, 2021, Miller had no respect for the law. He went to the Capitol to take over the building, stop the certification, and terrorize both lawmakers and the law enforcement officers protecting them. His goal was to stop the peaceful

---

[56] Government's Exhibit 803 at page 5. *See also* Case No. 1:21-cr-117-TFH, ECF No. 168.

transition of power for the first time in this country's history. He threatened the life of a Congresswoman. And then he went home, bragged about his attack on the Capitol, and helped lead an effort to doxx a Capitol Police officer and called for his execution. Miller's actions, and the intent behind them, was the epitome of disrespect for the law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[57] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to Miller also weighs heavily in favor of a lengthy term of incarceration.

First, although Miller has a criminal history category of I, his lack of remorse and his belief that he is an unconstitutionally held "political prisoner" shows that there is a need for this Court to impose a sentence that will deter him. On January 6, 2021, Miller was particularly motivated to storm the Capitol and stop the election certification. Miller's continued call for political violence immediately after the riot, along with his glorification of event in the days after, shows a particular need to deter future conduct. *See* Section VI(B) *supra.* Second, Miller has not expressed remorse

---

[57] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

and contrition.[58] In the leadup to January 6 and its aftermath, Miller's statements and postings through social media and text messages after January 6 were those of a man who fancied himself a revolutionary. Many defendants have expressed remorse about their conduct on January 6. Miller has not. Despite his guilty pleas, Miller's conduct demonstrates that his sentence must be sufficient to provide specific deterrence from committing future crimes of violence, especially when weighed with Miller's violent rhetoric.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid

---

[58] *See* Government's Trial Exhibit 613.

unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the

offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[59]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[60]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[59] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[60] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

The government acknowledges the Court's previous ruling, currently subject to the government's appeal, that, as a matter of statutory interpretation, Miller did not violate 18 U.S.C. § 1512(c)(2). A conviction on that count would likely have resulted in a higher Sentencing Guidelines range. *See* U.S.S.G. §2J1.2. But to fully implement the directive of Section 3553(a)(6) to consider avoiding unwarranted sentencing disparities, this Court could acknowledge that several defendants who engaged in conduct on January 6 that was most similar to Miller's were convicted of and sentenced for violations of Section 1512(c)(2).

For instance, in *United States v. Anthony Williams*, D.D.C 21-cr-377 (BAH), evidence at trial established that Williams' intent in traveling to the Capitol on January 6, 2021, was to stop the certification and overturn the results of the Presidential election. Starting almost immediately after the election, Williams suggested the Democratic party had been caught stealing votes and "may end up hung for treason" as punishment. At the Capitol on January 6, Williams helped people climb bicycle racks so that he and other rioters could access the Northwest stairs. Following the breach, Williams filmed a video of himself on the Northwest stairs nearly identically to Miller, boasting "We just stormed the stairs of the Capitol, pushed the cops back and were maced and pepper sprayed, and hit everybody. Fuck that, we took this fucking building." Williams entered the Senate Wing Door six minutes after it was first breached and eventually made his way to the Rotunda. Like Miller, Williams joined with other rioters in the Rotunda to actively resist officers' commands and pushed back against them. And, like Miller, Williams bragged about his participation in the riot and spread false information on social media claiming there was no violence at the Capitol. Following conviction at trial for the single felony of Obstruction of an

Official Proceeding, Chief Judge Howell imposed a sentence of 60 months.[61]

In *United States v. Hale-Cusanelli*, D.D.C. 21-cr-37 (TNM), the defendant also filmed himself on the Capitol grounds, chanting "Stop the Steal" at USCP officers and screaming about a "revolution." Hale-Cusanelli entered the Capitol through the Senate Wing Door 90 seconds after it was breached and proceeded to the Crypt, where he and other rioters overwhelmed officers and branched off into various directions. He was then seen on CCTV footage encouraging other rioters to advance, later telling a witness that he did that because "we need more people." Hale-Cusanelli then attempted to intervene while a USCP officer attempted to arrest another rioter. He left the building after approximately 30 minutes, then went home and described to others how "exhilarating" the riot was, telling a witness, "I really fucking wish there'd be a civil war." Hale-Cusanelli falsely testified at trial that, despite claiming to be a student of government, he did not know that Members of Congress were in the Capitol Building.

The jury convicted Hale-Cusanelli of, *inter alia*, violating Section 1512(c)(2). Judge McFadden overruled the government's recommendation that the applicable Guidelines range was 27—which included an 8-level enhancement for threatening physical injury or property damage pursuant to U.S.S.G. § 2J1.2(b)(1)(B) and a 3-level enhancement for substantial interference with the administration of justice pursuant to § 2J1.2(b)(2). Judge McFadden concluded that the combined offense level was 16 but varied above the resulting Guidelines range of 21 to 27 months and imposed a custodial sentence of 48 months. Unlike Miller, Hale-Cusanelli did not engage in

---

[61] Williams' did not receive a reduction for acceptance of responsibility, and with a total offense level of 25 and a criminal history category I, Williams's Guideline Imprisonment Range was 57 to 71 months.

any violence that day, did not assault police, and left the Capitol peacefully.

In *United States v. Matthew Bledsoe*, D.D.C. 21-cr-204 (BAH), the defendant, like Miller, documented his crimes through selfie-style images, social media posts, and text messages. Claiming the election had been stolen, Bledsoe attended the morning rally at the Ellipse and marched to the Capitol, where he climbed a wall to reach the Upper West Terrace. He entered the Capitol through the Senate Wing Door 12 minutes after the first breach, eventually making his way to the Rotunda where he made several laps around the room carrying a flag in support of the former president. Unlike Miller, Bledsoe did not engage in violence or obstruct police officers. Following the riot, Bledsoe showed a complete lack of remorse and insensitivity to those victimized by his conduct and sent a text message stating that the corrupt politicians "are all going to be executed." Like *Hale- Cusanelli*, Bledsoe also committed perjury at trial, falsely testifying that he did not see any police barricades and didn't know that he was not allowed to enter the Capitol that day. With a Guideline range of 70-87 months, Chief Judge Howell varied downward and sentenced Bledsoe to 48 months' imprisonment. Because Miller's conduct was substantially similar to that of Anthony Williams, Hale-Cusanelli, and Bledsoe, this Court would not create an unwarranted disparity by imposing the government's recommended sentence of 48 months' incarceration in this case.

This Court should also consider the companion cases of *United States v. Mault* and *United States v. Mattice*, D.D.C. 21-cr-657 (BAH). Both defendants planned to bring various items to the Capitol on January 6 that prefigured their use of violence against police. Mault suggested bringing gloves, a baton, pepper spray, and "asskicking boots." Mattice filmed Mault as he encouraged

police officers to stand aside on the West Plaza and helped lead the mob that penetrated the police line to force a retreat to the Lower West Terrace. They both made it to the mouth of the Lower West Terrace tunnel, where they deployed pepper spray against the police and gave canisters of spray to other rioters to do the same. Following the riot, they both characterized themselves as victims, claimed they had done nothing wrong, and lied to the FBI about their full involvement in the riot. While their conduct was appalling, neither Mault nor Mattice actually entered the Capitol, nor did they threaten the life of a United States Congresswoman.

Both defendants pled guilty to a single count of assault on a federal officer, in violation of 18 U.S.C. § 111(a)(1). Chief Judge Howell determined that the applicable Guidelines imprisonment range was 37 to 46 months and imposed a custodial sentence of 44 months. Here, Miller's entry into the Capitol building, his threats against a Congresswoman, and his violent rhetoric against the police officer who shot Ashli Babbitt support a higher sentence for him than the those imposed on Mattice and Mault.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims

of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).[62]  Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[63]  *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'" *United States v. Ekanem*, 383 F.3d 40, 44 (2d

---

[62]  While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.  *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see also United States v. Zerba,* 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice,* 2020 WL 220089, at *5 (D.N.J., Jan. 15, 2020).  The defendant in this case did not enter into a plea agreement.

[63]  The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA.  *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[64] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader

---

[64] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513. Here, the Court should find that Miller's conduct in entering the Capitol building as part of a mob caused damage to that building.

casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[65]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2)

---

[65] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. See 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Miller to pay $2,000 in restitution for his convictions on Counts 1, 2, 4, 5, and 7 through 13. This amount fairly reflects Miller's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.  CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 48 months imprisonment, $2,000 restitution, a 3-year terms of supervised release, and a mandatory special assessment of $605.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:

Stephen J. Rancourt
Assistant United States Attorney, Detailee
Texas Bar No, 24079181
601 D Street, N.W.
Washington, D.C. 20530
(806) 472-7398
stephen.rancourt@usdoj.gov

53