## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CRIMINAL ACTION NO.** |
| | ) | |
| **Plaintiff,** | ) | **1:21-CR-00119-CJN** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GARRET MILLER,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### SENTENCING MEMORANDUM and MOTION FOR DOWNWARD VARIANCE[1]

> **F. Clinton Broden**
> **TX Bar No. 24001495**
> **Broden & Mickelsen**
> **2600 State Street**
> **Dallas, Texas 75204**
> **(214) 720-9552**
> **(214) 720-9594 (facsimile)**
> **clint@texascrimlaw.com**
>
> **Attorney for Defendant**
> **Garret Miller**

---

[1]Defendant addresses his objections to the presentence report in a separate pleading attached hereto as Attachment A.

## **TABLE OF CONTENTS**

TABLE OF CONTENTS.....................................................................................2

INDEX OF SUPPORT LETTERS.....................................................................4

I. GARRET MILLER'S BACKGROUND.........................................................7

II. WHAT GARRET MILLER DID AND DID NOT DO ON JANUARY 6..............11

    A. What He Did Do.................................................................................12

    B. What He Did *Not* Do........................................................................12

III. PRETRIAL DETENTION AND CONDITIONS OF THAT DETENTION.........14

    A. Prior to His Arrival in DC and Lack of Medical Treatment.......................14

    B. CTF................................................................................................15

    C. Conclusion.......................................................................................17

IV. 18 U.S.C. § 3353......................................................................................17

    A. Nature and Circumstances of the Offense [§ 3353(1)]................................17

    B. Mr. Miller's History and Characteristics [§ 3353(1)]................................17

    C. Seriousness of the Offense, Respect for the Law, Just Punishment, Deterrence and Protection of the Public [§§ 3353(2)(A)-(C)]........................18

    D. Need for Treatment [§ 3353(2)(D)].......................................................18

    E. Avoiding Unnecessary Sentencing Disparities [§ 3353(7)].........................20

V. CONCLUSION..........................................................................................40

CERTIFICATE OF SERVICE.........................................................................................42

## <u>INDEX OF SUPPORT LETTERS</u>

| <u>Name</u> | <u>Attachment</u> |
|---|:---:|
| Mary Miller (Mother) | C |
| Philip Miller (Father) | D |
| Logan Miller (Brother) | E |
| Jason Miller (Brother) | F |
| Timothy Miller (Uncle) | G |
| Carrie Anne Wilson-Woolverton (Aunt) | H |
| Thomas E. Hammonds (Cousin) | I |
| Jeff Woolverton (Uncle) | J |
| Sheila Woolverton (Aunt) | K |
| Ted Vasei (Cousin) | L |
| Zane Stapp (Former Wrestling Coach) | M |
| Dr. Richard L. Albright (Ministries Director) | N |
| Tyler Knauss (Friend) | O |
| Larry Essex, Jr. (Friend) | P |
| Kurt Nelson (Friend) | Q |
| Melissa Carpenter (Friend) | R |
| Mohamed Rafeek (Friend) | S |

Mark Brown (Friend and Former High School Teacher)                    T

Michael Edelstone (Friend)                                           U

John Schneider (Friend)                                              V

Sterling Glass (Friend and Former Roommate)                          W

## SENTENCING MEMORANDUM

Defendant Garret Miller submits this Sentencing Memorandum in order to assist the Court in imposing a sentence in this case that is, "sufficient but not greater than necessary to comply with the purposes" of 18 U.S.C. § 3553.

Many judges have been heard to remark that sentencing a defendant is one of the most difficult, if not *the* most difficult, tasks they have.[2]  The defense understands that, in connection with the January 6 cases, courts encounter difficulties that exacerbate what is already one of the most difficult tasks.

It is anticipated that the government's Sentencing Memorandum will spill much ink simply about January 6th in general and, given that the events of that day stand as an unprecedented blight on this country's history, the government's inclination to do so is somewhat understandable.  Nevertheless, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings...."  *Gall v. United States*, 552 U.S. 38, 52 (2007).

Still and on the other hand, because of the sheer number of January 6th

---

[2]*See*, *e.g.*, Jack B. Weinstein, *Does Religion Have a Role in Criminal Sentencing?*, 23 Touro L. Rev. 539, 539 (2007) ("Sentencing, that is to say punishment, is perhaps the most difficult task of a trial court judge."); *Carter v. Illinois*, 329 U.S. 173, 178(1946) ("It is a commonplace that no more difficult task confronts judges than the determination of punishment not fixed by statute.").

defendants that will be sentenced in this district and the fact that one of the factors set forth in 18 U.S.C. § 3553 is the need to avoid sentencing disparities, it is also recognized that courts in this district must look beyond the individual in an attempt to achieve some degree of uniformity.

Undersigned Counsel respectfully suggests that a **time served** sentence is appropriate in this case.  Mr. Miller has been incarcerated under onerous conditions since January 20, 2021.  A time served sentence, when the 54 good time day credits per year are considered, is the equivalent of a 29-30 month sentence.

## I.  GARRET MILLERS' BACKGROUND

Some common themes come through in Mr. Miller's various support letters that are attached hereto as Attachments C-W.  First, Mr. Miller has a very supportive family and long-term friends.  Second, up until the nation became so divided and Garret Miller stopped working, Mr. Miller had very little interest in politics.[3]  Indeed, throughout his two-year representation of Mr. Miller, Undersigned Counsel has come to learn that, after Mr. Miller stopped working, he began to feel marginalized and, sitting at home all day long, he became fixated regarding the various election

---

[3]*See* Letter of **Kurt** Nelson (Attachment Q) ("He also, in my recollection, was not enamored by politics."); Letter of **Mohamed Rafeek** (Attachment S) ("We never had any conversations about politics...."); Letter of **Michael Edelstone** (Attachment U) ("The Miller brothers and I bonded over bicycles, barbecue, and an intense love of the outdoors; we rarely concerned ourselves with current events or the details of a presidential election.").

conspiracy claims that spread on the internet like a plague.[4]  Third, and perhaps most importantly, many of the letters make clear that Mr. Miller is remorseful and accepts responsibility for  his actions and that it is very unlikely that he will ever reoffend.

Indeed, friends and family characterize Mr. Miller as an extremely giving person.  A few letters mention him having achieved the rank of Eagle Scout and how he excelled as a high school wrestler.  But others go to the heart of his character.  For example:

> •"In August of 2019 we found out that my late wife Sherry had Cancer. I got a call from Garret on Christmas Eve.  He had found out that Sherry had cancer and he asked if he could come see me.  We were on our way to church so I agreed to meet him after the Christmas Eve service. Garret came and gave me a hug and handed me $800 cash to help pay for her medical bills.  This was very unexpected, but hopefully you can see that Garret cares deeply for others."  Former Wrestling Coach **Zane Stapp** (Attachment M).

> "Garret is the type of person where the expression 'give you the shirt off his back' applies. He is the epitome of that and I have experienced that personally from Garret. As someone who has gotten to spend extensive time with Garret, I can honestly say his attitude and character has made me a better person. For example, we met up in Florida to go camping a few years ago. When it was time to leave we both had long drives back to our home states; Ohio mine and Texas his. I was ready to hit the road and get the long miles past me when we said 'goodbye' in a Walmart parking lot. When I was close to home and wanted to check in on his progress, he was just starting out from that Walmart! 'Why?!' I asked. To no surprise, while he was checking his vehicles fluids, someone

---

[4]In 2020, Mr. Miller quit a job he had for six years when his supervisor refused to give him a day off to attend his brother's wedding.  *See* PSR at ¶ 133.

came over to ask him for help with their broken down vehicle. Garret spent the rest of the day helping that stranded person finding, getting, and installing the right part. Only Garret." Letter of Kurt Nelson (Attachment Q).

•His brother, **Logan Miller** describes Mr. Miller coming "all the way across the country to help [him] move." (Attachment E).

•Another brother, **Jason Miller**, writes "Garret is a *gentle man*-- a protector by nature. If he sees someone in need or distress, he helps them. There are countless once-stranded motorists and people living on the street that could attest to this if given the chance. It goes without saying that he's always been there for us and for his friends. But it's his kindness towards strangers that has always stuck with me. So many of us think we're too busy to help, or try to convince ourselves that it wouldn't do any good. Garret's never allowed himself to do that; he's never become blind or numb to the suffering he sees around him. (Attachment F).

•**John Schneider** writes: "I truly believe that Garret would do anything he could to help his fellow man." (Attachment V).

Many of the letter writers note Mr. Miller's sincere appreciation as to the wrongfulness of his actions surrounding January 6 and his rededication to his religion.

•"During Garret's time awaiting trial I have had the opportunity to talk to Garret once or twice a month. He has definitely been reflective and I believe he has changed in a positive way. He has used his time to create art out of trash, do Bible study, and reflect on life. While Garret and I do not talk about his case, our conversations about what he is studying in the Bible help me know that Garret has reflected on his actions and he will make the most of his life once he comes home." Letter from Former Wrestling Coach **Zane Stapp** (Attachment M).

9

•"Being able to reset in a healthy environment with his loving parents will give Garret the best opportunity for reform. I know Garret has rekindled his relationship with his faith in Christ and I believe he can use his determination that he has shown throughout his life for something positive. Garret has a whole lot of good still left in him and I hope you consider this in your Judgement." **Tyler Knauss** (Attachment O).

•As Director of Counseling Ministries at my local church, I have been very direct with Garret about spiritual issues during my correspondence with him since he has been in custody. I found that he has embraced these opportunities to relate regarding his Christian faith. These exchanges indicate to me that he has 'owned' his mistakes, and that he has returned to his faith as the primary motivating factor in his life." **Dr. Richard L. Albright** (Attachment N).

•"Recently Garret express to me the regrets he has for his actions and how much he learned from his experience as a whole. I believe through this he's has [sic.] a much deeper and stronger relationship with Christ...." **Larry Essex, Jr.** (Attachment P).

•"He knows that what he did was wrong....I'm 100% sure that it was a moment he regrets...." Letter of brother **Logan Miller** (Attachment E).

•"I believe he now recognizes that his choices of Jan. 6th were not in support of the Constitution and laws of the land." Letter of Uncle **Timothy Howard Miller** (Attachment G) .

•"My personal belief is that Garret has come to terms with his accountability for his actions, has come to recognize that his social media postings and activities on January 6 were inappropriate and regretful, and is working to recalibrate his character positively." Letter from Cousin **Ted Vasei** (Attachment L).

•"I sincerely believe that Garret understands that his actions in Washington DC were incorrect, that he regrets any poor judgment he exhibited, that he's rekindled his relationship with Christ and returned

to his Christian faith principles."  **Carrie Anne Wilson-Woolverton** (Attachment H).

Perhaps, most important, is **Garret Miller's own letter** to the Court which

Counsel cut and pasted from a letter emailed to him by Mr. Miller:

> [W]hen I reflect upon the Civil Disorder of January 6th, 2021, I feel great anguish at the memory of all of those who were hurt by what took place that day. The lives lost and the physical and emotional injuries that burden those involved today and the days to come. The loss of faith and hope that can not be restored will never be measured. When I saw a fence built around our capitol I was deeply saddened. The fact that I worsened the situation that day and after, rather then helped be a solution will haunt me. I feel a deep remorse for not being helpful to police that day and aiding in destruction and pain. It was unnecessary, barbaric, and disrespectful. I was proud, arrogant, and acted in anger. I needed to be humbled. My social media posts were disgusting and a complete embarassment [sic.]. I appologize [sic.] to Officer T.C., to Sargent Q.C., and all other officers I interacted with on that day. I would like to apologize to officer Byrd and his family for my comments. I would like to apologize to Congresswomen Osacio-Cortez and Senator Schumer for my comments. I would like to thank them all for their service.

Attachment B

## II.  WHAT GARRET MILLER DID AND DID NOT DO ON JANUARY 6

In imposing a sentence that is, "sufficient but not greater than necessary to comply with the purposes" of 18 U.S.C. § 3553, it is imperative that a distinction be made between what Garret Miller did and what he did *not* do in relation to the events of January 6.

## A.  What He Did Do

It is true that Mr. Miller traveled to Washington, D.C. with gear that would indicate he was prepared for a fight (although it is clear through his social media postings that he believed the fight would be with ANTIFA antagonizers and not law enforcement officials).  It is equally true that he entered the Capitol Rotunda after initially being detained in front of the police barricades and promising to leave the Capitol grounds.  It is also true that he stood his ground in the Rotunda when law enforcement officials began to push the crowd out and that he made contact with Q.C. when he was resisting being pushed out of the Rotunda.  Finally, it is true that he responded to a tweet from Congresswoman Ocasio-Cortez, advocating for the impeachment of a president that had somehow convinced Mr. Miller that the 2020 election was stolen, by tweeting, "Assassinate AOC."

## B.  What He Did *Not* Do

Unlike many others that day, Mr. Miller did not bring any weapons to the Capitol and he did not use other objects as weapons.[5]  Unlike many others that day, Mr. Miller did not go beyond the Rotunda and an adjacent hallway.  Unlike many

---

[5]There are many cases where rioters commandeered bike racks, signs, fire extinguishers, etc... and used them as weapons against law enforcement.

others that day, Mr. Miller did not engage in any assaultive conduct.[6]  Mr. Miller did

not attempt to encourage other rioters.  He did not attempt to damage any property.

And, while he did make the tweet responding to Congresswoman Ocasio-Cortez and

engaged in the vile *private* messenger chat regarding the Capitol Police Officer he

believed killed a protestor, there is no indication that he made any effort whatsoever

to actually harm anybody (in fact, every indication is to the contrary).

---

[6]The government, in its Sentencing Memorandum, claims that Mr. Miller "assaulted" Q.C. and others on January 6.  Of course, that is not true.  Indeed, as the Court is well aware, 18 U.S.C. § 111 also encompasses resisting and impeding.

More to the point, the government vociferously resisted Mr. Miller's interpretation of  18 U.S.C. § 111 that would have required the government to prove assaultive conduct consistent with case law from various circuits.  *See United States v. Chapman*, 528 F.3d 1215, 1219 (9th Cir. 2008); *United States v. Wolfname*, 835 F.3d 1214, 1220 (10th Cir. 2016); and *United States v. Davis*, 690 F.3d 127, 135-36 (2d Cir. 2012), *cert. denied,* 568 U.S. 1107 (2013).  Indeed, Footnote 15 to the Government's trial brief [Doc. 120] advances the following citations in support of its argument- on that this Court ultimately accepted- that § 111 does *not* require an assault:

See *United States v. Stands Alone*, 11 F.4th 532, 535-37 (7th Cir. 2021) ("A proper reading of the text militates against defining resist, oppose, impede, intimidate, and interfere merely as synonyms of 'assault.'"); *United States v. Briley*, 770 F.3d 267, 273-274 (4th Cir. 2014) ("We must ... ascribe meaning to the five remaining verbs."); *United States v. McCaughey*, et al, No. 21-cr-040 (TNM) (endorsing interpretation of 111(a) in *Stands Alone and Briley*, pp. 13-14 of transcript of Sept. 13, 2022 oral verdict). *See also United States v. Williams*, 602 F.3d 313, 317 (5th Cir. 2010) ("[T]he dual purpose of the statute, which, the Supreme Court has noted, is not simply to protect federal officers by punishing assault, but also to 'deter interference with federal law enforcement activities' and ensure the integrity of federal operations by punishing obstruction and other forms of resistance."); *United States v. Gagnon*, 553 F.3d 1021, 1026 (6th Cir. 2009) ("Congress's drafting makes clear that § 111's purpose is to protect federal officers and certain employees from a broader range of harmful conduct than just common-law assault.").

Here, Mr. Miller did not "assault" Q.C. but, instead, placed his hand or her hand and forearm to resist her efforts to push him toward the exit door.

It should also be noted that, beginning days after the tweet regarding Congresswoman Ocasio-Cortez, the FBI had placed a GPS tracker on Mr. Miller's phone and there is no indication that he left the North Texas area.  **Likewise, on January 18, 2021, the FBI, in a letter to Capitol Police, concluded that the evidence indicated that Mr. Miller was *not* a threat to "members of Congress or the community."**

## III. PRETRIAL DETENTION AND CONDITIONS OF THAT DETENTION

In determining a sentence in this case, Undersigned Counsel urges the Court to consider the pretrial conditions under which Mr. Miller was detained.  Indeed, not all detentions are the same.

### A. Prior to His Arrival in DC and Lack of Medical Treatment

Garret Miller was arrested in the Northern District of Texas on January 20, 2021, and was later detained pending trial.

On or about February 23, 2021, Mr. Miller broke his collar bone while playing soccer in the recreation yard at a detention facility in Eden, Texas, and the jail doctor wanted Mr. Miller x-rayed.  Instead, and even though Mr. Miller was in severe pain, he was shipped to FTC-Oklahoma on February 26, 2021.  Once there, it was not until on or about March 22, 2021, that he was finally x-rayed and an orthopedist "recommended extensive medical services, including the possibility of surgery." *See*

Doc. 16 at 9.[7]  Then, it was not until on or about April 15, 2021- seven weeks after he broke his collar bone- that Mr. Miller finally received surgery where a plate and screws were used to set his collar bone and keep it in place.  Despite still being in pain while recuperating from the surgery, Mr. Miller was then shipped to the Central Treatment Facility (the "CTF") in Washington on April 29, 2021.[8]

**B. CTF**

CTF inmates were not allowed any visitors from the time Mr. Miller arrived on April 29, 2021, until February 14, 2022.  Moreover, CTF inmates were not given access to any video visitation during that time.  In short, Mr. Miller was almost completely isolated for ten months after his arrival at the CTF.

Even more concerning, CTF inmates were confined to their cells for 23 hours a day from the time Mr. Miller arrived until approximately June 13, 2021; 22 hours from approximately June 13, 2021, to approximately October 2021; and again for 22 hours from December 22, 2021, to February 28, 2022.  In other words, for several months while he was at the CTF, Mr. Miller was confined to his cell for between 22-23 hours per day.  The psychological strain that puts on an individual cannot be

---

[7]Even that required the intervention of the Assistant United States Attorney, Elizabeth Kelley, who was originally assigned to the case.

[8]The timeline of events is confirmed in a letter from Mr. Miller's mother, Mary Miller. *See* Attachment C.

seriously debated and is closely akin to the dangers of solitary confinement.

As noted by former Justice Kennedy:

The human toll wrought by extended terms of isolation long has been understood, and questioned, by writers and commentators. Eighteenth-century British prison reformer John Howard wrote "that criminals who had affected an air of boldness during their trial, and appeared quite unconcerned at the pronouncing sentence upon them, were struck with horror, and shed tears when brought to these darksome solitary abodes." The State of the Prisons in England and Wales 152 (1777). In literature, Charles Dickens recounted the toil of Dr. Manette, whose 18 years of isolation in One Hundred and Five, North Tower, caused him, even years after his release, to lapse in and out of a mindless state with almost no awareness or appreciation for time or his surroundings. A Tale of Two Cities (1859). And even Manette, while imprisoned, had a work bench and tools to make shoes, a type of diversion no doubt denied many of today's inmates.

One hundred and twenty-five years ago, this Court recognized that, even for prisoners sentenced to death, solitary confinement bears "a further terror and peculiar mark of infamy." *In re Medley*, 134 U.S. 160, 170, 10 S.Ct. 384, 33 L.Ed. 835 (1890); *see also id.*, at 168, 10 S.Ct. 384 ("A considerable number of the prisoners fell, after even a short [solitary] confinement, into a semi-fatuous condition ... and others became violently insane; others, still, committed suicide"). The past centuries' experience and consideration of this issue is discussed at length in texts such as The Oxford History of the Prison: The Practice of Punishment in Western Society (1995), a joint disciplinary work edited by law professor Norval Morris and professor of medicine and psychiatry David Rothman that discusses the deprivations attendant to solitary confinement. *Id.*, at 184, 10 S.Ct. 384.

*Davis v. Ayala*, 567 U.S. 257, 287-88 (2015) (Kennedy, J., concurring)

## C. Conclusion

Mr. Miller understands that pretrial detainees "cannot expect the amenities, conveniences and services of a good hotel." *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir.1988). Still, as noted above, there is pretrial confinement and there is pretrial confinement. Prior to arriving at the CTF, there was a shocking indifference shown to Mr. Miller's medical condition and, as a result, he suffered in horrible pain. Then, after arriving at the CTF, he and other inmates were isolated from their families and each other. In the end, the time Mr. Miller has served was served under much more onerous conditions than the time generally served by pretrial detainees or persons who are sentenced directly to a BOP facility.

## IV. 18 U.S.C. § 3353

### A. Nature and Circumstances of the Offense [§ 3353(1)]

Undersigned Counsel will not attempt to defend the indefensible. Again, however, it is important to focus on Mr. Miller's individual actions with regard to what occurred on January 6, 2021.

### B. Mr. Miller's History and Characteristics [§ 3353(1)]

Without fully repeating what has been said in Section I of this Sentencing Memorandum, it again bears noting that, until the divide that was brought upon this nation, Mr. Miller was a productive and law-abiding citizen. His characteristics are

17

reflected in the supporting letters attached hereto.  Moreover, as noted in the Presentence Report, Mr. Miler has no criminal history.  *See* PSR at ¶¶ 102-04. Finally, Mr. Miller's letter to the Court, as well as the letters from others to whom he has expressed sincere regret, reflect that Mr. Miller is remorseful for his actions and, just as importantly, that he has refocused his life to embrace the teachings of his religion.

### C.  Seriousness of the Offense, Respect for the Law, Just Punishment, Deterrence and Protection of the Public [§§ 3353(2)(A)-(C)

Again, it is impossible not to recognize that Mr. Miller committed serious offenses.  Nevertheless, it should also be recognized that, up until that point, Mr. Miller was a productive member of our society and respected the law.

As a result of his actions, Mr. Miller has already served approximately 25 months confinement- most of it under very difficult conditions- and will forever be a felon.  Likewise, upon release, he will be under this Court's supervision.  These consequences serve to act as both a specific and general deterrence.

### D.  Need for Treatment [§ 3353(2)(D)]

Significantly and as a reflection of the dedication Mr. Miller's family has to help him to succeed, his family has already arranged for the services of a licensed therapist to work with Mr. Miller if and when he is released from custody.  As

explained by Mr. Miller's, Philip Miller father:

> We have arranged for Garret to receive therapy with professionals familiar with the conflicts of reentering social interactions and adjusting to a normal existence. We intend to comply with the directives and conditions recommended by the court and provide timely reports to the court as required.

Attachment C.

Undersigned Counsel has spoken directly with Dr. Michael Ferraro who has

been retained by Mr. Miller's parents and Dr. Ferraro explains in a letter:

> I understand you represent Garret Miller who is currently incarcerated and has a court hearing this month. I have spoken to both you and Phil Miller, Garret's father, about possibly providing mental health counseling to Garret should he be released.

> Should Garret and I work together, we would conduct comprehensive, detailed exploration into his entire life. The goal would be to identify and understand those experiences that have shaped his life and caused him to be in his current situation. We would also focus on traumas that have occurred both in childhood and adulthood with the purpose of resolving them so they do not interfere with his future.

> Inherent in this work is establishing the kind of life Garret wishes to have in the future and creating a clear plan to achieve that life.

*See* Letter of **Michael Ferraro**, LMFT, LPC, LCDC (attached hereto as Attachment X).

Such treatment will benefit Mr. Miller and society far better than the limited

treatment that might possibly be available to him if sentenced to further incarceration.

**E.  Avoiding Unnecessary Sentencing Disparities[§ 3353(7)]**

As noted above, Undersigned Counsel recognizes that, in light of the sheer number of January 6 defendants, it is likely important to the Court to attempt to achieve some degree of uniformity in the various sentences imposed.  As such, Undersigned Counsel has identified the **forty-one cases** in which defendants have been sentenced to **30 months or more imprisonment** among the 394 January 6 defendants sentenced so far and has reviewed the facts set forth in the government sentencing memorandums filed in each of the forty-one cases.[9]

(1) *United States v. Webster*, No. 1:21-CR-00208-APM **120 months incarceration**

- Convicted after a trial.

- Former Marine and a 22-year veteran of the New York City Police Department

- Traveled to D.C. with an NYPD bulletproof vest and a Smith and Wesson Model 640 revolver, small enough to conceal inside a jacket pocket.

- Carried a large metal flagpole.

- After attempting to provoke an officer standing behind a bike-rack

---

[9]This analysis is based upon the Sentencing Chart filed in *United States v. Horning*, No. 1:21-CR-00275-ABJ on February 7, 2023.  The analysis does not include the 87-month sentence in *United States v. Guy Reffitt*, No. 1:21-CR-00032-DLF, since Mr. Reffitt is represented by Undersigned Counsel.

barricade into a fight, he forcefully pushed against the bike rack. The officer reached across to shove him away but in doing so, struck Webster on his face. Webster then swung the flagpole against the bike rack with enough force to break the metal pole in half. He charged at the officer and tackled the officer to the ground after the officer wrestled the flagpole out of his grip. He then dragged the officer by his helmet, pinned him to the ground, and tried to rip his gas mask off. This caused tear gas to become trapped inside the officer's mask, and his throat and nose began to burn. While he restrained the officer on the ground, other rioters began kicking the officer. He left the officer on the ground and continued toward the Capitol.

(2) *United States v. Head*, No. 1:21-CR-00291-ABJ **90 months incarceration**

•Carried knife on hip.

•Repeatedly struck towards police line with a riot shield.

•Pushed the shield against an officer for nearly three minutes. After a continued struggle with the officer, he wrapped his arm around the officer's neck and yelled, "I've got one!" He then dragged the officer into the mob, isolating him as the crowd violently assaulted the officer.

(3) *United States v. Robertson*, No. 1:21-CR-00034-CRC **87 months incarceration**

•Police sergeant with the Rocky Mount, Virginia, police department and army veteran.

•Brought a gas mask and large wooden stick.

•Raised up his wooden stick in "port arms," a tactical position used by the military and law enforcement to push others away, and blocked the path of officers attempting to hold back the mob.

•Destroyed evidence from him and a co-defendant prior to arrest.

**(4)** *United States v. Young*, No. 1:21-CR-00291-ABJ **86 months incarceration**

•Brought 16-year-old son with him.

•Stormed the police line in the tunnel on the Lower West Terrace.

•Handed fellow rioter a taser.

•Held a strobe light toward officers fighting in an effort to impair their vision and distract them.

•Worked with another rioter to throw a large audio speaker toward the police line, which missed the officers and struck a fellow rioter on the head, drawing blood.

•Used a long pole or stick to jab towards the police line.

•Joined an attack on an officer by restraining his wrist while a co-defendant removed his police badge and police radio.  The officer's wrist was broken by a riot shield moving through the crowd above the rioters' heads.

•Assaulted an officer who was temporarily disoriented and blinded by bear spray by grabbing at his helmet and body, pushing him, and hitting him.

**(5)** *United States v. Khater*, No. 1:21-CR-00222-TFH **80 months incarceration**

•Arrived to D.C. with two containers of bear spray and two containers of hand-held pepper spray.

•Pepper sprayed any police officer he could find for nearly half a minute.  He sprayed at least three officers at close range on the Lower West Terrace.

•By his own admission, he climbed up the scaffolding in order to take

a picture.

(6) *United States v. McGrew*, No. 1:21-CR-00398-BAH **78 months incarceration**

•Former U.S. Marine.

•Flew with bear mace to D.C.

•Entered the Capitol through the unguarded Upper West Terrace doorway.  Prior to entering, he encouraged other rioters, repeatedly yelling, "Let's Go!"

•Struck an MPD officer within seconds of entering the Capitol.

•Screamed at officers and refused to follow instructions to leave the building.

•Struck several more officers, attempted to and successfully grabbed officer's batons, and locked arms with other rioters, in defiance of officer's commands that rioters leave the building.

•After being pushed out of the Rotunda, he traveled to the Lower West Terrace. There, as he had at the West Plaza, he pushed his way through throngs of people until he was face-to-face with officers.  He then participated in an unsuccessful push into a tunnel entrance to the Capitol and taunted officers, before grabbing a wooden handrail with a metal hook on the end and launched it into the tunnel. Afterwards, he and other rioters began pushing into the tunnel again and pushing the officers within the tunnel back.

(7) *United States v. Caldwell, Daniel*, No. 1:21-CR-00181-CKK **68 months incarceration**

•Marine veteran.

•Armed himself with bear spray, outfitted himself with glasses that

could protect himself from some of the effects of pepper spray, and brought a hand held two-way radio.

•Sprayed a line of officers protecting the Lower West Terrace Place with a canister of gaseous chemical irritant.

•Confronted and taunted police officers by asking them to spray, and asking if they were "scared."

•Present on the front lines of the main assault for almost the duration of the confrontation.

(8) *United States v. Palmer*, No. 1:21-CR-0328-TSC **63 months incarceration**

•Was on the steps leading to the LWT tunnel and, having acquired a wooden plank, he threw the plank like a spear at police officers.

•He picked up a fire extinguisher and sprayed police with its contents. Then, once it was empty, he threw it at police officers.

•He then "cast around for additional items with which he could assault the police." He took hold of a long piece of scaffolding wrapped in canvas and pushed it at the legs of the police.

•He then picked up the fire extinguisher he previously used to assault police and again threw it at police.

•Also, at some point, he picked up an orange traffic barrier and threw it towards the police.

(9) *United States v. Ponder*, No. 1:21-CR-00259-TSC **63 months incarceration**

•Convicted after a trial.

•Recruited co-defendants.

•Swung a pole at an officer and after his pole broke against the officer's shield, he re-armed himself with a sturdier pole and assaulted another officer.

•15 minutes after the first two assaults, he assaulted another officer with the same sturdier pole.

(10) *United States v. Sandlin*, No. 1:21-CR-00088-DLF **63 months incarceration**

•Traveled to D.C. along with two co-conspirators in a car full of weapons, including several knives, bear spray, Glock 43 pistol, two magazines of ammunition, gas masks, stun gun, slingshot, military-style vests/body armor, two helmets, a baton, walkie-talkies and Sandlin's M&P pocket pistol.

•Made his way through the East Rotunda doors with his co-conspirators and shoved officers to force the door behind them open, allowing the mob outside to begin streaming in.

•Attempted to rip the helmet off an officer.

•Along with his co-conspirators, he engaged in a shoving match with officers in an attempt to keep the doors to the Senate Gallery open, striking an officer's head in the process.

•Wandered through the Capitol in pursuit of members of Congress, asking an unknown individual, "is that where the Senators are at?"

•Smoked a marijuana joint in the Rotunda of the Capitol while stating, "we made history" and "this is our house."

(11) *United States v. Jensen*, No. 1:21-CR-00006-TJK **60 months incarceration**

•Convicted after a trial.

•Ringleader during the attack on the U.S. Capitol, working to rile up the crowd and encourage others to follow him into and through the building.

•Scaled a twenty-plus-foot wall to be one of the first rioters to break into the building and disrupt the proceedings in Congress.

•Tenth rioter to enter the Capitol.

•Led a group of armed rioters in pursuit of an officer up a staircase, steps away from the Senate Chamber, where members of Congress were sheltering at the very moment.

(12) _United States v. Mazza_, No. 1:21-CR-00736-JEB **60 months incarceration**

•Traveled to D.C. with two loaded handguns: a Smith and Wesson, .40 caliber semi-automatic handgun, and a .45 caliber/.410 caliber revolver ("Taurus Judge").

•Dropped or lost the Taurus Judge revolver on the steps leading up to the West Front Terrace.

•After entering the Capitol, he joined mob of other rioters who were trying to break through the police line to gain entry into the lower level of the Capitol.

•Armed himself with a stolen police baton and used it to assault police officers.

•Remained on Capitol grounds for a number of hours still armed with the loaded .40 caliber semi-automatic firearm.

•Filed false police report about how he had lost the Taurus Judge and provided false information to Capitol Police.

(13) _United States v. Williams_, No. 1:21-CR-00377-BAH **60 months incarceration**

•Convicted after a trial.

•Helped rioters climb bicycle racks so that he and the other rioters to overrun the police on the Northwest stairs.

•Stole water bottles that Capitol police officers had stored to be used for decontamination if they were hit with chemical irritants.

•Entered the Capitol through the Senate door with the first large wave of rioters to breach the Capitol.

•Celebrated and smoked marijuana with other rioters in the Rotunda.

(14) *United States v. Pruitt*, No. 1:21-CR-00023-TJK **55 months incarceration**

•Proud Boys member

•Wore a tactical glove with knuckle pads and a cut-off t-shirt with the logo of the "Punisher" –an anti-hero known for dispensing violent vigilante justice.

•Was wearing an electronic ankle monitor for being arrested recently.

•Climbed a bike rack as a ladder to be at the front of the mob that breached the building.

•Tossed a chair in the direction of officers in the Visitor Center.

•Came face to face with then-Senate Minority Leader Chuck Schumer, who was trying to evacuate

(15) *United States v. Denney*, No. 1:22-CR-00070-RDM **52 months incarceration**

•Former military police officer.

• Used Facebook to recruit for his militia group called the Patriot Boys of North Texas and fundraised for weapons, gear, lodging, and travel.

• Arrived eager for violence in full battle attire wearing a helmet, knuckled gloves, and a ballistic vest with body armor under his jacket.

• Deployed pepper spray at the line of Capitol police officers.

• Grabbed and shoved a police officer.

• Threw a pepper spray cannister in the direction of the line of officers.

• Assaulted officers with a pole and attempted to disarm them.

• Along with another rioter, he launched a large tube at the line of police officers guarding the west side of the Capitol building.

• Swung his arm and fist at an officer in an attempt at pulling him down the stairs.

• Lied to FBI agents about his knowledge of the assault.

(16) *United States v. Wilson*, No. 1:21-CR-00345-RCL **51 months imprisonment**

• Physically engaged with officers by punching, shoving and kicking them, as well as attempting to steal their riot shields.

• Picked up a several feet long white cylindrical object, believed to be a thin polyvinyl chloride (PVC) pipe, and indiscriminately struck at officers with it.

• ”[E]ngaged multiple officers with whatever means he had available.”

(17) *United States v. Bledsoe*, No. 1:21-CR-00204-BAH **48 months incarceration**

28

•Convicted after a trial.  Moreover his PSR recommended a sentencing enhancement based on his false testimony at trial.

•Scaled a wall to access the upper northwest terrace.

•Climbed statue of President Gerald Ford and planted a Trump flag on his arm.

•Remained inside the Capitol for 22 minutes and wandered through the Statuary Hall before joining another crowd of rioters circling the House Chamber while members of Congress were trapped inside and unable to evacuate.

(18) *United States v. Decarlo*, No. 1:21-CR-00073-BAH **48 months incarceration**

•Significant ties to Proud Boys

•Threw smoke bomb at police.

•Rummaged through a Capitol police duffle bag and stole a pair of flex cuffs.

•Scrawled "Murder the Media" on one of the Capitol's doors.

(19) *United States v. Hale-Cusanelli*, No. 1:21-CR-00037-TNM **48 months incarceration**

•Convicted after a trial sporting a "Hitler mustache."

•Former Army reservist and security contractor who held a "Secret" level security clearance when he and others sieged the Capitol.

•At front of a mob that attacked police and smashed windows and doors to breach the Capitol.

•Unsuccessfully intervened in an arrest of a rioter by trying to pull the

rioter away from the officer.

(20) *United States v. Herrera*, No. 1:21-CR-619-BAH **48 months incarceration**

• Convicted after a trial.

• Came prepared wearing a gas mask, goggles, and a bulletproof vest.

• Climbed scaffolding and entered the Capitol through a fire door, located near the Senate Parliamentarian's Office on the Senate wing side of the building.

• Posted an Instagram photo of himself picking up a stack of papers and throwing them in the air. Later, in an exchange with someone else on Instagram, he said he had picked up the papers and had someone photograph him because he wanted a "fuck you" picture.

• Stole a bottle of liquor, which he drank and raised triumphantly as he exited the Capitol the first time.

• Reentered the Capitol through the nearby Senate Wing Doors. As he entered, he walked past shattered windows on each side of the door and spent a few minutes setting up his camera and taking photographs.

• Then he proceeded to a nearby "hideaway" office of a U.S. Senator, where he smoked a marijuana cigarette that was passed around by other rioters.

• After, he proceeded to the Crypt, and remained inside for 15 minutes while he took more photographs, before exiting the building.

(21) *United States v. Ochs*, No. 1:21-CR-00073-BAH **48 months incarceration**

• Proud Boys member.

•Walked around and filmed the attack on the U.S. Capitol

•Threw smoke bomb at police.

•Smoked cigarettes in Rotunda.

•Pointed rioters toward the Speaker's Office.

•Posed in front of "Murder the Media" graffiti his co-defendant had scrawled on one of the Capitol's doors.

(22) *United States v. Coffman*, No. 1:21-CR-00004-CKK **46 months imprisonment**

•Drove to Washington on January 6 from Alabama in a pickup truck containing loaded firearms, including a 9mm handgun, a rifle, and a shotgun. Also, inside the pickup truck and in its covered bed were hundreds of rounds of ammunition, large-capacity ammunition feeding devices, a crossbow with bolts, machetes, camouflage smoke devices, a stun gun, cloth rags, lighters, a cooler containing eleven mason jars with holes punched in the lids, and other items. The eleven mason jars each contained a mixture of gasoline and Styrofoam. The mason jars and their contents, along with the lighters and cloth rags, made up the component parts of bottle-based improvised incendiary weapons (*i.e.* Molotov cocktails).

•The Styrofoam in the Molotov cocktails was designed to have a napalm effect of adhering to the skin of its victims.

•A month before January 6, he had traveled to Washington and attempted to drive to the residence of a United States Senator.

(23) *United States v. Hughes*, No. 1:21-CR-000106-TJK **46 months incarceration**

•Climbed scaffolding.

31

•Among first rioters to reach the Upper West Terrace.

•Eighth rioter to enter the Senate Wing Door building through smashed window.

•Kicked the Senate Wing Door open from inside with another rioter.

•Chased a Capitol Police officer and yelled violent and angry threats.

•Occupied the Senate chamber and reviewed sensitive documents that had been left behind by Senators forced to flee for their lives.

(24) *United States v. Richardson*, No. 1:21-CR-00721-CKK **46 months incarceration**

•Struck a police officer three times with a metal flagpole, stopping only when the pole broke in his hands.

•Retreated after he was pepper sprayed.  Two minutes later, he and other rioters grabbed and shoved a large metal billboard toward the police, using it as a battering ram.

(25) *United States v. Thompson*, No. 1:21-CR-00461-RCL **46 months incarceration**

•Joined rioters as they actively assaulted police.

•Armed himself with a police baton and incited violence outside of the Capitol.  Also stayed in the heart of the violent zone, watching *hours* of attacks against law enforcement.  Indeed for nearly two hours he stood "in the vicinity of some of the most violent conduct on January 6, observing, commenting and occasionally chanting while windows were smashed, and the police line was repeatedly attacked."

•Provided rioters with riot shields to use against the police which had previously been stolen from the police.

• Assisted in throwing a large audio speaker at police.

• Assaulted a police officer with a baton when the officer was trying to assist a rioter needing medical attention.

(26) *United States v. Languerand*, No. 1:21-CR-00353-JDB **44 months incarceration**

• Threw a piece of wood at police.

• Just a few minutes later, he and another rioter threw a heavy black audio speaker at the police.

• A minute later, threw two sticks in rapid succession at officers.

• Three minutes later, threw another stick at officers.

• A few seconds later, threw a large orange traffic bollard which ricocheted off the riot shield of an officer before colliding with multiple officers inside the archway.

• A minute later, threw a pepper spray container followed by a bottle of liquid.

• Approximately 30 seconds later, threw a piece of wood,

• Then threw another stick at the police.

(27) *United States v. Mattice*, No. 1:21-CR-00657-BAH **44 months incarceration**

• Anticipated and planned for violence in pre-riot text message conversations with co-defendant Mault.

• Recorded a video conveying his intent and foreshadowing his violent conduct. He explained, "We're all getting ready to go march on Capitol Hill.  We're gonna fuck some shit up. It's about to be nuts."

•Along with co-defendant Mault, and other rioters, they pushed against the line of police, broke the line, and forced the police barriers apart, overwhelming and surrounding the police.

•Texted family to brag about breaking police line.

•Body-surfed over members of the crowd and hung from the wooden frame beneath the arch.

•Used chemical spray against police officers.

•Lied to FBI agents claiming that he did not fight with police but, instead simply absorbed their blows without fighting back.

(28) *United States v. Mault*, No. 1:21-CR-00657-BAH **44 months incarceration**

•Anticipated and planned for violence in pre-riot text message conversations with co-defendant Mattice.

•Along with co-defendant Mattice, and other rioters, they pushed against the line of police, broke the line, and forced the police barriers apart, overwhelming and surrounding the police.

•Body-surfed over members of the crowd and hung from the wooden frame beneath the arch.

•Assaulted police officers. Obtained a canister from another rioter and deployed its dangerous contents at police officers.

(29) *United States v. Secor*, No. 1:21-CR-00157-TNM **42 months incarceration**

•Scaled scaffolding.

•Walked through the office suite of Nancy Pelosi.

34

•Assisted a group of rioters to push open the East Rotunda doors and helped other rioters enter the building.

•Sat in the seat that Vice President Mike Pence occupied 30 minutes earlier.

(30) *United States v. Chansley*, No. 1:21-CR-0003-RCL **41 months incarceration**

•Q-Anon Shaman and the very face of the events of January 6.

•Climbed the scaffolding.

•Entered the Capitol and roamed the second and third floors of the building.

•Entered the Senate gallery and screamed obscenities.

•Scaled the Senate dias "taking the seat that Vice President Mike Pence had occupied less than an hour before" and took pictures of himself on the dias.

•Called other rioters up to the dias and lead them in an incantation including to be thankful for the "opportunity 'to allow us to send a message to all the tyrants, the communists, and the globalists, that this is our nation, not theirs, that we will not allow American, the American way of the United States of America to go down.'"

•Gave a *60 Minutes* interview falsely claiming that he was let into the Capitol by law enforcement and was merely intending to bring divinity, to bring God back into the Senate.

(31) *United States v. Fairlamb*, No. 1:21-CR-00120-RCL **41 months incarceration**

•Shoved and Punched an MPD officer.

•Climbed the scaffolding.

•Entered the Capitol carrying a stolen police baton.

(32) *United States v. Neefe*, No. 1:21-CR-00567-RCL **41 months incarceration**

•Fabricated a wooden club and carried it on to the Capitol grounds.

•Assisted a group of rioters in hoisting and thrusting a large metal sign frame into a line of officers. The sign could have "split someone's head open."

(33) *United States v. Rubenacker*, No. 1:21-CR-00193-BAH **41 months incarceration**

•One of the first 50 rioters to enter the Capitol.

•Was at the front of the mob, along with other rioters, and chased a Capitol police officer up a flight of stairs, directly past where lawmakers had just retreated from conducting the joint session, yelling "Where are they counting the votes?" and "He's one person, we're thousands!"

•Exited the east side of the Capitol and reentered later through the East Rotunda doors as part of a mob of rioters, during which rioters surrounded and assaulted law enforcement officers attempting to prohibit entry to the East Rotunda doors.

•Smoked marijuana in the Rotunda.

•Swung a water bottle at an officer's head and threw liquid at other officers.

(34) *United States v. Smith*, No. 1:21-CR-00567-RCL **41 months incarceration**

•Assisted a group of rioters in hoisting and thrusting a large metal sign

frame into a line of officers.  The sign could have "split someone's head open."

•Encouraged rioters to keep forcing a door closed so that officers could not exit and defend the Capitol.

(35) *United States v. Hughes*, No. 1:21-CR-00106-CKK **38 months incarceration**

•Climbed scaffolding.

•At the front of the mob that forced bike rack barriers down and breached the police line.

•Among first rioters to reach the Upper West Terrace.

Ninth rioter to enter the Senate Wing Door building through smashed window.

•Chased a Capitol Police officer and yelled violent and angry threats.

(36) *United States v. Reid*, No. 1:21-CR-00316-DLF **37 months incarceration**

•Was in the front among the first to rush up the steps when rioters broke through a police line under the scaffolding.

•For over an hour, he walked through the Capitol, surged through police lines, led rioters through the building, and encouraged other rioters to enter.

•Made his way to the Speaker's Lobby and damaged a television and water cooler in the nearby bathroom.

(37) *United States v. Tenney*, No. 1:21-CR-00640-TFH **36 months incarceration**

•He and a co-defendant entered the Capitol through the West Terrace.

He then walked through the rotunda and it was he who personally forced open the Rotunda Doors on the east side which ultimately allowed rioters to enter from that side of the building.

•He grabbed the Sergeant at Arms from behind and pushed him into a doorframe.  He also locked arms with a U.S. Capitol Police Officer B.A. and shoved another U.S. Capitol Police officer.

(38) *United States v. Thompson*, No. 1:21-CR-00161-RBW **36 months incarceration**

•Convicted after a trial.

•Came prepared wearing a bulletproof vest.

•Walked into and looted Senate Parliamentarian's office, stealing two bottles of liquor.

•Then went outside to find and encouraged co-defendant Lyon to participate in the riot.

•He stole a coat rack, and announcer pager used by U.S. Capitol Police to send emergency alerts throughout the building.

•Picked up someone's cell phone off a staffer's desk.

(39) *United States v. Byerly*, No. 1:21-CR-00527-RDM **34 months incarceration**

•Purchased a stun gun and traveled with it to D.C.

•Engaged in three separate assaults. Two against police and one against a news reporter.

•Assisted a group of rioters in using a large steel frame Trump sign as a battering ram against police officers.

•Participated in vicious assault against a news reporter, by grabbing the victim with both hands near the shoulder and upper chest and pushing him backward.  He pushed and dragged the victim toward a dense crowd. He then placed both of his hands in the area of the victim's face and neck and continued to shove and push the victim away from the stairs, and toward a low stone wall.

•Used his stun gun against Capitol police and MPD officers.

•After having had the stun gun removed from his hands, he continued to charge toward and physically strike officers.

•Grabbed and wrestled an officer for his baton.

(40) *United States v. Miller*, No. 1:21-CR-00075-RDM **33 months incarceration**

•While on restricted ground of the Capitol, draped in a Confederate flag, threw a full beer can at law enforcement.

•Used a bike rack to scale the Capitol wall.

•Threw batteries at officers.

•Sprayed officers located in the Lower West Terrace tunnel with the contents of a fire extinguisher as other rioters assaulted officers with bats, flagpoles and riot shields.  The contents of the fire extinguisher sprayed at least a dozen police officers.

\* \* \* \* \* \* \* \*

Admittedly, an apples-to-apples comparison is often difficult to achieve.

Nevertheless, the very fundamental question that must be answered is, should Mr.

Miller who

did *not* engage in any violence,

did *not* throw any objects at police,

did *not* attack police with any weapons,

did *not* spray police with hazardous chemicals contained in fire extinguishers, and

did *not* go beyond the Rotunda and an adjacent hallway,

be treated similarly to those that did?  Frankly put, most if not all defendants who received a sentence of greater than 30 months imprisonment are at a whole different level than Mr. Miller and Undersigned Counsel submits that is it important for Mr. Miller's sentence to reflect these distinctions.

## V.  CONCLUSION

Based upon the foregoing, Undersigned Counsel respectfully suggests that a sentence of **time served (effectively a 30 month sentence)** is, in fact, sufficient but not greater than necessary to comply with the purposes" of 18 U.S.C. § 3553.

Respectfully submitted,


/s/ F. Clinton Broden
F. Clinton Broden
TX Bar No. 24001495
Broden & Mickelsen
2600 State Street
Dallas, Texas 75204
(214) 720-9552
(214) 720-9594 (facsimile)
clint@texascrimlaw.com
Garret Miller

## **CERTIFICATE OF SERVICE**

I, F. Clinton Broden, certify that on February 16, 2023, I caused a copy of the

above document to be served via electronic filing on all counsel of record:

/s/ F. Clinton Broden
F. Clinton Broden
